Julia Donoho, Esq. (SBN  263966)
Rebecca McWilliams, Esq. (Pro Hac Vice)
**POLICYHOLDER PROS**
250 D Street, Suite 214
Santa Rosa, CA  95404
(707) 849-4116
*galgadot@policyholderpros.com*
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

BRIAN and ALISON SHEAHAN, as husband and wife; DOUGLAS POPE, an individual; NEIL and SANDRA WYLIE, as husband and wife; et.al.

                    Plaintiffs,

          v.


STATE FARM GENERAL INSURANCE COMPANY, an Illinois company; VERISK ANALYTICS, Inc., INSURANCE SERVICES OFFICE, Inc., and XACTWARE SOLUTIONS, Inc., Delaware Corporations;  all doing business in California; and DOES 1 to 100

                    Defendants

Case No.:   18-cv-06186-EMC

JUDGE: Honorable Edward M. Chen


**FIRST AMENDED COMPLAINT**
1. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;
2. FRAUD-INTENTIONAL MISREPRESENTATION;
3. FRAUD-FALSE PROMISE;
4. NEGLIGENT MISREPRESENTATION;
5. NEGLIGENCE;
6. REFORMATION;
7. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW;
8. VIOLATION OF CALIFORNIA CARTWRIGHT ACT;
9. UNFAIR OR DECEPTIVE ACTS IN THE BUSINESS OF INSURANCE;
10. VIOLATION OF US CODE TITLE 15 SHERMAN ACT - CARTEL
11. VIOLATION OF US CODE TITLE 15 SHERMAN ACT - MONOPOLY
12. VIOLATION OF US CODE TITLE 15 SHERMAN ACT - CONSPIRACY
13. VIOLATION OF CALIFORNIA PRODUCTS LIABILITY ACT


Jury Trial is Requested

## JURISDICTION AND VENUE

1. This civil case is an original complaint filed in federal court including state and federal claims.

2. The state claims arise under California law related to insurance regulations, with unfair business practices, related negligence claims, and contract causes of action, against defendant State Farm General Insurance Company, ("State Farm").

3. The federal claims arise under US Code Title 15 §1, Chapter 2 and 15, Sherman Act allegations against defendants State Farm, and their monopolistic conspirator - Insurance Services Office, Inc. ("ISO") and its related organizations Verisk Analytics ("Verisk") and Xactware Solutions Inc. ("Xactimate"), who provide software tools that assist State Farm in its unfair and inconsistent business practices.

4. This court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. §1331 which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States.

   b. 28 U.S.C. §1367 which gives district court supplemental jurisdiction over state law claims.

5. Venue is appropriate in this district under 28 U.S.C. §1391 because the events that give rise to this complaint arose in this district.  (See Exhibit 1)

## DEMAND FOR JURY TRIAL

6. Plaintiff hereby demands a trial by jury of all claims and causes of action for which a jury is available under the law.

## INTRODUCTION

7. This is an alleged Class Action lawsuit against State Farm for intentionally underinsuring residential properties first at policy issuance, then again in the adjusting process following losses from disaster – the one-two punch – and in unfair business practices issuing policies with replacement caps that could not remedy the underinsurance, making full recovery of lost property impossible after catastrophic disaster.

8. State Farm has engaged in unfair business practices, deliberately, maliciously, and knowingly underinsuring its customers, breaching its contract with the Plaintiffs, and misrepresenting the

qualities of their policies, allowing State Farm's market share to grow to become the largest insurer in the U.S.

9. State Farm has conspired with the Verisk Companies, in an unlawful monopoly to provide real estate valuations for underwriting and construction estimates for rebuilding with software tools that are eviscerating the life savings of American families, in violation of federal antitrust regulations. State Farm and the Verisk Companies are using software tools that are poorly designed to intentionally suck the wealth of good Americans away from them, and redirect this wealth into assets owned by insurer State Farm and data analytics behemoth the Verisk Companies. They have conspired to use artificial data for underwriting and construction cost estimating to further their objectives, developing software products that fail to deliver accurate values, causing harm to many families, and making the Verisk Companies into a multinational corporation that has a stranglehold on the insurance industry.

10. None of these companies are licensed as real estate professionals, financial planners, or general contractors, yet through their relationships with the country's major insurance organization, State Farm, they are valuing real estate and construction significantly below value to sell more policies and limit State Farm's exposure, without concern for the families that are financially ruined by their conspiracy.

11. This is an alleged Class Action lawsuit that many plaintiffs similarly situated have suffered due to these unfair business practices and the monopoly

**BACKGROUND**

12. The Wine Country Wildfires in Northern California began the late evening of October 8, 2017, raging throughout Northern California, causing a two-week evacuation from the burn areas, when the firefighters were able to gain control of these blazes. Due to these fires, at least 44 people died, over 8,920 structures were destroyed, and another 756 were damaged by fire. Many homeowners had no idea if they had a home left until the evacuation lifted, and many of them returned to their property to find that everything they owned was gone.

13. The loss was multiplied once they started to deal with their insurer. Plaintiffs who would like to rebuild their homes and restore their personal property following this total loss then realized that State Farm intentionally undervalued their homes, as part of a larger scheme to undervalue all of State Farm's California customer's homes. This has effectively precluded the Plaintiffs and others

similarly situated from being able to rebuild their homes and restore their property with their insurance proceeds. Some plaintiffs are not even able to pay off their mortgage.  This problem is prevalent in many California disaster situations and many other areas of the country where homes have been lost in disasters. In many cases, the State Farm insureds experience a far greater financial devastation than other insureds.

14. Good neighbors is what many of us search for, to live peaceably in our homes. That is also why many look to State Farm for home insurance. Their motto "Like a good neighbor, State Farm is there," as sung by Barry Manilow, sounds good when you are a new homeowner.  But, when the policy is tested, State Farm falls far short of delivering on that promise.

15. State Farm conspired with software providers, utilizing zip code calculators by Marshall & Swift and later 360 Value, an ISO product, and using construction cost estimating software by Xactware, to create an extreme underinsurance situation for many policyholders.  This was accomplished first in the process of issuing undervalued policies according to the zip code calculator for which State Farm agents produce wildly variable results, and second, following the loss of the home, in underestimating the costs of rebuilding using software that relies on manufactured housing data rather than in situ construction, again with State Farm adjusters operating the software for wildly variable results, to allow State Farm to avoid the liability associated with fully insuring houses and property in catastrophic situations.

16. Additionally, subsequent to the Oakland fires, in 1997, State Farm stopped issuing Guaranteed Replacement cost policies and began to issue only 20% replacement cap policies. For those who held their policies for over 20 years, they were not explained the ramifications of the change.

17. State Farm is a large insurance company that provides insurance, completes underwriting, and performs claims adjustment for millions of policyholders. State Farm failed to fully and accurately account for Plaintiffs' homes' architecture, design elements, building materials, finishing, building code changes, other structures, landscaping, and other details that substantially determine rebuilding costs.  State Farm failed to make site visits to document home information basics such as confirming overall square footage as well as these significant home features. State Farm knew or should have known that failing to consider these parameters would result in an underestimated rebuild cost of the Plaintiffs' homes. Many policies were issued with just the bare data of zip code and estimated square footage. State Farm knew that it relied on insufficient data about home value and rebuilding costs to create, recommend, and implement substantially insufficient policy limits.

18. Among agents of State Farm, there can be a wide variety of results in the setting of policy limits. Often the zip code calculator valued properties at 30-40% of property value, when 60-70% would have been appropriate. When the agents are unable to get a good value from the zip code calculator software, they often add 10% to the policy at the underwriting stage. This shows that the agent's have knowledge that the results are two low, but they are not authorized or trained how to get an accurate number for their clients. 10% of too low is still too low (10% of a 30% underestimated property value is 3% added on, so that is not a net change.  Rather than work with the clients to get a reasonable value, State Farm agents simply do not show the underwriting documents to the client nor explain how the value was derived. They issue the policy with a smile, but without sharing the true details of the proposed coverage.

19. Following a loss, among the estimators for State Farm, there can be a wide variety of results from the Xactimate software, often falling 50% below market rebuilding costs. Sometimes, State Farm estimators prepare multiple estimates to drive the recovery value even lower. The customer does not always see this, but it is happening in some cases. The adversarial culture begins here devaluing homeowners' rights.

20. Then, the culture of long-time adjusters at State Farm demonstrates their knowing malice.  The adjusters have made statements verbally and in writing to homeowners that they know that the policies are underinsuring the property, that they know the homeowners have to use their personal property money toward their house if they want to have their home back, with callous disregard for whether the homeowners and their family will have furniture or clothing. It becomes infeasible to both rebuild one's home and restore property.

21. The combined effect of the undervalued policy issuance, the underestimated construction costs and the changing of the policies to small replacement caps, State Farm has eviscerated many families' life savings and left them in severe financial distress after disaster. These acts by State Farm have caused additional trauma to the Plaintiffs, some of whom are over the age of 65, beyond the loss of their homes. By underinsuring homeowners, State Farm has been able to lower the rates on their policy premiums, attract a greater volume of business, and thus caused a more pervasive problem.

22. State Farm knew, or should have known, that its recommended policy limits combined with their underinsurance and underestimating, would make it impossible to cover the total replacement cost of its policyholders' homes and property. State Farm's intentional undervaluation methods, including the misuse of its software tools, are an "Illusory Coverage Scheme" – created to make money for

State Farm and defraud Plaintiffs of their appropriate insurance coverage and restitution.  Following the Northern California Wildfires, State Farm received many complaints about the widespread issue of policy underestimating and also underestimating rebuild and replacement costs.

23. ISO/ Verisk, by acquiring both software tools and providing them simultaneously to State Farm – one for agents and the other for adjuster/estimators, had a duty to create alignment between the two software packages, which they have failed to do. Further, ISO/Verisk purports to offer data on property values and rebuilding costs which it is not professionally licensed to provide. ISO/Verisk is a global corporation working in 30 countries, and providing data support to 21 billion policyholders and 1.2 billion claims.

24. When policies are issued at 30% of property value, that is a knowing loss to a property, unless it can be proven that the land value is 70% of the property value. The average homeowner starts out with only 20% equity. If they are only insured to half of their property value, this leaves a 50% gap that makes recovery impossible.

25. State Farm has a requirement that policies be issued at 40% of replacement cost minimum, that they do not disclose to their homeowners.  Agents can use the software product to create an artificially low estimate of replacement cost and then issue the policy at 40% of that value without understanding that is what they are doing and without explaining that to a homeowner.

26. Further, the cost to rebuild in situ is far greater than what the Xactimate data show for this area. When the rebuild costs are coming in at 50% of market cost, and the policy limits fall short of that, there is no way to recover the difference. The gap is too large.

27. Therefore, by its conduct, State Farm is choosing to continue working with ISO/Verisk, to drive their policy costs down and attract higher volume, and it has reaped, and continues to reap substantial financial benefit to the detriment of its insureds.

28. State Farm is the largest property and casualty insurance provider in the United States. State Farm is ranked 33rd in the 2017 Fortune 500, which lists American companies by revenue.

29. This complaint is brought on behalf of homeowners who have purchased homes and insured with State Farm, sustained damage or loss during the Northern California Wildfires, and their property has been undervalued by State Farm's business practices.

30. The Plaintiffs, on their own behalf and on behalf of all others similarly situated, are seeking reimbursement through a class action for State Farm's undervaluation of policy limits and the

resulting underinsurance, in addition to the subsequent undervaluation for reconstruction costs, and treble damages, as allowed by California Law.

## THE NORTHERN CALIFORNIA WILDFIRES

31.  On October 8, 2017, three wildfires began and raged through Northern California, joined by another eight fires, until the last fire was contained and put out on October 31, 2017. As a result of these Northern California Wildfires, 44 people died, over 8,920 structures were destroyed, 726 damaged, and 228,503 acres burned. The week of October 8-14 was the deadliest week of wildfires in California history. The scope and scale of damage is among some of the worst from wildfires in state history. The Tubbs Fire burned between Calistoga and Santa Rosa, California. It charred 36,807 acres, destroyed 5,643 structures, and damaged 317 structures. The Atlas Fire charred 51,600 acres, destroyed 781 structures, and damaged another 120 structures, in the area's northeast of Napa, California. The Nuns Fire spread between Sonoma County and Napa County, charred 56,000 acres, and destroyed 1,355 structures.

32. These Northern California Wildfires destroyed homes in beautiful residential communities surrounded by lush, green hillsides, pristine wooded areas, and rolling vineyards. After this incredible loss, Northern California residents are determined to rebuild. Plaintiffs will not allow State Farm - through its negligence, misrepresentation, omissions and greed – to thwart their efforts to return home. State Farm's acts have resulted in cataclysmic losses to Plaintiffs, made all the worse because those losses were entirely avoidable absent State Farm's wrongdoing.

## PARTIES

33. Plaintiffs Brian Sheahan and Allison Sheahan, husband and wife, at all times material to the allegations of the Complaint, were the property owners and residents of the property located at 3817 Moss Hollow Ct, Santa Rosa, Sonoma, CA 95404 ("Sheahan Property").

34. Plaintiff Douglas Pope, at all times material to the complaint was the rental property owner of the single-family residence at 1411 Berwick Ct., Santa Rosa, Sonoma CA 95403.

35. Plaintiffs are informed and believe and thereon allege that State Farm is, and at all relevant times was, an Illinois corporation doing business in California.

36. At all relevant times, State Farm General Insurance Company was authorized to transact business in the State of California, and State Farm was, and is transacting the business of insurance in the State of California.

37. State Farm's parent company is headquartered in Bloomington, Illinois, and has offices throughout the United States and Canada.

38. Plaintiffs are informed and believe that defendant Verisk Analytics, Inc. is a Delaware corporations doing business globally, with its principal place of business in Jersey City, New Jersey.  Verisk is not listed with the California Secretary of State , but through their actions their products are being utilized in California.

39. Insurance Services Office, Inc. and Xactware Solutions, Inc. are subsidiaries of Verisk Analytics, Inc. and are Delaware corporations, which are authorized to transact business in California.  They are also headquartered in New Jersey.

40. The Verisk Companies' software products are utilized for various purposes in California, including the purpose of estimating replacement values for underwriting of policies and estimating rebuilding costs after losses are incurred, to determine reimbursement obligations to insureds.

41. The true names and capacities of Does 1 through 100, inclusive, whether individual, corporate, associate, partnership, sole proprietorship, or otherwise, are currently unknown to Plaintiffs, who therefore sue said defendants by such fictitious names.  Plaintiffs will seek leave of court to amend this Complaint to show their true names and capacities when the same has been ascertained, or according to proof at the time of trial.

42. Plaintiffs are informed and believe thereupon allege that at all times mentioned herein, each of the defendants was the agent of each of the remaining defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency and with the permission and consent of its co-defendants.

## GENERAL ALLEGATIONS REGARDING PLAINTIFF'S CLAIMS

43. Plaintiffs are, and at all times were, the designated and named insureds under homeowner's insurance policies issued by State Farm. The policies were in full force and effect at all times relevant to the allegations contained herein. Plaintiffs are informed and believe and thereon allege that the policies provide coverage to Plaintiffs for losses sustained to their homes and other property as a result of wildfires.

44. Since Plaintiffs first purchased their policies, Plaintiffs have paid premiums and performed each act required on their part to keep their policies in full force and effect.

45. The Verisk Companies are purveyors of a digital databases of home construction information. The Verisk Companies have two software products which they provide to State Farm and other national insurers. "360 Value" is a zip code calculator, used by State Farm to determine the homeowner's initial policy value. "Xactimate" is a construction valuation software used by State Farm to determine the cost to rebuild or repair the property.

46. State Farm is a purveyor of insurance. Insurance is a vital and quasi-public service. As a supplier of a public service, State Farm must give as much consideration to the interests of its policyholders as it does to its own interests. The obligations of State Farm go beyond meeting reasonable expectations of coverage; the obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of an insurer. Indeed, insurers hold themselves out as fiduciaries and holders of the public's trust, and therefore, must perform their obligations in good faith. The relationship between State Farm and its insured is thus, at very least, a quasi-fiduciary relationship which imposes fiduciary-like duties on the insurer.

47. Because it is well-recognized that the relationship between the insurer and insured is characterized by unequal bargaining power, where the balance of power rests with the insurer, insurers such as State Farm are bound to "special" and "heightened" duties akin to fiduciary duties. This duty is relevant to the insurer's conduct during the offer and sale of a policy or certificate, as recognized by California Insurance Code § 785(b) ("Section 785").

48. Pursuant to Section 785, insurers, brokers, and agents owe a special duty of honesty, good faith, and fair dealing to prospective insureds who are 65 years old or older, in addition to any other express or implied duty owed. Upon information and belief, the proposed class will include Plaintiffs 65 years old or older.

49. State Farm provides a software tool for their agents called 360 Value. This tool is a zip code calculator, using lowest common denominator data to set values, and without detailed input it gives a generic, tract-home type cost valuation. After a detailed inventory and input, including a site visit to document the insured property and carefully applied by a trained agent, 360 Value can deliver an accurate result. Unfortunately, whether intentionally or by negligence, most State Farm agents do not use 360 Value in the correct manner to achieve an accurate result. The 360 Value result is used as the face value of the State Farm policy issued, or often with a 10% increase, leading to a steeply underinsured property. Misapplication of 360 Value to set policy limits prior to a major disaster has proved to be catastrophic to the Plaintiffs.

50. State Farm represented to Plaintiffs that it following the Northern California Wildfires, it was using a software replacement tool to calculate their homes' rebuilding costs. This tool purportedly allowed State Farm to precisely calculate the cost of replacing Plaintiff's homes given the specific characteristics of each home. Following a loss, State Farm uses a software tool called Xactimate, which is based on manufactured home data, such as trailers and prefabricated homes, to price houses like a kit of parts. The underlying data provided by ISO/Verisk does not represent the true cost to rebuild homes in Northern California, and State Farm has consistently and intentionally failed to apply the appropriate local cost data to arrive at an accurate rebuild cost for the Plaintiffs' homes. Exhibit 2.



SHEAHAN, BRIAN

**State Farm**

05-1679-F04

| | |
|---|---|
| Insured: | SHEAHAN, BRIAN |
| Property: | 3817 Moss Hollow CT |
| | Santa Rosa, CA 95404-1567 |
| Home: | 707-527-7540 |
| Cellular: | 707-483-8184 |
| Type of Loss: | Fire |
| Deductible: | $5,000.00 |
| Date of Loss: | 10/9/2017 |
| Date Inspected: | 10/22/2017 |

| | |
|---|---|
| Estimate: | 05-1679-F04 |
| Claim Number: | 051679F04 |
| Policy Number: | 57-BL-C699-2 |
| Price List: | CASO28_JAN18 |
| | New Construction |

**Summary for Coverage A - Dwelling - 33 Fire, Lightning, & Removal**

| | |
|---|---|
| Line Item Total | |
| California Carpet Stewardship Assessment Fee | 809,219.02 |
| California Lumber Assessment Fee | 25.66 |
| Material Sales Tax | 911.68 |
| | 34,179.20 |
| Subtotal | 844,335.56 |
| General Contractor Overhead | 84,434.21 |
| General Contractor Profit | 84,434.21 |
| Replacement Cost Value (Including General Contractor Overhead and Profit) | 1,013,203.98 |
| Less Deductible | (5,000.00) |
| Less Amount Over Limit(s) | (204,143.98) |
| Net Payment | $804,060.00 |

Teague, Brian
866-787-8676 x 18377

EXHIBIT 2

51. State Farm's application of Xactimate software is intentionally designed to result in an improperly low rebuilding cost for the California market, producing rebuild costs that are not tenable following a disaster.

52. By itself, Xactimate is a tool that may be used properly by an agent to arrive at the correct valuation, but upon information and belief it appears that State Farm's adjusters are either not trained to, or alternatively they are intentionally applying the Xactimate software data to not arrive at an accurate result.

53. Below is a chart that shows the problem.

|  | 360 /Initial Value | Coverage A Date of Loss | Xactimate | Cost of Construction |
|---|---|---|---|---|
| Plaintiff Sheahan | $509,000 | 768,700 | $804,060 | $2,017,614 |
| Plaintiff Pope | $170,000 | $330,851 | $539,361 | $717,000 |
| Plaintiff Wylie | $227,400 | $513,900 | $772,979 | $1,222,027 |

54. State Farm's ongoing inaccurate underwriting comes with the one-two punch. State Farm's use of 360 Value underwriting software initially underinsures the policy limits, which sets up the homeowner to have a financial catastrophe, and then the Xactimate valuation software leads to an intentionally deflated rebuild cost, which corroborates the false undervaluation. In many cases, the homeowners never saw the information input in 360 Value software, they were not interviewed, and no one visited their house. State Farm's 360 Value output and subsequent Xactimate price are so far apart that there is no way for the homeowner's Replacement Cap and Building Code Upgrade elements of their policy to get them anywhere close to the actual rebuild cost. Exhibit 3. The Plaintiffs and proposed class are typically only seeing the Xactimate, so they are not aware of the root cause of the undervaluation, and upon receiving the information from State Farm, they are demoralized about ever being able to afford rebuilding. Because State Farm's undervaluation started so low with the initial 360 Value pricing, following a catastrophe such as the Northern California

Wildfires, thousands of policyholders are systematically financially ruined.

| OVERHEAD AND PROFITS | | | | |
|---|---|---|---|---|
| Overhead 10% | $ | 133,945.00 | $ 32,800.00 | $ 166,745.00 |
| Sub Total | $ | 1,473,395.00 | $ 360,800.00 | $ 1,834,195.00 |
| Profit 10% | $ | 147,339.50 | $ 36,080.00 | $ 183,419.50 |
| TOTAL FOR CONSTRUCTION | $ | *1,620,734.50* | $ 396,880.00 | $ *2,017,614.50* |
| STARTER BUDGET provided by Rob Auger. Please call with any questions. (916) 869.4664   *Per SF Price* | | *360.16* | $8.20 | *448.36* |

| | Code Upgrades |
|---|---|
| | $191,500.00 |

| BID PROJECT NOTES | | Other Structures |
|---|---|---|
| *Price is subject to change as STARTER BUDGET continues to be generated.* | | $86,500.00 |

| PAYMENT SCHEDULE | | | Landscaping |
|---|---|---|---|
| | | | $50,000.00 |

| Phase | Description | Est. Date | Amount |
|---|---|---|---|
| Deposit | Startup payment at start of the design or site improvements or vertical construction, whichever comes first. Statements of billed/completed work will be sent out 2 times per month. Overhead and profits will billed and recognized as subcontractor invoices are paid. Client payments are to be made within 7 days of invoice. | | $50,000.00 |
| | | TOTAL PAYMENTS | $2,017,614.50 |

CONFIDENTIAL                                    Page 3 of 4                    3817 Moss Hollow Ct Santa Rosa - REPLACEMENT STARTER BUDGET Revision (1) - Brian Sheahan - 03.17.18

## EXHIBIT 3

55. State Farm actively undertook the duty to assist Plaintiffs with establishing adequate policy limits. On its website (Exhibit 4), State Farm provides options for a homeowner to determine the replacement cost of the home. State Farm offers a 360 Value to determine the value of the home. *"The most appropriate way to estimate the replacement cost of your home is to hire a building contractor or other building professional to produce a detailed replacement cost estimate. Or your State Farm agent can utilize an estimating tool from Xactware Solutions to assist you with an estimate."* Exhibit 4.

56. From the plain language of the text, State Farm offers to have the homeowner's agent aid the prospective policyholder using an estimating tool. In other words, State Farm expressed a willingness to undertake certain duties and responsibilities to protect Plaintiffs' homes by establishing adequate policy limits.

**What is Replacement Cost?**

Replacement cost is the cost necessary to repair or replace your entire home. When you insure your home for its replacement cost, your insurer will reimburse you for the cost of rebuilding or repairing your home, based on the size and structure of the home that was lost or damaged.

The most appropriate way to estimate the replacement cost of your home is to hire a building contractor or other building professional to produce a detailed replacement cost estimate. Or your State Farm® agent ↗ can utilize an estimating tool from Xactware Solutions—to assist you with an estimate. Only the cost of the property's structure and its associated systems, fixtures, and finishes will be included in the estimate; land value is included in a home's market value but should not be included in the amount of insurance you buy.

**Benefits:** In the event of a loss, replacement cost coverage will help your family return to their home and usual quality of life with minimal financial interruption. For the best protection, experts recommend that you insure your home for at least 100 percent of its estimated replacement cost.

**Risks:** Replacement costs can change over time, so you should review your policy annually to make sure its coverage meets your needs. Inform your insurer if you have upgraded or improved your home, because these alterations may increase your home's estimated replacement cost. Also, you'll want to stay informed about changing market conditions in your area. Rising labor, materials, and transportation costs can directly affect your home's estimated replacement cost. For maximum protection, consider a policy that includes an inflation clause that automatically adjusts to account for changes in construction costs.

EXHIBIT 4.

57. State Farm uses 360 Value to determine Plaintiff's initial homeowner's policy limits. The disclaimer at the bottom of the 360 Value Replacement Cost Estimate states that the document:

*"[I]s a general estimate provided for State Farm customers and should not be considered professional replacement cost survey of the building."* Exhibit 4.

58. However, Plaintiffs argue that through the behavior of its sales agents and the plaint language on its website, State Farm holds out a 360 Value to have the same authority and value as a "detailed replacement cost estimate" (Exhibit 5) performed by a contractor or building professional. State Farm knew or should have known that Plaintiffs would rely upon its false representation that the 360 Value Replacement Cost Estimate is accurate and can be relied upon to determine policy limits. State Farm's course of procedure in offering 360 Value Replacement Cost Estimates and then setting policy limits based upon the exact cost in the 360 Value document, for thousands of homeowners in California, sets an expectation and understanding that Plaintiffs can rely upon the 360 Value to be a correct and accurate policy limits value.

360Value Replacement Cost Estimate G2Y3-D2BA-7 (v.2)                                              Page 1 of 2

Replacement Cost Estimate for:

# SHEAHAN, BRIAN & ALISON
Estimate G2Y3-D2BA-7 (v.2)

 360Value

Agent: Andy Esquivel

### Owner Information
| | |
|---|---|
| Name: SHEAHAN, BRIAN & ALISON | Date Entered: 10/15/2009 |
| Street: 3817 MOSS HOLLOW CT | Date Calculated: 10/15/2009 |
| City, State ZIP: SANTA ROSA, CA 95404 | Created By: Andy Esquivel |
| Country: USA | Last Modified By: Andy Esquivel |
| Policy #: 02-G-67-BLC699-2 | |

### General Information
| | |
|---|---|
| Number of Stories: 100% Split Level | Sq. Feet: 3600 |
| Use: Single Family Detached | Year Built: 1986 |
| Quality Grade: Above Average | |

### Foundation
| | |
|---|---|
| Foundation Shape: 13+ Corners - Irregular/Complex | Foundation Type: 10% Concrete Slab, 90% Crawlspace |

### Exterior
| | |
|---|---|
| Roof Shape: Gable | Exterior Wall Construction: 95% Wood Framing, 5% None |
| Exterior Wall Finish: 95% Siding - Redwood (Clapboard), 5% Brick - Solid | - Included in Ext. Wall Finish |

### Interior
| | |
|---|---|
| Floor Coverings: 60% Carpet, 40% Hardwood - Plank | Interior Wall Finish: 98% Paint, 2% Wallpaper |

### Rooms
| | |
|---|---|
| Bathrooms: 3 Full Bath | Bedrooms: 1 Medium - (10'x10'), 2 Large - (14'x12'), 1 Extra Large - (16'x14') |

### Attached Structures
| | |
|---|---|
| Deck #1: | |
| Square Footage: 800 | Material: Redwood Deck |

### Systems
| | |
|---|---|
| Air Conditioning: 1 Central Air Conditioning | Specialty Systems: 1 Central Vacuum System, 1 Intercom System |
| Fireplace #1: | |
| Type: Wood Stove | |
| Fireplace #2: | |
| Type: Zero Clearance Fireplace | |

### Home Features
| | |
|---|---|
| Lighting: 1 Ornate Chandelier, 5 Ceiling Fan, 5 Recessed Light | Interior Doors and Millwork: 2 Built-in Desk/Vanity |
| Other Interior Features: 1 Wet Bar | |

## Estimated Replacement Cost (Calculated Value)

Calculated Value:                                                                 **$524,000.00**

*This Xactware estimate provides an estimated replacement cost based on the information you provided about the age, style, size, and features of the building. The more information you provide, the more the estimate will reflect the individual characteristics of the building. The estimate is based on certain assumptions and generalities about construction costs. This estimate is also based on material and labor costs as determined by Xactware pricing surveys. This is a general estimate provided for State Farm® customers and should not be considered to be a professional replacement cost survey of the building.*

(Replacement cost includes all applicable permits, fees, overhead, profit, and sales tax)

EXHIBIT 5

59. The State Farm 360 Value Replacement Cost Estimate provides a calculated value based on the
summation of number of stories, square footage, use, year built, quality grade, foundation shape,

foundation type, roof shape, exterior wall finish, exterior wall construction, floor coverings, interior wall finish, bathrooms, bedrooms, deck square footage and material, air conditioning, specialty systems, number and type of fireplaces, lighting, interior doors and millwork, other interior features, material and labor costs, permits, fees, overhead, profit, and sales tax. Although not mentioned on the form, in order to fill out a 360 Value form on State Farm's website, a zip code is also required.

60. Defendants' acts and practices constitute unlawful business practices, as they violate 10 California Code of Regulations § 2695.183, Standards for Estimates of Replacement Value. Section 2695.183 provides that "no licensee shall communicate an estimate of replacement cost to an applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis" unless certain "requirements and standards" are met. State Farm's 360 Value estimate does not address many of the required sections and therefore does not meet the California required minimum criteria.

61. Through State Farm's affirmative acceptance of the duty to calculate appropriate policy limits, and the use of the 360 Value factors to calculate a total rebuild cost amount for Plaintiffs' homes, State Farm assumes the risk of determining an accurate policy limit amount. State Farm knows, or should have known, that its policyholders rely on the Estimated Replacement Cost figure it recommends when establishing policy limits for policyholders, including Plaintiffs.

62. Within Plaintiffs' homeowners insurance policies, State Farm represents the following:

> *"The limit of liability for this structure (Coverage A) is based on an estimate of the cost to rebuild your home, including an approximate cost for labor and materials in your area, and specific information that you have provided about your home. It is up to you to choose the coverages and limits that meet your needs. We recommend that you purchase a coverage limit at least equal to the estimated replacement cost of your home. Replacement cost estimates are available from building contractors and replacement cost appraisers, or, your agent can provide an estimate from a third-party vendor using information you provide about your home. We can accept the type of estimate you choose as long as it provides a reasonable level of detail about your home. State Farm does not guarantee that any estimate will be the actual future cost to rebuild your home. Higher limits are available at higher premiums. Lower limits are also available, which if selected may make certain coverages unavailable to you. We encourage you to periodically review your coverage and limits with your agent and to notify us of any changes or additions to your home." Emphasis Added. Exhibit 6.*

63. State Farm, through its own actions and the actions of its agents, has held itself out as providing a third-party estimate, reliable to determine policy limits. While State Farm does not offer a guarantee as to the actual cost to rebuild a policyholder's home, there is an acceptable range of data within or outside which an estimate can be found to be accurate or inaccurate. For example, in the construction

industry, contractors are expected to perform construction work within 10% of the total price quoted, that additional 10% is held as a contingency for unexpected changes. Likewise, if State Farm cannot apply ISO's software to achieve an accurate value for policy limits and rebuild cost within 10% of the actual cost, then the software's output is unreliable for cost estimating. Plaintiffs argue that State Farm's 360 Value estimates follow a pattern across thousands of California policyholders, where the estimated values were so far outside a reasonable margin of error range as to be completely unreliable and unfit for use in determining policy limits.

**Your Coverage Amount....**

The limit of liability for this structure (Coverage A) is based on an estimate of the cost to rebuild your home, including an approximate cost for labor and materials in your area, and specific information that you have provided about your home. It is up to you to choose the coverages and limits that meet your needs. We recommend that you purchase a coverage limit at least equal to the estimated replacement cost of your home. Replacement cost estimates are available from building contractors and replacement cost appraisers, or, your agent can provide an estimate from a third-party vendor using information you provide about your home. We can accept the type of estimate you choose as long as it provides a reasonable level of detail about your home. State Farm® does not guarantee that any estimate will be the actual future cost to rebuild your home. Higher limits are available at higher premiums. Lower limits are also available, which if selected may make certain coverages unavailable to you. We encourage you to periodically review your coverages and limits with your agent and to notify us of any changes or additions to your home.

302

EXHIBIT 6

64. Furthermore, State Farm represented to Plaintiffs that they could obtain replacement cost estimates from their agents using "a third-party vendor [360 Value] using information [policyholders] provide about [their] home."  State Farm, through the use of 360 Value software, set policy limits which it claimed to be calculated to capture the true rebuild or replacement costs of Plaintiffs' homes so that Plaintiffs could restore their homes to pre-loss condition in the event of a loss.

65. Plaintiffs reasonably relied on State Farm's representation that 360 Value was a dependable valuation tool and the agent using the software to create an estimate knew how to accurately produce a reliable result. Plaintiffs also reasonably relied upon State Farm's representation that 360 Value's valuation represented the true cost to rebuild or replace Plaintiffs' homes to pre-loss condition in the event of a loss. And from this reasonable reliance, Plaintiffs agreed to policy limits set by State Farm. These policy limits, according to Defendants, would provide enough coverage such that Plaintiffs would be able to rebuild their homes to pre-loss condition in the event of a loss.

66. On information and belief, whereas State Farm represented to Plaintiffs that the reason it had adopted 360 Value was to accurately calculate the total replacement cost of Plaintiffs' homes for the

purpose of setting policy limits, State Farm's actual reason for adopting 360 Value was to systematically depress the value of adjusted claims made against State Farm. State Farm policies however, despite allegedly providing coverage for a total loss event, undervalued the true rebuild or replacement costs of Plaintiffs' homes, leaving Plaintiffs underinsured. State Farm has a long history of chronically underinsuring policyholders in California and nationwide.

67. On information and belief, prior to establishing Plaintiffs' policy limits, State Farm was aware that its process of applying 360 Value underestimates the actual rebuild cost of its policyholders' homes. Despite State Farm having knowledge that 360 Value's software inaccurately calculated the total rebuild cost of its policyholders' homes, State Farm represented to Plaintiffs that 360 Value was reliable at estimating the true rebuild cost of Plaintiffs' homes. In other words, on information and belief, State Farm knew, or at the very least should have known that its policyholders were underinsured and unprotected.

68. State Farm knew that its process of applying 360 Value data underestimates home values for claim purposes, it was also aware, or should have been aware, that 360 Value would calculate lower policy limits by underestimating actual home rebuild and replacement costs. Therefore, State Farm and 360 Value should have been aware – and at least warned Plaintiffs – that 360 Value was likely to underestimate their actual home rebuild costs. Instead, State Farm and 360 Value represented that 360 Value was capable of calculating the minimum replacement cost for the purpose of setting insurance policy limits. This lulled policyholders, like Plaintiffs, into relying on those representations when agreeing to the policy limits established by State Farm, which should have been sufficient to cover the total loss of their homes.

69. State Farm has been using data-based home valuation software like 360 Value since at least 1997 to create an estimated value used to determine policyholders' policy limits. 360 Value knew or should have known that State Farm's use of its data has historically resulted in chronic widespread underinsured policies in California.

70. As a vendor providing data analysis software, ISO has a duty to ensure that its software is suitable for its intended purpose under California Insurance Code and State Law. ISO breached that duty by egregiously allowing State Farm to harm its customers by intentionally and/or negligently underinsuring them by improperly using and/or misapplying the 360 Value tool.

71. In the alternative, it is also possible that ISO's tools are faulty software and cannot be used properly to achieve a proper valuation. This would mean that ISO carries some blame for false advertising which has damaged Plaintiffs.

72. As a result of State Farm's and 360 Value's misapplication of the software, misrepresentations and omissions, Plaintiffs are underinsured. Despite Plaintiffs contracting with State Farm for the purpose of insuring that they could rebuild or replace their properties after a loss event and despite Plaintiffs' reliance on State Farm and 360 Value's representations that their policy limit recommendations were sufficient to cover the total rebuild or replacement cost of Plaintiffs' homes, Plaintiffs are substantially underinsured in an amount to be proven at trial. Agents often did not discuss the results of this investigation keeping their clients in the dark, instead of reviewing this most critical piece of information.

73. Furthermore, State Farm perpetuated a scheme of illusory homeowners' coverage on its policyholders. State Farm policyholders believed they were receiving premium home protection (i.e., coverage more than sufficient to compensate the policyholders for the total loss of their home and then some). In fact, the policyholders (in this case, Plaintiffs) were paying premiums for coverage which the policyholders would never be able to receive as a result of State Farm's and 360 Value's failure to accurately calculate the minimum replacement cost for Plaintiffs' homes, sometimes at 30% of value.

74. Through 1997, homeowners were eligible to purchase Guaranteed Replacement Coverage, and when that was taken away, they were left with 20% Replacement Cap coverage, but it was never explained how drastically different that coverage was at the time their policies were changed. For those customers the expectation of protection was even greater.

75. Further, the Replacement Cap coverage which obligates State Farm to "pay up to an additional 20%" of the amount of insurance applying to the damaged building is insufficient to cover the gap from the already underinsured value, to the market cost of rebuilding after disaster. Thus, despite paying premiums for homeowners' coverage purportedly sufficient to cover the full replacement or rebuild cost of Plaintiffs' home, plus an additional 20% coverage above the minimum replacement cost, State Farm policyholders, such as Plaintiffs, were paying for coverage that could not cover the minimum replacement and/or rebuild cost of their homes. Exhibit 7.

**EXHIBIT 7**

Option ID – Increased Dwelling Limit is replaced by the following:

Option ID – Increased Dwelling Limit. We will settle losses to damaged building structures covered under COVERAGE A – DWELLING according to the SECTION I – LOSS SETTLEMENT provision shown in the Declarations.

If the reasonable and necessary cost to repair or replace damaged building structures exceeds the applicable limit of liability shown in the Declarations, we will pay the additional amounts not to exceed:

1.  the Option ID limit of liability shown in the Declarations to repair or replace the Dwelling; or

2.  10% of the Option ID limit of liability to repair or replace building structures covered under COVERAGE A – DWELLING, Dwelling Extension.

Report Increased Values. You must notify us within 90 days of the start of any new building structure costing $5,000 or more; or any additions to or remodeling of building structures which increase their values by $5,000 or more. You must pay any additional premium due for the increased value. We will not pay more than the applicable limit of liability shown in the Declarations, if you fail to notify us of the increased value within 90 days.

**EXHIBIT 8**

State Farm General Insurance Company
900 Old River Rd.
Bakersfield, CA 93311-9501

                                        H-02-  0035-FBA4    H W  F
                              062684  0901
SHEAHAN, BRIAN & ALISON
3817 MOSS HOLLOW CT
SANTA ROSA CA  95404-1567

Location:  Same as Mailing Address

Loss Settlement Provisions (See Policy)
A1  Replacement Cost - Similar Construction
B1  Limited Replacement Cost - Coverage B

Forms, Options, and Endorsements
Homeowners Policy                        FP-7955.CA
Increase Dwlg up to $153,740             OPT  ID
Ordinance/Law   25%/  $192,175           OPT  OL
Additional Insured                       OPT  AI
Jewelry and Furs $1,500/$2,500           OPT  JF
Form 438bfu NS Lndr Loss Pay             FE-1313
Homeowners Policy Endorsement            FE-3422
Identity Restoration Coverage            FE-3301
Amendatory Endorsement                   FE-3247

76. By its conduct, State Farm has reaped enormous financial benefit to the detriment of its insureds. State Farm collects premiums on coverages that as a result of State Farm's insufficient, yet recommended policy limits and improperly applied rebuild estimate, the actual amounts necessary to rebuild the home can never be reached.

77. State Farm's intentional undervaluation of homeowners at the time they purchase their policy, and again at the time that the total loss is calculated is a derogation of special duty that State Farm's agents take on when they use 360 Value and Xactimate software. It is a malicious and deliberately unfair business practice, pervasive in the State Farm system, which is operating on volume of policies sold, and State Farm's use of the Xactimate to reduce the homeowner's payout, rather than upholding underwriting quality to the true value.

78. State Farm knew or should have known that using ISO software to perform underwriting calculations was inappropriate because the data is based on subdivisions and trailer parks. The custom built homes that were lost in the Northern California Wildfires were higher quality than the

underlying data used to determine their value. The ISO software data is inaccurate and inappropriate for the Northern California housing market. Further, State Farm fail to train its adjusters, or worse, intentionally undervalued the Plaintiffs' homes by improperly using ISO software.

79. State Farm fleeced its customers both coming and going. It intentionally and fraudulently undervalued initial policies and then upon the loss of the home, in Plaintiffs' claim instances, State Farm refused to honor its own lowballed contract and give the customer their 100% rebuild cost reimbursement.

80. State Farm told customers that they had full coverage. Through the use of ISO software, State Farm intentionally underinsured the homes that it provided insurance for in the Norther California Wildfires. While stating that it was selling full coverage policies, State Farm was actually offering reduced premiums at cheaper rates because it knew that this would induce customers to buy the discounted policies. State Farm held itself out as offering full coverage for total loss, but this was not the case.

81. The Plaintiffs now have experienced a total loss with retroactively underinsured properties, and cannot get reimbursed for the actual value of the homes that they lost. Their damages are the difference between the actual value of the home that they lost and the policy limits of the issued policy – due to reliance on faulty or misapplied software, which State Farm was aware would undervalue the homes.

**PLAINTIFFS' SPECIFIC ALLEGATIONS**

82. The Sheahan family alleges their policy was undervalued, with the 360 Value software at $509,000 in 2001, their policy increasing to $768,700 at date of loss, and following the fire loss their construction cost Xactimate was presented at $804,060, well below any possibility to locate a competent contractor in this area at this time.  Their construction contract came in at $2,017,614, showing just how far apart these numbers are.

83. For the typical State Farm homeowner, and for Sheahan specifically, there is no way to receive from the policy, the full amount of insurance that could reasonably be utilized to restore this property, and find a pathway to rebuilding that stays within that budget.  This is not true for other insurers, especially those who are not utilizing the mutually undercutting software and data products

84. Plaintiffs allege they were never specifically interviewed about the qualities of their dwelling such as might be appropriate to create an reasonable estimate of value for underwriting. Furthermore, the State Farm agents are not trained to share the date nor to give homeowners the opportunity to provide input into the completion of the 360 Value software, and rarely if ever, do homeowners see these underwriting documents.

85. Mr. Pope alleges his policy was undervalued, with the zip code calculator, and then through its infeasibility of construction within the budget. The original value of the policy was set at $170,000. It increased to $330,851 at the date of loss, The Xactimate came in at $539,361, but actual cost to rebuild is estimated at $717,000.The adjuster who estimated the property could not even measure the full area of the lot to arrive at an appropriate landscape value. The insurers' construction cost estimate came in well below any possibility to locate a competent contractor in this area at this time. There is no way to receive from the policy, the full amount of insurance that could reasonably be utilized to restore this property. Additionally, Mr. Pope alleges that he was told after the disaster that State Farm believed it was reasonable to issue policies at 40% of replacement value, though he was never told this is what he was being offered. Since 40% of value even with a 20% replacement cap can only get you to 48% of value, there is no way that this is a replacement cost policy.

86. The Wylie family were long time residents in their dwelling, and were surprised to learn of the undervaluation of their property. They had originally purchased Guaranteed Replacement Value for their home. Despite policy changes and notices, they had no awareness of the shift in coverage, meaning that they no longer had anything close to a guarantee of replacement value. The revised policy was reduced to dwelling A plus 20% which is a radical reduction in coverage of which they were not informed. The original 360 Value was $227,400. The policy limits at the time of loss were at $513,900, with 20% additional this only comes to $616,680 which is insufficient to replace their house. The Xactimate came in at $772,979. The real cost to rebuild their dwelling is $1,222,027. Absent further investment there was no way to cure their gap in the insurance coverage for this family that believed they had full insurance. They bought guaranteed replacement coverage when they first insured and they got something that delivered only 50 cents on the dollar.

87. In all cases, it appears that State Farm has been actively perpetrating this common scheme of lowballing policy limits and then following up with a lowballed rebuild value to reinforce the false narrative of home rebuilding costs in California, while providing a much weaker policy than insureds believed that they had purchased.

88. Based upon this analysis, it appears that State Farm had a common scheme to intentionally undervalue policyholders homes at the time the policy was issued and again for the total loss, resulting in significant, egregious, and intentional undervaluation of many homes belonging to Northern California Wildfire victims.

## CAUSES OF ACTION

1. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;
2. FRAUD-INTENTIONAL MISREPRESENTATION;
3. FRAUD-FALSE PROMISE;
4. NEGLIGENT MISREPRESENTATION;
5. NEGLIGENCE;
6. REFORMATION;
7. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW;
8. VIOLATION OF CALIFORNIA CARTWRIGHT ACT;
9. UNFAIR OR DECEPTIVE ACTS IN THE BUSINESS OF INSURANCE;
10. VIOLATION OF US CODE TITLE 15 SHERMAN ACT – CARTEL
11. VIOLATION OF US CODE TITLE 15 SHERMAN ACT – MONOPOLY
12. CODE TITLE 15 SHERMAN ACT - CONSPIRACY
13. VIOLATION OF CALIFORNIA PRODUCTS LIABILITY ACT

## FIRST CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

89. Plaintiffs repeat and reallege paragraphs 1 through 88 of this Complaint and incorporate them by reference, as though fully set forth herein.

90. Under California law, a covenant of good faith and fair dealing is implied in every contract including Plaintiffs' homeowner's insurance policies. The conduct of insurers, brokers, and agents prior to purchase must be conducted pursuant to the duty of good faith and fair dealing. Moreover, insurers owe prospective insureds who are 65 or over an additional duty of honesty, good faith and fair dealing prior to purchase. Cal. Ins. Code § 785(a).

91. State Farm, as an insurance company, must act in utmost good faith in the interpretation of its policies, and in the investigation and payment of claims. It is unlawful for an insurer to engage in unreasonable delay; to put its financial interests ahead of the financial interests of the policyholder;

or to lowball and underpay claims. State Farm cannot use deception or trickery in sales or claims handling. It cannot compel an insured to hire an attorney in order to be paid what they are owed. It must be fair to its policyholders. The violation of any of these standards is a violation of the duty of good faith which the law imposes on insurance companies.

92. State Farm made representations to Plaintiffs, and the proposed class, some of whom are 65 and older, through its contracts, and its website, that 360 Value could accurately calculate the cost of replacing or rebuilding their homes prior to the time Plaintiffs purchased or renewed their State Farm homeowners insurance policy. Plaintiffs relied on State Farm's representations regarding 360 Value and other pre-contractual conduct when determining to purchase or renew their State Farm homeowners insurance policies.

93. Plaintiffs contracted with State Farm for the purpose of obtaining coverage sufficient to cover the total replacement and/or rebuild cost of Plaintiffs' homes to pre-loss condition in the event of loss.

94. State Farm agreed to use its zip code calculator software to calculate replacement costs in such a way as they would be reasonably accurate, and by doing so, provide policy limits sufficient to cover the total rebuild cost of Plaintiffs' homes in the event of loss. State Farm affirmatively undertook the duty and responsibility of calculating the total rebuild cost of Plaintiffs' homes in the event of total loss and notified Plaintiffs that the total rebuild cost estimates State Farm calculated were generated from a third party software that State Farm held out to be as reliable as a contractor's estimate, and that the provided cost estimates were sufficient to cover the rebuild costs of Plaintiffs' homes in the event of total loss.

95. In other words, State Farm recommended that Plaintiffs purchase policy limits consistent with the total rebuild cost figure generated by 360 Value's software, as said policy limit represented, at least, the minimum amount needed to rebuild Plaintiffs' homes in the event of total loss. Consistent with this representation, Plaintiffs accepted the policy limits State Farm recommended to them.

96. Plaintiffs have made claims to State Farm to honor its promise to provide coverage sufficient to cover the total rebuild costs of Plaintiffs' homes. The amounts required to rebuild Plaintiffs' homes, however, exceed the amounts State Farm represented were sufficient to rebuild Plaintiffs' homes to their pre-loss condition.

97. Following the Northern California Wildfires, State Farm used Xactimate software to determine the cost to rebuild Plaintiffs' house that was, and in may cases, the total rebuild cost was significantly

different, beyond a 10% margin of error, compared to the total policy limits calculated using 360 Value software.

98. Herein lies the crux. State Farm has failed to pay out amounts sufficient to cover the total rebuild cost of Plaintiffs' homes, which is akin to denying Plaintiffs the benefit of their bargain. Plaintiffs were told that they purchased homeowners policies sufficient to cover the total rebuild and/or replacement cost of their homes in the event of total loss. Plaintiffs dutifully made payments in expectation of full coverage if a disaster occurred. Plaintiffs demand that State Farm provide a reliable process for calculation of replacement costs that are sufficient to cover the total rebuild cost of Plaintiffs' homes to their pre-loss condition.

99. State Farm has no good faith reason for denying the reformation of Plaintiffs' policies to reflect the true cost to rebuild and/or replace Plaintiffs' homes. This is especially true in this instance because State Farm represented that the coverage amounts in the homeowners policies Plaintiffs purchased were sufficient to rebuild Plaintiffs' homes after a total loss. Indeed, it was State Farm who recommended that Plaintiffs rely on the total rebuild cost figure that 360 Value generated, as this third party estimating tool was held out to be the same as a contractor's estimate and could be relied upon to generate policy limits sufficient to rebuild Plaintiffs' homes to their pre-loss condition.

100.    As a direct and proximate result of State Farm's failure to provide policy limits coverage sufficient to cover the total rebuild cost of Plaintiffs' homes – the reason why Plaintiffs contracted with State Farm in the first instance – Plaintiffs have suffered damages in an amount to be determined according to proof at the time of trial, plus interest, and other foreseeable and incidental damages according to proof, in amounts to be determined at the time of trial.

101.    As a further proximate result of the aforementioned wrongful conduct of State Farm, Plaintiffs were compelled to retain legal counsel to obtain the benefits due under the homeowners insurance policies, including all future policy benefits. Therefore, State Farm is liable to Plaintiffs for those attorneys' fees reasonably necessary and that Plaintiffs incurred to obtain the benefits, including future policy benefits, in a sum to be determined at the time of trial.

102.    State Farm's conduct described herein was despicable conduct as part of a common scheme carried on by State Farm with a willful and conscious disregard of the rights of Plaintiffs. State Farm subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights, making Plaintiffs believe that they could never afford to rebuild their homes, and State Farm's conduct was an intentional misrepresentation of a material fact known to State Farm with the intention to deprive

Plaintiffs of property or legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil Code 53294, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of State Farm and its conduct.

## SECOND CAUSE OF ACTION
### (Fraud- Intentional Misrepresentation)

103.    Plaintiffs repeat and reallege Paragraphs 1 through 104 of this Complaint and incorporate them by reference, as though fully set forth herein.

104.    State Farm represented that the use of 360 Value software allowed it to calculate the cost of replacing Plaintiffs' homes given the specific characteristics of each home and that 360 Value's policy limit calculations were the equivalent of a contractor's estimate and suitable for replacing and/or rebuilding Plaintiffs' homes to pre-loss condition. State Farm likewise represents on its website: *"The most appropriate way to estimate the replacement cost of your home is to hire a building contractor or other building professional to produce a detailed replacement cost estimate. Or your State Farm agent can utilize an estimating tool from Xactware Solutions – to assist you with an estimate."* Exhibit 1.

105.    State Farm and ISO represented that ISO's software Xactware could accurately calculate the replacement costs for each home, knowing that such representations would be communicated to and relied upon by Plaintiffs, or to State Farm policyholders similarly situated, for the purpose of calculating reliable rebuilding costs.

106.    Based on information and belief, Defendants knew their representations were false when made, or made these representations with reckless disregard for their truth. State Farm is a large insurance company that provides insurance, completes underwriting, and performs claims adjustment for millions of policyholders. It knows that it cannot provide an estimate of rebuilding costs by inputting simplistic parameters of a home's characteristics while failing to fully and accurately account for the home's architecture, building materials, finishing, and other details that substantially determine rebuilding costs.

107.    State Farm has been using data from ISO since at least 1997. On information and belief, State Farm has received many complaints from California policyholders that ISO's software substantially underestimates rebuilding costs.

108.    ISO's 360 Value software is a zip code calculator, using lowest common denominator data to set values for homes within a certain geographic area based on a generic, tract-home type cost valuation. ISO knows or should have known that the limited information State Farm inputs or alternatively, State Farm's ongoing practice of improperly and negligently inputting information into its software is utterly insufficient to calculate rebuilding costs and is aware, or should be, that Plaintiffs will obtain and rely on these calculations.

109.    ISO is a software company that, among other things, provides sophisticated tools to allow insurance companies to estimate claims costs by, for example, up-to-date pricing information and creating three-dimensional home sketches. The underlying data within the Xactware tool is based on manufactured home data, such as trailers and prefabricated homes, used to price houses like a kit of parts. ISO knows that the meager information State Farm inputs is insufficient to calculate rebuilding costs and ISO is aware that Plaintiffs will obtain and rely on its calculations.

110.    Fundamentally, the underlying data in both of ISO's software platforms does not accurately represent the appropriate cost per square foot for California homes such as those lost by the Plaintiffs in the Northern California Wildfires.

111.    State Farm's application of ISO's software is intentionally designed to result in an improperly low rebuilding cost for the California market, producing rebuild costs that are not tenable following a disaster. In the alternative, it may be that ISO's tools may be used properly by a trained agent to arrive at an accurate valuation, but it has become apparent to Plaintiffs that State Farm Adjusters are either not trained to, or they are trained to not arrive at an accurate result. Plaintiffs consider an accurate valuation to be within 10% of rebuild construction cost.

112.    Despite actual notice that ISO's software did not and does not accurately estimate rebuilding costs, State Farm continues to represent that 360 Value can accurately and dependably calculate rebuilding costs before the loss occurs. State Farm and ISO knew that their claims regarding 360 Value software's reliability were manifestly false, but nevertheless continued to make these false representations in order to induce homeowners, including Plaintiffs, to buy or renew State Farm insurance.

113.    In fact, State Farm's and ISO's representations were false at the time they were made. State Farm relied on insufficient data about geography, home value and rebuilding costs to create and recommend substantially insufficient policy limits to Plaintiffs and those similarly situated.

114.    Defendants purposely included the false statement that ISO's software was the equivalent of a contractor's estimate and therefore the software reliably generated policy limits that would cover the cost of rebuilding Plaintiffs' homes to pre-loss condition, with the intention that Plaintiffs would rely on the representations and purchase State Farm insurance as a result. State Farm, with the knowledge, understanding, and consent of ISO, advertised a third party estimating tool on State Farm's website and policy language to induce Plaintiffs to rely on the representations and purchase State Farm insurance. The false statements were intended to induce, and did induce, Plaintiffs to believe that if they purchased State Farm insurance, they could be assured that State Farm had correctly calculated and set policy limits sufficient to cover the complete loss of Plaintiffs' homes.

115.    Plaintiffs purchased State Farm insurance in substantial part because of State Farm's and ISO's representations that they could and had accurately calculated the cost of rebuilding Plaintiffs' homes, and for the peace of mind of knowing that even if their home was completely destroyed, their insurance policy would compensate them for the full amount of their loss.

116.    Plaintiffs reasonably relied on Defendants' false representations because of Defendants' own statements regarding the usefulness, veracity and accuracy of the loss calculations; how long State Farm had been working with ISO's data; and because Defendants held themselves out as experts in establishing accurate policy limits. As any reasonable person would, Plaintiffs believed that a large insurance carrier and a large, sophisticated software company would, as they represented, be able to make accurate determinations about rebuilding costs.

117.    Plaintiffs have been damaged by the falsity of these representations. Because Defendants' methods and algorithms profoundly underestimate the cost of rebuilding, Plaintiffs are unable to rebuild their homes to their pre-loss condition. ISO's software was used to make calculations leading to the creation of insufficient policy limits-policy limits substantially less than the true replacement and/or rebuild costs necessary to restore Plaintiffs' homes to pre-loss condition. State Farm also intentionally made misrepresentations in the Illusory Coverage Scheme to bolster State Farm's profits to the detriment of Plaintiffs and policyholders similarly situated.

118.    As a proximate result of Plaintiffs' reliance on Defendants' false representations, Plaintiffs have suffered, and will continue to suffer damages, plus interest, and other economic and consequential damages, for a total amount to be shown at the time of trial.

119.    As a further proximate result of Plaintiffs' reliance on Defendants' false representations, Plaintiffs have suffered anxiety, worry, mental and emotional distress, all to Plaintiffs' general damages in a sum to be determined at the time of trial.

120.    Defendants engaged in despicable conduct with a willful and conscious disregard of the rights of Plaintiffs, subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights, and/or Defendants made intentional misrepresentations of material fact with the intention to deprive Plaintiffs of property or legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil Code §3294, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants and their conduct.

**THIRD CAUSE OF ACTION**
**(Fraud-False Promise)**

121.    Plaintiffs repeat and re-allege paragraphs 1 through 120 of this Complaint and incorporate them by reference, as though fully set forth herein.

122.    77.State Farm represented to Plaintiffs that it would cover Plaintiffs' costs of rebuilding their homes to pre-loss condition in the event of loss via Plaintiffs' respective homeowners insurance policies and via representations that the 360 Value tool allowed State Farm to calculate the total cost of replacing Plaintiffs' homes and to provide appropriate policy limits.

123.    Instead, State Farm has stated that it will only pay Plaintiffs amounts which do not permit Plaintiffs to rebuild and/or replace their homes. This result does not comport with State Farm's promise to compensate Plaintiffs for an accurately-calculated replacement cost value in the case of a catastrophic loss. As such, State Farm's promise to accurately calculate the true cost of rebuilding Plaintiffs' homes, and then compensate Plaintiffs for that amount is false.

124.    State Farm knew these representations were false when made. Based on information and belief, State Farm, despite its representations to the contrary, never intended to compensate Plaintiffs for the true cost of rebuilding their homes to pre-loss condition. State Farm only intended to pay the grossly inadequate policy limits it calculated and recommended to Plaintiffs. Moreover, State Farm knew when it made the promise that ISO's software, 360 Value, calculated policy limits that through the software and/or the agent, or both, underestimated the true rebuild and replacement costs of Plaintiffs' homes. State Farm also knew when it made a promise to policyholders following the Northern California Fires that ISO's software calculated rebuild costs that the software

underestimated the true rebuild and replacement costs of Plaintiff's homes. State Farm's Illusory Coverage Scheme also ensured that Plaintiffs would not be able to access the benefit of State Farm's promised coverage.

125.    After the fires destroyed all or part of Plaintiffs' homes, the true extent of State Farm's false promise became apparent. State Farm states that it will only compensate Plaintiffs up to their intentionally undervalued insurance policy limits, leading Plaintiffs to realize that the policy limits State Farm and ISO software calculated and recommended to Plaintiffs are substantially less than the true costs of rebuilding their homes to pre-loss condition.

126.    State Farm through its actions, and contract language perpetuated the false promise that the policy limit State Farm calculated would compensate Plaintiffs for the actual cost of rebuilding, for the purpose of inducing Plaintiffs to purchase and renew their State Farm insurance policies. State Farm knew that this promise would give Plaintiffs undue confidence in State Farm's insurance policies, while the overall effect of using 360 Value and Xactimate software would also allow State Farm to keep claim payouts low.

127.    Plaintiffs purchased State Farm insurance and relied on ISO's estimate in substantial part because of State Farm's representations that it would fully compensate Plaintiffs for the cost of rebuilding their homes in the event of loss and the peace of mind this afforded them.

128.    Plaintiffs reasonably relied on State Farm's false promise because of State Farm's assurances that it would provide full coverage for Plaintiffs' loss. Plaintiffs believed State Farm's representations that it would stand by its promise that a third party tool was reliable as a contractor's estimate and could be relied upon to calculate policy limits that would fully compensate Plaintiffs for their property losses. Plaintiffs also relied on State Farm's assertions of superior knowledge regarding the calculation and establishment of sufficient policy limits. After all, State Farm is a large insurer and has been making underwriting, costing, and claims calculations for millions of Americans. Additionally, ISO is a large data analysis firm that has been providing data to State Farm since 1997.

129.    Plaintiffs have been damaged by the falsity of State Farm's promise. Instead of compensating Plaintiffs for the true cost of rebuilding, State Farm will only pay Plaintiffs pursuant to their policy limits, which are insufficient to replace or rebuild Plaintiffs' homes to pre-loss condition. Plaintiffs' inability to cover the costs of rebuilding their homes stems directly from their reliance on State Farm's false promises and Plaintiffs' consequent purchase of State Farm insurance.

130.    As a proximate result of Plaintiffs' reliance on State Farm's false promise, Plaintiffs have suffered, and will continue to suffer in the future, damages, plus interest, and other economic and consequential damages, for a total amount to be shown at the time of trial.

131.    As a further proximate result of Plaintiffs' reliance on State Farm's false promise, Plaintiffs have suffered anxiety, worry, mental and emotional distress, all to Plaintiffs' general damages in a sum to be determined at the time of trial.

132.    State Farm's conduct described herein was despicable conduct carried on by State Farm with a willful and conscious disregard of the rights of Plaintiffs, subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights, or was an intentional misrepresentation of a material fact known to State Farm with the intention to deprive Plaintiffs of property or legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil Code 53294, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of State Farm and its conduct.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

133.    Plaintiffs repeat and reallege paragraphs 1 through 132 of this Complaint and incorporate them by reference, as though fully set forth herein.

134.    State Farm represented to Plaintiffs that using ISO's software tools, 360 Value, and Xactimate, allowed State Farm to precisely calculate the cost of replacing Plaintiffs' homes given the specific characteristics of each home, as an alternative to and equally as reliable as an estimate from a contractor.

135.    State Farm further represented that its policy limits, set by the 360 Value software, were reliable as the actual cost for rebuilding Plaintiffs' homes.

136.    ISO represented that its software could accurately calculate the replacement and/or rebuild costs for each home, knowing that such representations would be communicated to and relied upon by Plaintiffs, or to State Farm policyholders similarly situated, for the purpose of calculating what State Farm represented as the equivalent of a contractor's estimate to determine the rebuilding costs and as reflected in policy limits State Farm recommended to Plaintiffs and those similarly situated.

137.    Defendants had a duty to ensure that their representations regarding Xactimate and 360 Value were accurate. Defendants represented themselves as possessing particular expertise in calculating rebuilding costs in case of property loss. Having undertaken this duty, and having made affirmative

assertions that their calculations for rebuilding Plaintiffs' homes were accurate, Defendants were obliged to ensure that their representations that they had accurately determined rebuilding costs, and by extension" Plaintiffs' policy limits, were true because Plaintiffs, and any reasonable person in Plaintiffs' position would foreseeably rely on the truth of those representations.

138.   Defendants' representations were not true. State Farm agents and ISO's software did not accurately calculate rebuilding costs, and thus denied Plaintiffs' the ability to replace or rebuild their homes to pre-loss condition. Plaintiffs' policy limits are based on Plaintiffs' reasonable reliance on ISO's software calculations, which systematically underestimated the true costs of replacing or rebuilding Plaintiffs' homes to pre-loss condition.

139.   Defendants knew, or should have known that the insufficient data it collected from homeowners, and the generalized assumptions that 360 Value used to calculate loss, did not provide an accurate approximation of the true costs, and did not provide a reasonable basis for calculating  homeowners' policy limits. State Farm also negligently made misrepresentations in the Illusory Coverage Scheme to bolster State Farm's profits to the detriment of its policyholders. As such, Defendants knew, or should have known that their representations were false when made.

140.   After Plaintiffs' homes were destroyed in whole or in part by fire, the true extent of Defendants' false representations became apparent. State Farm now states that it will only compensate Plaintiffs up to their policy limits, which Plaintiffs have now discovered are completely insufficient to replace or rebuild Plaintiffs' homes to their pre-loss condition.

141.   Defendants purposely made these false representations intending that Plaintiffs would rely on them and for the purpose of inducing Plaintiffs to purchase and renew their State Farm insurance policies.

142.   Plaintiffs purchased State Farm insurance in substantial part because of Defendants' false representations that ISO's software satisfied Plaintiffs' desire that their policies have sufficient limits to fully compensate them in the event of total loss.

143.   Plaintiffs reasonably relied on Defendants' false representations because Defendants held themselves out as experts in the field of loss estimation. As any reasonable person would, Plaintiffs believed that if a large insurance carrier and a large, sophisticated software company stated that each individually, or jointly, or both, could accurately calculate the costs of rebuilding, Plaintiffs could rely upon these statements.

144.    Plaintiffs have been damaged by Defendants' false representations. Instead of compensating Plaintiffs for their rebuilding costs, State Farm will only pay Plaintiffs up to their inadequate policy limits. Plaintiffs' inability to cover the costs of rebuilding their homes stems directly from, and was a substantial factor in their reliance on Defendants' false representations and Plaintiffs' consequent purchase of State Farm insurance.

145.    As a proximate result of Plaintiffs' reliance on Defendants' false representations, Plaintiffs have suffered, and will continue to suffer in the future, damages, plus interest, and other economic, non-economic and consequential damages, for a total amount to be shown at the time of trial.

146.    As a further proximate result of Plaintiffs' reliance on Defendants' false promise, Plaintiffs have suffered anxiety, worry, mental and emotional distress, all to Plaintiffs' general damages in a sum to be determined at the time of trial.


## FIFTH CAUSE OF ACTION
### (Negligence)

147.    Plaintiffs repeat and re-allege paragraphs 1 through 146 of this Complaint and incorporate them by reference, as though fully set forth herein.

148.    Defendants represented to Plaintiffs that they had a software tool that could produce an estimate equal to that of a contractor that could be relied upon to accurately calculate the costs of replacing or reconstructing Plaintiffs' homes following a loss event. Defendants knew, or should have known, that policyholders would rely on Defendants' recommended tool and that they had expertise that allowed Defendants' to calculate the minimum policy limits that would enable Plaintiffs to replace or rebuild their homes in the event of loss. Defendants also knew that if Plaintiffs, or those in Plaintiffs' position relied on Defendants' expertise, but the policy limits proved inadequate, Plaintiffs would be materially harmed and unable to replace or rebuild their homes. In the alternative, Defendant's knew or should have known that State Farm agents would intentionally and/or negligently use the software to achieve calculations that would justify underinsurance.

149.    Defendants also knew, or should have known that Xactimate and/or 360 Value was insufficient to calculate the specific rebuilding costs of each home. Defendants also knew, or should have known that as a result of their failure to accurately calculate policy limits which reflected the cost to rebuild or replace Plaintiffs' homes, in addition to other actions described herein regarding the Illusory

Coverage Scheme, Plaintiffs were denied the ability to access additional home coverages, such as the Home Protector Coverage, despite Plaintiffs paying premiums for those coverages.

150.    Defendants' affirmations that ISO's software was equal to a contractor's estimate and would accurately calculate policy limits for rebuilding each of Plaintiffs' homes, were, instead, made to induce policy sales and systematically depress claim reimbursements. Given the foreseeability of Plaintiffs' harm, the close connection between Defendants' wrongful acts and Plaintiffs' harm, and the morally bankrupt commercial motives for Defendants' wrongs, Defendants undertook a special duty to use reasonable care and to accurately set each of Plaintiffs' policy limits to fully compensate them for the cost of replacing or rebuilding their homes in the event of a loss.

151.    ISO Value likewise represented that its software could accurately calculate the replacement costs for each home, knowing that Plaintiffs, or State Farm policyholders similarly situated, would consider and rely upon such representations for the purpose of calculating rebuilding costs. ISO understood that Plaintiffs, or those in Plaintiffs' position, would foreseeably rely on its expertise in selecting policy limits.

152.    Having undertaken this special duty, Defendants were obliged to use reasonable care to ensure that Plaintiffs' policy limits for replacing and/or rebuilding their homes to their pre-loss condition was adequate.

153.    Defendants breached that duty because ISO's software did not accurately calculate rebuilding costs. Instead, Plaintiffs' policy limits, as set by ISO's software calculations and Plaintiffs' adoption of State Farm's recommendations, substantially underestimates the true costs of replacing and/or rebuilding each of Plaintiffs' homes. State Farm nevertheless states that it will only compensate Plaintiffs up to their policy limits, which Plaintiffs have now discovered are inadequate to restore Plaintiffs' homes to pre-loss condition.

154.    In the alternative, State Farm breached its special duty by intentionally and/or negligently applying the software tool to achieve a lowballed estimate, which it knew would be used as Plaintiff's policy limits.

155.    Plaintiffs' policy limits, calculated with ISO software and recommended to Plaintiffs by defendant State Farm, are inadequate to replace or rebuild Plaintiffs' homes to pre-loss condition. Plaintiffs relied on Defendants' representations that the policy limits they recommended to Plaintiffs were adequate. Given Defendants' representations of expertise, this was reasonable. Defendants' breach of their duty therefore was a substantial factor in causing Plaintiffs' harm.

156.    As a proximate result of Defendants' breach, Plaintiffs have suffered, and will continue to suffer in the future, damages, plus interest, and other economic and consequential damages, for a total amount to be shown at the time of trial.

157.    As a further proximate result of Defendants' breach, Plaintiffs have suffered anxiety, worry, mental and emotional distress, all to Plaintiffs' general damages in a sum to be determined at the time of trial.

158.    Defendants' conduct described herein was intended by Defendants to cause injury to Plaintiffs or was despicable conduct Defendants pursued with a willful and conscious disregard of the rights of Plaintiffs, subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights, or was an intentional or negligent misrepresentation of a material fact known to Defendants with the intention to deprive Plaintiffs of property or legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil Code 53294, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants and their conduct.

### SIXTH CAUSE OF ACTION
**(Reformation)**

159.    Plaintiffs repeat and re-allege paragraphs 1 through 158 of this Complaint and incorporate them by reference, as though fully set forth herein.

160.    Plaintiffs' respective insurance policies do not reflect the actual agreement of the parties. Whereas State Farm and each respective Plaintiff agreed that State Farm would provide policy coverage sufficient to cover the cost of rebuilding Plaintiffs' homes, the policy limit derived from ISO software calculation is grossly inadequate.

161.    This error came about through State Farm's fraudulent representation that State Farm, and ISO had accurately calculated the cost of rebuilding each Plaintiff's home, and State Farm's fraudulent promise to fully cover the rebuilding costs of each Plaintiff's home.

162.    Alternatively, the incorrect policy limits came about through Plaintiffs' reliance on Defendants' negligent representation that ISO software had accurately calculated the cost of rebuilding each of Plaintiffs' homes. State Farm had reason to know that Plaintiffs would believe its representations because it held itself out as an expert with special knowledge in the area of loss estimation.

163.   Plaintiffs therefore request that their respective insurance policies are reformed to reflect the true intent of the parties, which is that their homeowners insurance policies compensate them for the true cost of rebuilding their homes, notwithstanding the stated policy limits.

**SEVENTH CAUSE OF ACTION**
**(Violation of California Unfair Competition Law, Bus. & Prof. Code 517200, et seq.)**

164.   Plaintiffs repeat and re-allege paragraphs 1 through 163 of this Complaint and incorporate them by reference, as though fully set forth herein.

165.   Each Defendant is a "person" subject to the California Unfair Competition Law ("UCL") pursuant to Business and Professions Code § 17201.

166.   The UCL prohibits acts of "unfair competition" including any "unlawful, unfair or fraudulent business act or practice." Cal Bus. & Prof. Code § 17200.

167.   California Business & Professions Code § 517204 permits individuals, such as Plaintiffs, to institute an action on behalf of the general public to obtain injunctive and restitutionary relief against persons and entities that engage in unfair business practices and/or unfair competition.

168.   Defendants' acts and practices, including establishing Plaintiffs' insurance policy limits and the Illusory Coverage Scheme, as alleged in this Complaint, constitute unlawful, unfair, and fraudulent business practices, in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code SS 17200 et seq.

169.   Defendants' acts and practices constitute unlawful business practices, as they violate 10 California Code of Regulations § 2695.183, Standards for Estimates of Replacement Value. Section 2695.183 provides that "no licensee shall communicate an estimate of replacement cost to an applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis" unless certain "requirements and standards" are met. Among these requirements and standards are "consideration of components and features of the insured structure," including "at least" the following criteria:

   A.   The estimate of replacement cost shall include the expenses that would reasonably be incurred to rebuild the insured structure(s) in its entirety, including at least the following:

      (1) Cost of labor, building materials and supplies;

      (2) Overhead and profit;

      (3) Cost of demolition and debris removal;

(4) Cost of permits and architect's plans; and

(5) Consideration of components and features of the insured structure, including at least the following:

    (A) Type of foundation;

    (B) Type of frame;

    (C) Roofing materials and type of roof;

    (D) Siding materials and type of siding;

    (E) Whether the structure is located on a slope;

    (F) The square footage of the living space;

    (G) Geographic location of property;

    (H) Number of stories and any nonstandard wall heights;

    (I) Materials used in, and generic types of, interior features and finishes, such as, where applicable, the type of heating and air conditioning system, walls, flooring, ceiling, fireplaces, kitchen, and bath(s);

    (J) Age of the structure or the year it was built; and

    (K) Size and type of attached garage.

B.  The estimate of replacement cost shall be based on an estimate of the cost to rebuild or replace the structure taking into account the cost to reconstruct the single property being evaluated, as compared to the cost to build multiple, or tract, dwellings…"

170.   Defendants' method of calculating the replacement cost of Plaintiffs' homes materially failed to consider several of these components and features of Plaintiffs' insured structures. The 360 Value estimate failed to include: 1. costs for architect's plans; 2. roofing material and type of roof; 3. Whether the structure is located on a slope; 4. Nonstandard wall heights; and 5. Size and type of attached garage. The Xactimate estimate following a loss also does not address a cost for architect's plans. As a result of Defendants' failure to perform and rely upon an estimate that meets the minimum criteria set forth by California law, and Defendants' use of the estimate to determine policy limits, Plaintiffs are underinsured and unable to replace and/or rebuild their homes to their pre-loss condition.

171.   The State Farm 360 Value Replacement Cost Estimate provides a "calculated value" based on the summation of number of stories, square footage, use, year built, quality grade, foundation shape, foundation type, roof shape, exterior wall finish, exterior wall construction, floor coverings, interior

wall finish, bathrooms, bedrooms, deck square footage and material, air conditioning, specialty systems, number and type of fireplaces, lighting, interior doors and millwork, other interior features, material and labor costs, permits, fees, overhead, profit, and sales tax. Although not mentioned on the form, in order to fill out a 360 Value form on State Farm's website, a zip code is also required.

172.    In addition, Section 2695.183 specifically references the need to address the structure as a single property being evaluated, as opposed to the cost to build tract dwellings. California law is explicit in addressing the replacement cost so that it cannot rely upon the reduced cost to produce tract dwellings, and therefore the importance of estimating the rebuild of a house as a single standalone project, rather than a subdivision or tract homes, which can achieve reduced cost through economies of scale. ISO's faulty data is based upon the cost to build tract homes.

173.    Defendants' acts and practices, as alleged above, are substantially injurious to Plaintiffs and State Farm policyholders; (ii) any claimed utility of Defendants' conduct is outweighed by the harm to Plaintiffs and similarly situated State Farm policyholders; and (iii) the injury is not one that consumers reasonably could have avoided.

174.    Defendants' acts and practices constitute unfair, unlawful, and/or fraudulent business practices in that they are likely to deceive a reasonable consumer by causing policyholders, like Plaintiffs, to believe that State Farm and ISO had accurately calculated replacement costs in the event of a loss to their homes. Had Plaintiffs not been misled, Plaintiffs would have used alternative means of calculating the replacement costs of their homes, and would not have relied on Defendants' calculations and recommendations to adopt their policy limits.

175.    Defendants represented themselves as experts regarding the calculation of replacement costs, and Plaintiffs could not reasonably be expected to learn or discover the true facts related to these calculations without accurate disclosure.

176.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs have suffered injury in fact and lost money or property, in that they suffered monetary loss from having their policy limits set too low and rebuild cost substantially undervalued as a result of Defendants' unfair business practices.

177.    Defendants' misrepresentations and omissions regarding the calculation of replacement value on Plaintiffs' homes were material and likely to deceive reasonable consumers such as Plaintiffs.

178.    Pursuant to section 17203 of the California Business and Professions Code and available equitable powers, Plaintiffs are entitled to a preliminary and permanent injunction enjoining

Defendants from continuing the unlawful and unfair business practices described above. This specifically includes Plaintiffs' demand to have State Farm adjust their claims without respect to the policy limits set forth in their homeowners insurance policies. In addition, Plaintiffs are entitled to recover reasonable attorneys' fees pursuant to Section 1021.5 of the California Code of Civil Procedure.

## EIGHTH CAUSE OF ACTION
### (Violation of California Cartwright Act - Bus. & Prof. Code, Section 16700 et seq.)

179.   Plaintiffs repeat and re-allege paragraphs 1 through 178 of this Complaint and incorporate them by reference, as though fully set forth herein.

180.   California Bus. & Prof. Code Section 16727 prohibits charging a price discount where the effect of such sale may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State.

181.   Plaintiffs' allege that Defendants engaged in price fixing through the Illusory Coverage Scheme to sell fraudulent homeowners insurance policies at a reduced rate. Here, State Farm  and Verisk are offering insurance by the exclusive use of this software system, methodology and data sets, disadvantaging homeowners and other insurance companies not using these software, methods and data.

182.   In addition, Plaintiffs allege that Defendants have violated Cal. Bus. & Prof. Code Section 17043 by selling products at prices below the Defendants cost in the intent to injure the complaining party or destroy competition.

183.   Plaintiffs acknowledge that as an insurance company, State Farm makes its money by gambling on aggregate risk spread out over many home insurance policies. In the case of the Wine Country Wildfires, State Farm intentionally issued fraudulent policies to many California homeowners, with the knowledge that the actually policy coverage would not be enough to rebuild in the event of a total loss. Plaintiffs contend that State Farm could not possibly recoup its cost for actual building replacement coverage for all of the individual policies issued, if they were indeed issued at the correct replacement value. Therefore, State Farm is actively, intentionally and fraudulently selling products at prices below its own cost.

184.   State Farm and Verisk engaged in predatory pricing conduct, by selling policies that State Farm knew would not cover the replacement of the insureds' homes, with the express intention of not

providing full replacement cost insurance coverage to insureds following a loss or damage to their homes.

185.   The undervaluation and subsequent discounted policies sold to State Farm's insureds were below an appropriate measure of the cost of adequate homeowners insurance. State Farm has been able to increase its sales volume and further saturate the market because the fraudulently inadequate policies it sold were cheaper than those offered by other insurance companies.

186.   Plaintiffs demand treble damages, all legal and attorney fees, and injunctive relief as allowed by the Cartwright Act.

## NINTH CAUSE OF ACTION
### (Violation of Unfair Or Deceptive Acts In The Business Of Insurance)

### As to Defendant State Farm

187.   Plaintiffs repeat and re-allege paragraphs 1 through 186 of this Complaint and incorporate them by reference, as though fully set forth herein.

188.   California Insurance Code Gen. Regulations Article 6.5 Section 790.03 defines unfair and deceptive acts in the business of insurance. Plaintiffs allege that State Farm violated Section 790.03(a) when it intentionally misrepresented its 360 Value tool as being equivalent to obtaining a contractor's estimate for the rebuild cost of a home in order to issue an initial insurance policy. State Farm intentionally misled Plaintiffs to believe that the zip code calculator would provide them with an insurance policy that could be relied upon to provide enough funds to rebuild their homes.

189.   By making these misrepresentations on its website, State Farm violated Section 790.03(b) disseminated an untrue, deceptive and misleading statement: *"The most appropriate way to estimate the replacement cost of your home is to hire a building contractor or other building professional to produce a detailed replacement cost estimate. Or your State Farm agent can utilize an estimating tool from Xactware Solutions to assist you with an estimate."* Exhibit 4.

190.   As discussed later in this complaint, State Farm's Illusory Coverage Scheme was intended to create, and assisted State Farm in creating, a monopoly, which is a violation of Section 790.03(c).

191.   State Farm has also violated Section 790.03(h) for knowingly committing with such frequency as to indicate a general business practice, by violating the following sections:

(1) Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.

(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

(3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.

(4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured.

(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

(6) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered.

(7) Attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he or she was entitled by reference to written or printed advertising material accompanying or made part of an application.

(11) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information.

(13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement.

192.    ISO is liable to Plaintiffs for intentionally understating what it knew to be the average and/or reasonable and/or otherwise appropriate construction and/or replacement cost for goods and services, with the knowledge and/or foreseeable expectation that State Farm would rely upon this data in the making of unconditional cash value or other payments to Plaintiffs. Such conduct on ISO's part was intentionally designed to maximize ISO's profits and revenue, while causing injury to Plaintiffs.

193.    In addition, and in the alternative, Plaintiffs respectfully submit that Defendant ISO is solidarily liable to Plaintiffs and the Proposed Class for conspiring with State Farm to intentionally violate the terms and provisions of their insurance policy contracts with Plaintiffs, the California Anti-Monopoly Statutes and/or the California Insurance Code, in accordance with California Civil Code.

**TENTH CAUSE OF ACTION**
**(Violation of US Code Title 15 Sherman Act - Cartel)**

194.    Plaintiffs repeat and re-allege paragraphs 1 through 193 of this Complaint and incorporate them by reference, as though fully set forth herein.

195.    The McCarran-Ferguson Act does not exempt insurers from conspiring to fix prices as a cartel. State law provides many protections to Insurance Companies, until and unless their activities go outside of the field of insurance.  Here, State Farm has ventured into the world of data analytics, combining the efforts of the largest insurance company in the U.S. with a global, multinational corporation that is invested in software and data.

196.    Together, these companies are driving the field of insurance by the exclusive use of this software system, methodology and data sets, disadvantaging homeowners and other insurance companies not using these software, methods and data. These two businesses have combined their activities to flood the market and sell a high volume of lowballed, fraudulent homeowners insurance policies, to the detriment of the policyholders.  In effect State Farm and subcontractor Verisk are working together as a vertical cartel.

**ELEVENTH CAUSE OF ACTION**
**(Violation of US Code Title 15 Sherman Act - Monopoly)**

197.    Plaintiffs repeat and reallege paragraphs 1 through 196 of this Complaint and incorporate them by reference.

198.    The McCarran-Ferguson Act does not exempt insurers from conspiring to fix prices or otherwise restrict competition. The Act was designed to ensure the preeminence of state regulation, not to free insurers from federal antitrust laws.

199.    State law provides many protections to Insurance Companies, until and unless their activities go outside of the field of insurance.  Here, State Farm has ventured into the world of data analytics, combining the efforts of the largest insurance company in the U.S. with a global, multinational corporation that is invested in software and data.  Together, these companies are driving the field of insurance by the exclusive use of this software system, methodology and data sets, disadvantaging homeowners and other insurance companies not using these software, methods and data.

200.    Through their monopoly on the market, these companies are creating an industry standard that utilizes zip code and square footage data in lieu of interviews, property visits, and appraisals by

licensed professionals to establish face value insurance policy underwriting limits.  For State Farm customers, they are using 360 Value software, which could potentially deliver reasonable results, but those depend on adequate training an understanding of the ramifications of the input decisions on the protection of the homeowner's interests.

201.   Further the Xactware construction cost estimating software has become ubiquitous in the home insurance market, to the level of monopoly, but it is based upon data that comes from manufactured housing rather than in situ residential construction, and it makes no distinction for key features of the development in which a structure is situated, nor any provision for addressing the age of the structure nor the other structures on the property.

202.   The purpose of the Sherman Act is to protect the public from the failure of the market. Verisk maintains a monopoly on construction cost data in the United States, which it provides to both State Farm and the insurance industry market as a whole. State Farm's and Verisk's continued course of procedure, as outlined in this complaint, is an attempt at conspiracy to monopolize the homeowners insurance industry. The signs of insurance and construction data market failure are now beginning to show, as uncovered by the thousands of underinsured homes totally destroyed in the Wine Country Wildfires, where the homeowners are unable to recover and return home. The devastating losses suffered by Plaintiffs are the canary in the coal mine of insurance market failure.

203.   State Farm possesses monopoly power in the United States home insurance market. State Farm and Verisk engaged in predatory pricing conduct, by selling policies that State Farm knew would not cover the replacement of the insureds' homes, with the express intention of not providing full replacement cost insurance coverage to insureds following a loss or damage to their homes.

204.   The undervaluation and subsequent discounted policies sold to State Farm's insureds were below an appropriate measure of the cost of adequate homeowners insurance. State Farm has been able to increase its sales volume and further saturate the market because the fraudulently inadequate policies it sold were cheaper than those offered by other insurance companies.

205.   Further, there is a dangerous possibility that State Farm will be able to recoup its investment in below-cost prices due to the market share it commands, and the fact that the policies it sold will not actually cover the cost to rebuild following the total loss of the policyholders' homes. This is truly a race to the bottom for policyholders, effectively incentivizing the sale of "junk" homeowners insurance policies by other insurance companies.

206.    State Farm's substantial, durable presence and market power in California has been brought about by State Farm's fraudulent conduct, through its Illusory Coverage Scheme of undervaluing homeowners insurance policies and thereby increasing its sales volume and market share. State Farm maintains its monopoly power by continued pernicious monopolizing conduct through fraud and other improper means as alleged in this complaint.

### TWELFTH CAUSE OF ACTION
### (Violation of US Code Title 15 Sherman Act - Conspiracy)

207.    Plaintiffs repeat and reallege paragraphs 1 through 206 of this Complaint and incorporate them by reference, as though fully set forth herein.

208.    The McCarran-Ferguson Act does not exempt insurers from conspiring to fix prices.

209.    The Plaintiffs allege that State Farm and Verisk, both persons and two major industry entities, intentionally agreed to violate state and federal law and defraud their customers, and committed to performing the Illusory Coverage Scheme in furtherance of the agreement.

210.    State Farm and Verisk have conspired to eviscerate the Plaintiffs' life savings, without regard for how they are manipulating data and departing from standard local business practices in delivering qualified estimates of property values and construction costs.  They are doing this without license to operate in the fields of real estate and construction, but nonetheless acting with the upper hand due to their tremendous power in market, their volume allows them to disadvantage the Plaintiffs and many similarly situated families.

211.    Plaintiffs allege that Defendants colluded and conspired to build this system comprised of software products, process, and data, including training agents and setting up internal processes, which disadvantages the homeowners at each level of dealing with the insurance and claims process.

212.    Furthermore, Plaintiffs allege that the Verisk data has been intentionally used in ways that it was not designed.  State Farm has moved to stand firmly behind Verisk's generic zip code data, as if that represents any information of interest to a unique subject property.  While it may be good for the insurance industry to try to create a tool that can address their larger demands, the appropriate solution is to create a tool that actually quantifies and protects customers individual needs for homeowners insurance.

### THIRTEENTH CAUSE OF ACTION
### (Violation Of California Products Liability Act)

213. Plaintiffs repeat and re-allege paragraphs 1 through 212 of this Complaint and incorporate them by reference, as though fully set forth herein.

214. Plaintiffs allege that the Defendants designed and sold a defective insurance product, which was inherently a defective product at the time that the insurance policy was issued. Plaintiffs used the insurance policy in a reasonably foreseeable manner and Plaintiffs have suffered harm as a result of the defective policies.

215. The insurance Illusory Coverage Scheme was defectively designed from its inception. Using the Consumer Expectation Test, the insurance coverage did not perform as safely (or at all) as an ordinary customer would have expected when looking to apply homeowner's insurance coverage for reconstruction of the home following a total loss. An ordinary customer would have applied their insurance coverage to rebuild, but State Farm's intentionally undervalued policy is not enough money to do so. Therefore, the result of the underinsurance was Plaintiffs' injury - the remaining outstanding and unreachable funds necessary to rebuild the lost home.

216. Alternatively, under the inadequate or failure to warn doctrine, State Farm failed to warn the Plaintiffs and others similarly situated that its Illusory Coverage Scheme had the potential risk of not covering the policyholder's actual cost to rebuild following a total loss of home. This risk of not achieving coverage to rebuild was known by State Farm in light of general industry knowledge at the time the policy was issued. However, an ordinary customer would not have recognized this risk, and State Farm failed to adequately warn or instruct policyholders of this potential risk, and the failure to properly warn was a substantial factor in causing the harm, namely not enough coverage in the policy to rebuild following a total loss.

217. In addition, Defendant ISO is liable to Plaintiffs for the economic damages suffered by Plaintiffs whose unconditional payments were less than what they should have been, due to the defective underlying data within the ISO software. The ISO software presented an unreasonable danger of economic injury, as there existed an alternative feasible product that was capable of preventing the Plaintiffs' damage. This alternative feasible product is ISO home valuation software data applied with fair, reasonable, average and otherwise appropriate, rather than devalued and deflated, construction and/or replacement cost data. Such alternative design data was available to ISO without any increased burdens, in terms of either technological feasibility or cost. ISO is therefore alternatively liable to Plaintiffs and the Proposed Class under the California Products Liability Act.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the alleged Class request that the Court enter an order or judgment against the Defendants, and each of them as named in the future, as follows:

1. For an award of Plaintiffs' past, present and future general, special, actual, and compensatory damages as proven at time of trial;

2. For reformation of Plaintiffs' insurance policies to mandate Coverage A at the true cost of rebuilding Plaintiffs' dwelling, and increasing all coverage limits commensurate with the new value of Coverage A, notwithstanding the stated policy limits;

3. For attorneys' fees, expert fees, consultant fees, engineering fees, related costs, and litigation costs and expense, as allowed under California Code of Civil Procedure § 1021.9;

4. Emotional distress damages for fear, worry, annoyance, disturbance, inconvenience, mental anguish, and for such other and further relief as the Court shall deem proper, all according to proof;

5. For punitive/exemplary damages pursuant to California Civil Code §3294 and or US Code Title 15, Section 1, Chapter 15;

6. For prejudgment interest, according to proof, and interest, as allowed by law;

7. For all costs of suit incurred;

8. For injunctive relief:

   a. enjoining State Farm from adjusting claims by applying policy limits based on the use of 60 Value and/or Xactware without detailed interviews, site visits, and explanations;

   b. compelling State Farm to provide better training to agents and adjusters in the use of any software they disseminate for underwriting policies or estimating construction costs;

   c. compelling State Farm to provide a second verification that the underwriting and policy values proposed will adequately protect homeowner's in the event of catastrophic loss;

   d. and enjoining all other continuing unlawful and unfair business practices.

9.   For such other and further relief which this Court deems just and proper.

Dated:  December 7, 2018

by:   /s/ Julia Donoho

Julia Donoho (SBN 263966)

Attorney for Plaintiffs and the Proposed Class

by:   /s/ Rebecca McWilliams

Rebecca Mc Williams (Pro Hac Vice)

Attorney for Plaintiffs and the Proposed Class