Julia Donoho, Esq. (SBN  263966)
Rebecca McWilliams, Esq. (Pro Hac Vice)
**POLICYHOLDER PROS**
250 D Street, Suite 214
Santa Rosa, CA  95404
(707) 849-4116
*galgadot@policyholderpros.com*
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN SHEAHAN and ALISON SHEAHAN, as husband and wife; DOUGLAS POPE and SUSAN AHART as husband and wife; NEIL WYLIE and SANDRA WYLIE, as husband and wife; MADONNA DAY, as a single woman; CARLOS PLASMAN, as a single man; GARY DENNIS and MARYLOU DENNIS as husband and wife; DIANE MALNEKOFF, as a single woman, and et.al. | Case No.:   18-cv-06186-EMC<br>JUDGE: Honorable Edward M. Chen<br><br>**THIRD AMENDED COMPLAINT**<br><br>1.  NEGLIGENT MISREPRESENTATION;<br>2.  NEGLIGENCE;<br>3.  VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW;<br>4.  VIOLATION OF CALIFORNIA CARTWRIGHT ACT;<br>5.  VIOLATION OF US CODE TITLE 15 SHERMAN ACT – CARTEL<br>6.  VIOLATION OF US CODE TITLE 15 SHERMAN ACT – CONSPIRACY |
| Plaintiffs, | |
| v. | |
| STATE FARM GENERAL INSURANCE COMPANY, an Illinois company; VERISK ANALYTICS, Inc., INSURANCE SERVICES OFFICE, Inc., and XACTWARE SOLUTIONS, Inc., Delaware Corporations, all doing business in California; | Jury Trial is Requested |
| Defendants | |

## JURISDICTION AND VENUE

1.  This civil case is an original complaint filed in federal court including state and federal claims.

2.  The state claims arise under California and common law, for negligent misrepresentation against defendant State Farm General Insurance Company, ("State Farm"), and for negligence, unfair business practices, and violations of the Cartwright Act, against State Farm and Verisk Analytics, Inc. ("Verisk"), and its related organizations Insurance Services Office, Inc. ("ISO") and Xactware

Solutions, Inc. ("Xactimate").  Verisk holds a monopoly providing defective financial technology software tools, and they have conspired with State Farm in the negligent and unfair business practices.

3.  The federal claims arise under Section 1 of the Sherman Act (USC Title 15 §1), and brought under Section 4 of the Clayton Act, with allegations for antitrust hub and spoke cartel and antitrust conspiracy against both defendants Verisk (hub) and State Farm (spoke).  Verisk holds a monopoly providing defective financial technology software tools, and they have conspired with State Farm in to harm policyholders.

4.  The Clayton Act allows for a private right of action to enforce the Sherman Act and for a private civil cartel class action under Rule 23 of the Federal Rules of Civil Procedure.

5.  This court has jurisdiction pursuant to the following statutes:

  a.  28 U.S.C. §1331 which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States.

  b.  28 U.S.C. §1367 which gives district court supplemental jurisdiction over state law claims.

6.  Venue is appropriate in this district under 28 U.S.C. §1391 because the events that give rise to this complaint arose in this district.  (See Declaration of Brain Sheahan)

**DEMAND FOR JURY TRIAL**

7.  Plaintiff hereby demands a trial by jury of all claims and causes of action for which a jury is available under the law.

**BACKGROUND**

8.  **1990's:**  After the Oakland Hills fire in 1991, insurers suffered big losses when contractors who rebuilt homes after disaster took advantage of the "Guaranteed Replacement Cost" coverage to charge premium rates.  The moral hazard of that coverage invited excessive market escalation and insurers became determined to control post-disaster construction costs and claims payments.  By 1997, "Guaranteed Replacement Cost" went away in California.

9. **MCKINSEY:** "Allstate and other insurers hired the mega-consulting firm McKinsey & Company to develop new strategies for handling claims."[1]  They advised insurers to control risks and drive profits using software. McKinsey wrote reports and consulted with insurers including State Farm, Allstate, Farmers, Liberty Mutual, etc.  From 1994, they advised making the claims process into a profit center by undergoing Claims Core Process Redesign (CCPR).[2]

10. **ISO:** Insurance Services Office (ISO) "was formed as an association of insurance companies to gather statistical data and other information from insurers and report to regulators, as required by law."[3] Since 1971, ISO has provided advisory services and information to many insurance companies, and provided standard forms and policies to insurers. They now offer many tools for insurance companies, including software provided to agents to create reports of property values that facilitate underwriting and speed up policy issuance. Reports are generated without owner input or agent visits to sites, despite the huge financial importance.

11. **IPO FLIP**:  Insurers that used these tools were able to issue more policies, faster, and grow in the marketplace. ISO was created by the insurance companies, served insurance companies, and grew with them. ISO reorganized from non-profit to an IPO with an independent board after a six-year antitrust challenge from 20 AG's.[4] "On May 23, 2008, in contemplation of our initial public offering, or IPO, ISO formed Verisk Analytics, Inc., … to be the holding company for our business. Verisk was initially formed as a wholly-owned subsidiary of ISO. On Oct. 6, 2009, in connection with our IPO, the Company effected a reorganization whereby ISO became a wholly-owned subsidiary of Verisk."[5] The IPO of Verisk was essentially a tax play and reorganization. As well as a valve by which the owners could cash in some equity.[6] The insurers profited largely by their investment in data and continue to do so in big ways.

---

[1]  Jay M. Feinman, *Delay, Deny, Defend: Why Insurance Companies Don't Pay Claims and What You Can Do About it"* (Delden Press, 2010)
[2] Ibid., 61.
[3] *2013 Annual Report Verisk Analytics, Inc.,* SEC Form 10-K, p. 67.
[4] https://law.justia.com/cases/federal/district-courts/FSupp/723/464/1630284/
[5] Ibid, SEC Form 10-K, p. 4.
[6] See: https://www.reuters.com/article/verisk-idUSN0533161120091007
" All 85.25 million shares in the IPO were being sold by Verisk's existing shareholders "  Who were the existing shareholders? Principal:  ESOP, Chubb, Berkshire Hathaway, AIG, CNA, Travelers, Hartford Great American, and execs from ISO/Verisk. Other Stockholders:  30 Insurance companies, and 34 affiliated industry individuals.
https://www.sec.gov/Archives/edgar/data/1442145/000095012309049069/y78574b4e424b4.htm#112

12. **VERISK:** Verisk's goals became more comprehensive.  "The mission of Verisk Analytics is to help our customers see, understand, and manage risk — and to profit from the risks they assume."[7]  In addition to analytics and catastrophe modeling, Verisk moved beyond risk and loss prediction into a more complete suite of products that are utilized for valuation, policy issuance, claims management, predictive modeling, underwriting, construction costs, etc.

13. **XACTWARE:** In 2006, before the IPO, ISO acquired Xactware Solutions, Inc., purveyor of Xactimate, a construction estimating tool that is now being used by the adjusters for most major insurers, primarily during the claims process.  This is a tool designed to control claims payments using data developed from the manufactured home industry, and discounted labor and materials form insurance companies preferred providers, applying a kit of parts approach that is not reflective of market conditions.  The homeowner is mostly excluded from this process, and it is a hidden activity which has tremendous effects on their net worth.

14. **MORAL HAZARD SHIFT:**  The moral hazard of over or under estimating property values and construction costs shifted over to the insurance companies when insurers started using these tools because the reports are now dictating property values, policy limits, and/or controlling the cost of rebuilding whole communities without serious input of local real estate appraisers, general contractors, and the actual property owners.  These are "fake" reports.

15. **NATION-WIDE PROBLEM:**  This invasion of homeowner's financial privacy and personal rights with fake reports, is a nation-wide problem designed to ensure that the industry profits from disasters.  The reports mine data that is personal and don't verify their sources with legitimate local resources. Agents don't know what they are selling, homeowners don't know what they are buying, and adjusters don't understand the impact of their work on the homeowners nor the communities.  There is no "Truth in Insurance."  The whole system is in trouble.  Software competitors are falling away and the growth of insurance companies using Verisk tools have outpaced the rest of the market and become ubiquitous.

16. **UNITED POLICYHOLDERS**:  A non-profit that helps homeowners states, "After every wildfire UP has worked since 1991, over 50% of the victims who thought they were fully insured turned out to be insured for less - often far less - than they needed to cover repairs and rebuilding.  We refer to this

_____
[7] Ibid., *2013 Annual Report,* p. 15.

as **"the underinsurance crisis."**  Solving it remains one of our top priorities.  The vast majority of people are underinsured through no fault of their own.  When they bought their insurance, an agent or insurer set the dollar amounts of coverage on their home and assured them those dollar amounts would be adequate for replacing the home,"[8] but were not.

17. **BUCK DOES NOT STOP:**  Verisk is not selling insurance or software to consumers. They are creating tools for insurers that create report products that are elements and expenses of their insurance package. The reports generated by Verisk software are eviscerating the life savings of good Americans. Verisk feigns a lack of responsibility and hides behind an ephemeral screen of "economic loss doctrine," pointing back at the insurance companies and how they use the tools. Insurance companies sidestep their responsibility with assertions that they have only a general duty to sell insurance.  Both are hiding from antitrust and trying to cloak themselves with McCarran Ferguson Act.  But, without recourse or accountability, the buck does not stop. The goal of CCPR recommended by McKinsey was to monopolize the market and drive profits regardless of the effect on homeowners. They have succeeded.  Verisk is now advertising that their software helps insurers develop obscene profits in the face of major calamities, $34 billion in profits in the first half of 2018.[9]  Verisk has grown to be a multi-national data analytics company, in 32 countries, with no competition or control. The pendulum of moral hazard has swung to the profiteers.

18. **KATRINA:**  The first big challenge of the McKinsey Report ,"CCPR," and Xactware software came after Katrina when Attorney General Foti, a New Orleans resident, worked with five local law firms to file a horizontal antitrust suit alleging conspiracy, collusion and price fixing against eight major insurers, with Xactware, Marshall and Swift, and McKinsey & Company[10]. One year into the case, the Attorney General lost his re-election to a local district attorney from Shreveport who refused to prosecute the case, and it did not survive a Rule 12 motion that was resisted pro bono, making it impossible for the case to progress.

---

[8] *Association of California Insurance Companies et al. v. Dave Jones, in his capacity as Insurance Commissioner for the State of California,* 2016, B248622/S226529, California Supreme Court

[9] "Property/Casualty Insurance Industry's Net Income More Than Doubles to $34 Billion in First-Half 2018," Verisk Analytics Press Release, Jersey City, N.J., October 15, 2018.

[10] *State of Louisiana, Ex Rel, Charles C. Foti, Jr. v. Allstate Insurance Company, Lafayette Insurance Company, Xactware, Inc., Marshall & Swift/Boeckh, LLC, Insurance Services Office, Inc., State Farm Fire And Casualty Company, USAA Casualty Insurance Company, Farmers Insurance Exchange, Standard Fire Insurance Company, McKinsey & Company.* Parish of Orleans Division L-6, Case #07-14595.

19. **FINANCIAL TECHNOLOGY:**  The President of Verisk, claims that Insur-Tech is the way of the future in this YouTube video  https://www.youtube.com/watch?v=ckq0E8QNMRY. Verisk may have a whole host of insurance technology tools, but the two software systems that are addressed in this suit are not insurance tools.  These financial technology instruments are using big data without accurate verification to predict individual asset values, with little inquiry, controls, consistency or communication. Verisk's objectives are to "simplify consumer's interaction and dramatically reduce the time to acquisition to **1 minute or less**."[11] Insurance companies are invading a person's financial assets and playing games with their personal wealth, and the system has no checks and balances.  Net worth is "Gone in 60 Seconds."



| EXAMPLE A | | $860k |
|---|---|---|
| | $550k | |
| ($346k) | | |
| $288k | | |
| **Agent - Policy issued** | **Adjuster - Estimated** | **Builder - Actual costs** |
| 360 Value - Zip Code Calculator | Xactimate - Claims Limit | Construction Costs |
| Coverage A is $288k, *(policy limit with replacement cap is $346k)* | Adjuster's estimate exceeds Policy Limit by $204k | Contractor's budget exceeds claims payment by $514k |

20. **SHAVING DRIVES HUGE PROFITS:**  We live in a bold new age of big data and analytics.  Rapidly understanding the impact of new applications of big data and schemes of monopoly that disadvantage the consumer are essential. As insurers use these tools, they drive down their own prices to be competitive and gain market share by minimizing the risk and the obligations to their bottom line, without concern for the real impact they are causing to homeowners (Example A) They are shaving a few dollars off their policy to monopolize the market, but causing homeowners in the same instant to lose **hundreds of thousands of dollars** from net worth.  The disparity of shaving a policy, and the huge losses homeowners suffer from this activity is staggering.

21. **HUB AND SPOKE CARTEL:**  Verisk is the hub of a larger anticompetitive scheme and each insurer is its own spoke.  State Farm is the largest offender, because they use the tools more harshly to seize a greater market share, and that is why they are named in this suit.  State Farm's application of these tools fails to provide values or estimates within a 10% window of consistency one to the next, or with the market.  We call on the court to now look into this whole system and find a pathway

---

[11] *Verisk Underwriting Report 2015*, John F. Petricelli, VP Verisk Analytics, and Bill Ayscue, Sr. Product Manager, March 10, 2015.

that respects the privacy and the values of the consumer first and creates a reliable, reasonable, and predictable system.

22. **MCCARRAN FERGUSON:**  Passed in 1945**,** with a narrow exception for insurance, the McCarran Ferguson Act (15 U.S.C.A. § 1011 et seq.) did not intend to create antitrust protections for financial technology products that invade personal financial assets.  Mortgages are regulated by the Financial Industry Regulatory Authority (FINRA). Financial data is protected by the Fair Credit Reporting Act (FCRA). Offering financial tools in the insurance arena does not take Verisk out of federal oversight for antitrust, FCRA and FINRA responsibility, nor absolve of responsibility under state laws for practicing appraising and contracting without a license.

23. Verisk sells their defective software tools in various industries, not just to insurance companies. They strive for complete market dominance.  They are a monopoly.  State Farm's use of these tools with promises to provide better insurance coverage by use of the tools does not shield them with the McCarran Ferguson protections.  Software is not insurance.  Reports generated from software are products of the moment in time when they are created, and are intended to limit net worth rather than protect assets. If they are inaccurate, homeowners lose their life savings. Therefore, the McCarran Ferguson Act does not apply here. In addition, State Farm is specifically using the big data software tools in a way that makes the insurance policies fail, applying their own algorithm to ensure failure of the product, thereby epically failing to protect the assets of the consumers who are looking to these particular policies for protection.

24. The #EPICFAILURE of the system is not something to be protected.  #FAKEREPORTS cannot hide under a 1945 act. These activities are unregulated, unlicensed, and out of control.  In *Spectrum Sports, Inc. v. McQuillan* 506 U.S. 447 (1993) the Supreme Court said: "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public **from the failure of the market**."

**INTRODUCTION**

25. This is an alleged Class Action lawsuit against State Farm and Verisk for underinsuring residential properties at POLICY ISSUANCE, then undervaluing construction costs in the CLAIMS PROCESS following losses from disaster.  This is a one-two punch – harming policyholders by underwriting

policies with artificially low limits, and compounding the injury with artificially low construction cost estimates during the claims process.

26. State Farm and Verisk have conspired together to create and apply defective financial technology tools for POLICY ISSUANCE and the CLAIMS PROCESS that are not being utilized to issue proper insurance, but instead to drive their own profits on the backs of policyholders' losses.

27. While Verisk provides these tools to more than one insurance company, in working with State Farm they have developed the tools to conform to specific algorithms and costs specified by State Farm.

28. By 2017, State Farm and Verisk had sufficiently developed this technology and they had enough experience data to the point where they knew or reasonably should have known that policies were artificially low and would cause serious harm to the policyholders in the event of a disaster, yet they did not act to remedy the underinsurance or to inform the policyholders.

29. The inconsistency of values from one tool at POLICY ISSUANCE to the next at CLAIMS PROCESS, despite the complete control of the data, indicates that State Farm and Verisk are acting in concert to apply algorithms to the data differentially, and causing great harm.

30. Despite control of the technology, the construction cost and market value information, and the shared experience data, State Farm and Verisk did not create any alignment of these software tools with each other or with the local markets, nor did they capture the nuances of market conditions.

**POLICY ISSUANCE**

31. Agents of State Farm ("Agents") are captive agents – in that they only work for State Farm and their actions are the actions of State Farm.  Agents are not licensed real estate appraisers or contractors, and receive only minimal training in housing valuation.

32. State Farm Agents had to write policies that were artificially low to provide competitive prices, and they have no incentive to update policies.

33. State Farm provides Agents with "zip code calculators" as underwriting tools to give guidelines to Agents for policy limits. Agent inputs the house size and zip code and the calculator gives them a valuation for Coverage A of the policy.  Coverage A drives all other policy limits.

34. Agents abandoned the reasonable care, diligence, and judgment in procuring the insurance requested by relying on the tools provided by State Farm. Agents did not visit sites.  Agents asked very few questions about the properties. Agents acted in reliance on the underwriting tools as

provided. Further, Agents treated the zip code calculators as proprietary secret information and did not show the zip code calculator results to the policyholder, and generally discussed only the cost of coverage with the policyholder at the time of issuance.

35. At all times, Agents represented that policy limits were sufficient for policyholder needs without verifying any details of properties and often based on wrong or incomplete information.

36. Guaranteed Replacement Cost - Older policies were issued with "Guaranteed Replacement" coverage, so the limits would not have mattered in the case of a total loss, but this was eliminated in the 1990's. At the time of eliminated this type of coverage, Agents did not meet with policyholders to verify adequate coverage nor did they call to review their policies.

37. Option ID – Increased Dwelling – After Guaranteed Replacement went away, Extended Replacement was provided.  The concept was to provide additional coverage in a surge demand situation such as a large disaster. Current State Farm policies only afford 20% ID coverage. If the Coverage A is set inappropriately low, say at 30-40% of cost, then the additional 20% only get the coverage up to 36-48% of costs.  This will not help in a normal environment, not to mention a surge demand experience.  Coverage A plus the 20% ID is still underinsurance.

38. Option OL - Building Ordinance and Law - State Farm policies provide for 10%, 25%, or 50% OL coverage.  Agents were not trained in building code changes and did not discuss appropriate levels of building code coverage based on the needs of the structure and did not vary this over time. Further these coverages are still insufficient to overcome the underinsurance.

39. Policyholders relied on Agents' representations and on the State Farm brand, marketing and representations in deciding to insure with State Farm and to continue renewing.  Policyholders trusted that their Agents were taking care of them and their policy needs.  Policyholders believed the slogan - "Like a Good Neighbor, State Farm is There."

**CLAIMS PROCESS**

40. State Farm utilizes in-house and contracted adjusters "Adjusters" to address policy claims after a loss.  For property claims involving built structures, they require all Adjusters to utilize Xactimate tools that they provide, which are made proprietary to State Farm's requirements.

41. Most Adjusters are not licensed contractors in the area of a disaster, but instead are trained one or two years on the software with no involvement in the local construction industry.  They apply a

"factor" in the software that is supposed to account for market conditions but does not. Further, the software is supposed to provide accurate price data for materials, but those also vary greatly depending on local market and any "factor" applied has not been sufficient.

42. State Farm provided defective software products to their Adjusters and did not train them sufficiently to use the tools in a manner to provide complete and accurate construction costs for their customers to be properly compensated at the time of loss or in their rebuilding efforts.

43. Policyholders quickly learned that these reports and underwriting tools were creating a fake insurance system using fake reports to give false underwriting valuations artificially low policy limits and false construction costs.  Policyholders discovered that State Farm did not actually insure them as they had believed and relied upon.

44. Policyholders had to seek out Contractors and Public Adjusters to get accurate construction costs, sometimes at a considerable premium from their own pocket, and when they did they found that the costs of construction far exceeded both the original policy limits and the estimated construction costs. Many had to abandon rebuilding their project, build a much smaller or lower quality structure, or add significant funds of their own to complete rebuilding.

**VERISK NEXUS**

45. Verisk holds a monopoly over the insurance industry providing these tools that they have not been licensed or regulated to provide, and that are normally provided by licensed real estate appraisers and contractors.

46. Verisk sells these tool often twice per loss – once to the insurance company Adjuster and again to the policyholder's contractor or public adjuster.  They are highly invested in the reports being incorrect so they can sell the software twice.  In fact, the adjusting process goes like this – the insurance company's adjuster is encouraged to keep the construction cost low so the first payment will be below policy limits.  Often this is achieved by leaving out items that State Law requires be included (see California Code of Regulations § 2695.183.)  Then the policyholder is forced into an adversarial mode and must procure a more accurate report to get policy limits and to ascertain the full extent of their loss.

47. Over time, the tools have become increasingly sophisticated and Verisk controls the data that the software to both underwrite and adjust claims.  Verisk continually updates their tools with new

information garnered from the use of their tools in an inward facing system that is not reflective of the real market.

48. With the State Farm and Verisk nexus, the policy issuance software and the claims process software do not align, the zip code calculator and Xactimate both fall far short of actual construction costs, and these large companies have the capacity to do better and bring more accuracy to the system.  How they are using what they have put in place is disingenuous at best and malicious at worst.

49. The difference between the zip code calculator/policy limits is generally hundreds of thousands of dollars short of the Xactimate which is in turn hundreds of thousands dollars shy of construction costs.  The differential between these software products is staggering and it is amazing to see that Xactimate users on the insurers side are often so far apart from Xactimate users on the homeowner's side.  This makes it clear the tools are built to be grossly inaccurate and unreliable.

50. The industry standard for accuracy in estimating costs is to be within 10% of actual costs.  How State Farm and Verisk are developing these tools, they are not arriving anywhere near this standard of deviation.

51. State Farm and Verisk have engaged in these negligent, unfair business practices, underinsuring Plaintiffs, and misrepresenting the qualities of their policies, and their claims process tools in order that State Farm's market share would maintain and grow and that Verisk's would maintain a monopoly in this industry

52. State Farm and the Verisk Companies are using poorly designed software tools to intentionally suck the wealth of good Americans away from them, and redirect this wealth into assets owned by insurer State Farm and data analytics behemoth Verisk. They have conspired to use artificial data for underwriting and construction cost estimating to further their objectives, developing software products that fail to deliver accurate values, causing harm to many families, and making the Verisk Companies into a multinational corporation that has a stranglehold on the insurance industry.

53. The Verisk companies have created faulty products that deliver inconsistent results, causing major financial damages to the consumers.  None of their companies are licensed as real estate professionals, insurers, financial planners, or general contractors, yet through their relationships with the country's major insurance organizations, like State Farm, their software is intentionally

valuing real estate and construction costs significantly below actual value and/or costs to become the industry standard utilized by most major insurers. Verisk shields itself with economic loss rules to insulate themselves from the harm they are causing with their products, while expanding to be a global multi-national corporation in more than 30 countries.  In the first half of 2018, Verisk claimed credit in a publicly available press release for helping the insurance industry reduce "losses" and increase after tax profits to double the profits in the first half of the previous year, resulting in earnings of $34 billion dollars.  Such "gross profits" are being won by denying the insurance companies' obligations to American families by using Verisk products.  (Exhibit 1).



### Press Release Details

**Property/Casualty Insurance Industry's Net Income More Than Doubles to $34 Billion in First-Half 2018**
10/15/2018

JERSEY CITY, N.J., October 15, 2018 - Private U.S. property/casualty insurers saw their net income after taxes more than double to $34 billion in first-half 2018 from $15.5 billion in first-half 2017, with the help of lower catastrophe losses, growing premiums, and an increase in investment income, according to ISO, a Verisk (Nasdaq:VRSK) business, and the Property Casualty Insurers Association of America (PCI).

Losses and loss adjustment expenses from catastrophes declined to $14.6 billion for first-half 2018 from $18 billion a year earlier. Net written premiums grew 13.3 percent in first-half 2018 from 4.1 percent a year earlier, affected in part by the growth in the economy, rising auto premiums, and changes that multiple insurers made to their reinsurance arrangements. Overall, insurers enjoyed a $6 billion net underwriting gain, rebounding from a $4.6 billion net underwriting loss for first-half 2017.

EXHIBIT 1

54. This is an alleged Class Action lawsuit that many plaintiffs similarly situated have suffered due to these unfair business practices and the collusion of the defendants in these practices.

### THE NORTHERN CALIFORNIA WILDFIRES

55.  On October 8, 2017, three wildfires began and raged through Northern California, joined by another eight fires, until the last fire was contained and put out on October 31, 2017. As a result of these Northern California Wildfires, 44 people died, over 8,920 structures were destroyed, 726 damaged, and 228,503 acres burned. The week of October 8-14 was the deadliest week of wildfires

in California history. The scope and scale of damage is among some of the worst from wildfires in state history. The Tubbs Fire burned between Calistoga and Santa Rosa, California. It charred 36,807 acres, destroyed 5,643 structures, and damaged 317 structures. The Atlas Fire charred 51,600 acres, destroyed 781 structures, and damaged another 120 structures, in the area's northeast of Napa, California. The Nuns Fire spread between Sonoma County and Napa County, charred 56,000 acres, and destroyed 1,355 structures.

56. These Northern California Wildfires destroyed homes in beautiful residential communities surrounded by lush, green hillsides, pristine wooded areas, and rolling vineyards. After this incredible loss, Northern California residents are determined to rebuild. Plaintiffs will not allow State Farm - through its negligence, misrepresentation, omissions and greed – to thwart their efforts to return home. State Farm's acts have resulted in cataclysmic losses to Plaintiffs, made all the worse because those losses were entirely avoidable absent State Farm's wrongdoing.

**PARTIES**

57. Plaintiffs Brian Sheahan and Allison Sheahan, husband and wife, at all times material to the allegations of the Complaint, were the property owners and residents of the property located at 3817 Moss Hollow Ct, Santa Rosa, Sonoma, CA 95404 ("Sheahan" Property).

58. Plaintiffs Douglas Pope and Susan Ahart, husband and wife, at all times material to the complaint were the rental property owners of the single-family residence at 1411 Berwick Ct., Santa Rosa, Sonoma CA 95403. ("Pope" Property).

59. Plaintiffs Neil Wylie and Sandra Wylie, husband and wife, at all times material to the allegations of the Complaint, were the property owners and residents of the property located at 2194 Chateau Ct, Santa Rosa, Sonoma, CA 95403 ("Wylie" Property).

60. Plaintiff Madonna Day, a single woman, at all times material to the allegations of the Complaint, was the property owner and resident of the property located at 3890 Highway 128, Calistoga, CA 94515 ("Day" Property).

61. Plaintiff Carlos Plasman, a single man, at all times material to the complaint was the rental property owner of the single-family residence at 2110 Trinity Rd., Glen Ellen, CA. ("Plasman" Property).

62. Gary Dennis and Marilou Dennis, husband and wife, at all times material to the allegations of the Complaint, were the property owners and residents of the property located at 5770 Crystal Dr, Santa Rosa, CA ("Dennis" Property).

63. Diane Malnekoff, a single woman, at all times material to the allegations of the Complaint, was the property owner and resident of the property located at 124 Pacific Heights Dr, Santa Rosa, CA 95403 ("Malnekoff" Property).

64. Plaintiffs are informed and believe and thereon allege that State Farm is, and at all relevant times was, an Illinois corporation doing business in California.

65. At all relevant times, State Farm General Insurance Company was authorized to transact business in the State of California, and State Farm was, and is transacting the business of insurance in the State of California.

66. State Farm's parent company is headquartered in Bloomington, Illinois, and has offices throughout the United States and Canada.

67. Plaintiffs are informed and believe that defendant Verisk Analytics, Inc. is a Delaware corporation doing business globally, with its principal place of business in Jersey City, New Jersey.  Verisk is not listed with the California Secretary of State, but through their actions their products are being utilized in California.

68. Plaintiffs are informed and believe that defendants Insurance Services Office, Inc. and Xactware Solutions, Inc. are subsidiaries of Verisk Analytics, Inc. and are Delaware corporations, which are authorized to transact business in California.  They are also headquartered in New Jersey.

69. The Verisk companies' software products are utilized for various purposes in California, including the purpose of estimating replacement values for underwriting of homeowner's insurance policies and estimating rebuilding costs after losses are incurred, to determine reimbursement obligations to insureds.

70. The true names and capacities of Does 1 through 100, inclusive, whether individual, corporate, associate, partnership, sole proprietorship, or otherwise, are currently unknown to Plaintiffs, who therefore sue said defendants by such fictitious names.  Plaintiffs will seek leave of court to amend this Complaint to show their true names and capacities when the same has been ascertained, or according to proof at the time of trial.

71. Plaintiffs are informed and believe thereupon allege that at all times mentioned herein, each of the defendants was the agent of each of the remaining defendants and, in doing the things hereinafter alleged, was acting within the course and scope of such agency and with the permission and consent of its co-defendants.

### GENERAL ALLEGATIONS REGARDING PLAINTIFF'S CLAIMS

72. Plaintiffs are, and at all times were, the designated and named insureds under homeowner's insurance policies issued by State Farm. The policies were in full force and effect at all times relevant to the allegations contained herein. Plaintiffs are informed and believe and thereon allege that the policies provide coverage to Plaintiffs for losses sustained to their homes and other property as a result of wildfires.

73. Since Plaintiffs first purchased their policies, Plaintiffs have paid premiums and performed each act required on their part to keep their policies in full force and effect.

74. The Verisk Companies are purveyors of a digital databases of home construction information. The Verisk Companies have two software products which they provide to State Farm and other national insurers. "360 Value" is a zip code calculator, used by State Farm to determine the homeowner's initial policy value. "Xactimate" is a construction valuation software used by State Farm to determine the cost to rebuild or repair the property.

75. State Farm is a purveyor of insurance. Insurance is a vital and quasi-public service. As a supplier of a public service, State Farm must give as much consideration to the interests of its policyholders as it does to its own interests. The obligations of State Farm go beyond meeting reasonable expectations of coverage; the obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of an insurer. Indeed, insurers hold themselves out as fiduciaries and holders of the public's trust, and therefore, must perform their obligations in good faith. The relationship between State Farm and its insured is thus, at very least, a quasi-fiduciary relationship which imposes fiduciary-like duties on the insurer.

76. Because it is well-recognized that the relationship between the insurer and insured is characterized by unequal bargaining power, where the balance of power rests with the insurer, insurers such as State Farm are bound to "special" and "heightened" duties akin to fiduciary duties. This duty is

relevant to the insurer's conduct during the offer and sale of a policy or certificate, as recognized by California Insurance Code § 785(b) ("Section 785").

77. Pursuant to Section 785, insurers, brokers, and agents owe a special duty of honesty, good faith, and fair dealing to prospective insureds who are 65 years old or older, in addition to any other express or implied duty owed. Upon information and belief, the proposed class will include Plaintiffs 65 years old or older.

78. State Farm provides a software tool for their agents called 360 Value. This tool is a zip code calculator, using lowest common denominator data to set values, and without detailed input it gives a generic, tract-home type cost valuation. After a detailed inventory and input, including a site visit to document the insured property and carefully applied by a trained agent, 360 Value can deliver an accurate result. Unfortunately, whether intentionally or by negligence, most State Farm agents do not use 360 Value in the correct manner to achieve an accurate result. The 360 Value result is used as the face value of the State Farm policy issued, or often with a 10% increase, leading to a steeply underinsured property. Misapplication of 360 Value to set policy limits prior to a major disaster has proved to be catastrophic to the Plaintiffs.

**State Farm**

SHEAHAN, BRIAN                                                                            05-1679-F04

| | | | |
|---|---|---|---|
| Insured: | SHEAHAN, BRIAN | Estimate: | 05-1679-F04 |
| Property: | 3817 Moss Hollow CT | Claim Number: | 051679F04 |
| | Santa Rosa, CA 95404-1567 | Policy Number: | 57-BL-C699-2 |
| Home: | 707-527-7540 | Price List: | CASO28_JAN18 |
| Cellular: | 707-483-8184 | | New Construction |
| Type of Loss: | Fire | | |
| Deductible: | $5,000.00 | | |
| Date of Loss: | 10/9/2017 | | |
| Date Inspected: | 10/22/2017 | | |

**Summary for Coverage A - Dwelling - 33 Fire, Lightning, & Removal**

| | |
|---|---|
| Line Item Total | 809,219.02 |
| California Carpet Stewardship Assessment Fee | 25.66 |
| California Lumber Assessment Fee | 911.68 |
| Material Sales Tax | 34,179.20 |
| Subtotal | 844,335.56 |
| General Contractor Overhead | 84,434.21 |
| General Contractor Profit | 84,434.21 |
| Replacement Cost Value (Including General Contractor Overhead and Profit) | 1,013,203.98 |
| Less Deductible | (5,000.00) |
| Less Amount Over Limit(s) | (204,143.98) |
| Net Payment | $804,060.00 |

EXHIBIT 2

---

79. State Farm represented to Plaintiffs that following the Northern California Wildfires, it was using a software replacement tool to calculate their homes' rebuilding costs. This tool purportedly allowed State Farm to precisely calculate the cost of replacing Plaintiff's homes given the specific characteristics of each home. Following a loss, State Farm uses a software tool called Xactimate, shown below with the estimated cost to rebuild the Sheahan home. Xactimate is based on manufactured home data, such as trailers and prefabricated homes, to price houses like a kit of parts. The underlying data provided by Verisk does not represent the true cost to rebuild homes in Northern California, and State Farm has consistently and intentionally failed to apply the appropriate local cost data to arrive at an accurate rebuild cost for the Plaintiffs' homes. Exhibit 2 shows the artificially low costs of rebuilding the Sheahan home at $804,060.  The actual construction costs when finally provided by Caymus with Abbeyside software at $2,178,811. The project became infeasible.

80. State Farm's application of Xactimate software is intentionally designed to result in an improperly low rebuilding cost for the California market, producing rebuild costs that are not tenable following a disaster.

81. By itself, Xactimate is a tool that may be used by an agent to arrive at a valuation within a 10% margin of error for construction estimation, but upon information and belief it appears that State Farm's adjusters are either not trained to, or alternatively they are intentionally misapplying the Xactimate software data to not arrive at an accurate result.

82. Below is a chart that shows the problem. For the first three plaintiffs, the initial value of the policy, and the renewal value at issuance significantly varies from the first Xactimate estimate and grossly varies from the actual construction costs.

|  | 360 /Initial Value | Coverage A Date of Loss | **Xactimate** | Actual Cost of Construction |
|---|---|---|---|---|
| Plaintiff Sheahan | $509,000 | 768,700 | **$804,060** | $2,017,614 |
| Plaintiff Pope | $170,000 | $330,851 | **$539,361** | $717,000 |
| Plaintiff Wylie | $227,400 | $513,900 | **$772,979** | $1,222,027 |

83. State Farm's ongoing inaccurate underwriting comes with the one-two punch. State Farm's use of 360 Value underwriting software initially underinsures the policy limits, which sets up the

homeowner to have a financial catastrophe, and then the Xactimate valuation software leads to an intentionally deflated rebuild cost, which corroborates the initial false undervaluation. In many cases, the homeowners never saw the information input in 360 Value software, they were not interviewed, and no one visited their house. State Farm's 360 Value output and subsequent Xactimate price are so far apart that there is no way for the homeowner's Replacement Cap and Building Code Upgrade elements of their policy to get them anywhere close to the actual rebuild cost. (See Exhibit 3.) The Plaintiffs and proposed class are typically only seeing the Xactimate, so they are not aware of the root cause of the undervaluation, and upon receiving the information from State Farm, they are demoralized about ever being able to afford rebuilding. Because State Farm's undervaluation started so low with the initial 360 Value pricing, following a catastrophe such as the Northern California Wildfires, thousands of policyholders are systematically financially ruined.

| OVERHEAD AND PROFITS | | | | | | |
|---|---|---|---|---|---|---|
| Overhead 10% | | $ | 133,945.00 | $ | 32,800.00 | $ | 166,745.00 |
| Sub Total | | $ | 1,473,395.00 | $ | 360,800.00 | $ | 1,834,195.00 |
| Profit  10% | | $ | 147,339.50 | $ | 36,080.00 | $ | 183,419.50 |
| TOTAL FOR CONSTRUCTION | | $ | 1,620,734.50 | $ | 396,880.00 | $ | 2,017,614.50 |
| STARTER BUDGET provided by Rob Anger. Please call with any questions. (916) 869.4664 | Per SF Price | 360.16 | | 88.20 | | 448.36 |

| | | |
|---|---|---|
| | | Code Upgrades $191,500.00 |
| BID PROJECT NOTES | | Other Structures $86,500.00 |
| Price is subject to change as STARTER BUDGET continues to be generated. | | |
| PAYMENT SCHEDULE | | Landscaping $50,000.00 |

| Phase | Description | Est. Date | Amount |
|---|---|---|---|
| Deposit | Startup payment at start of the design or site improvements or vertical construction, whichever comes first. Statements of billed/completed work will be sent out 2 times per month.  Overhead and profits will billed and recognized as subcontractor invoices are paid. Client payments are to be made within 7 days of invoice. | | $30,000.00 |
| | TOTAL PAYMENTS | | $2,017,614.50 |

CONFIDENTIAL                              Page 3 of 4                              3817 Moss Hollow Ct Santa Rosa - REPLACEMENT STARTER BUDGET Revision (1) - Brian Sheahan - 05.17.18

Contractor's building estimate for Sheahan family including Building Code Upgrades.
EXHIBIT 3

84. State Farm actively undertook the duty to assist Plaintiffs with establishing adequate policy limits. On its website (Exhibit 4), State Farm provides options for a homeowner to determine the replacement cost of the home. State Farm offers a 360 Value to determine the value of the home.

*"The most appropriate way to estimate the replacement cost of your home is to hire a building contractor or other building professional to produce a detailed replacement cost estimate. Or your State Farm agent can utilize an estimating tool from Xactware Solutions to assist you with an estimate."* Exhibit 4.

85. From the plain language of the text, State Farm offers to have the homeowner's agent aid the prospective policyholder using an estimating tool. In other words, State Farm expressed a willingness to undertake certain duties and responsibilities to protect Plaintiffs' homes by establishing adequate policy limits.

## What is Replacement Cost?

Replacement cost is the cost necessary to repair or replace your entire home. When you insure your home for its replacement cost, your insurer will reimburse you for the cost of rebuilding or repairing your home, based on the size and structure of the home that was lost or damaged.

The most appropriate way to estimate the replacement cost of your home is to hire a building contractor or other building professional to produce a detailed replacement cost estimate. Or your State Farm® agent ↗ can utilize an estimating tool from Xactware Solutions—to assist you with an estimate. Only the cost of the property's structure and its associated systems, fixtures, and finishes will be included in the estimate; land value is included in a home's market value but should not be included in the amount of insurance you buy.

**Benefits:** In the event of a loss, replacement cost coverage will help your family return to their home and usual quality of life with minimal financial interruption. For the best protection, experts recommend that you insure your home for at least 100 percent of its estimated replacement cost.

**Risks:** Replacement costs can change over time, so you should review your policy annually to make sure its coverage meets your needs. Inform your insurer if you have upgraded or improved your home, because these alterations may increase your home's estimated replacement cost. Also, you'll want to stay informed about changing market conditions in your area. Rising labor, materials, and transportation costs can directly affect your home's estimated replacement cost. For maximum protection, consider a policy that includes an inflation clause that automatically adjusts to account for changes in construction costs.

EXHIBIT 4.

86. State Farm uses 360 Value to determine Plaintiff's initial homeowner's policy limits. The disclaimer at the bottom of the 360 Value Replacement Cost Estimate states that the document:

*"[I]s a general estimate provided for State Farm customers and should not be considered professional replacement cost survey of the building."* (Exhibit 4.)

87. However, Plaintiffs argue that through the behavior of its sales agents and the plain language on its website, State Farm holds out a 360 Value to have the same authority and value as a "detailed replacement cost estimate" (Exhibit 5) performed by a contractor or building professional. State Farm knew or should have known that Plaintiffs would rely upon its false representation that the 360 Value Replacement Cost Estimate is accurate and can be relied upon to determine policy limits. State Farm's course of procedure in offering 360 Value Replacement Cost Estimates and then setting policy limits based upon the exact cost in the 360 Value document, for thousands of homeowners in California, sets an expectation and understanding that Plaintiffs can rely upon the 360 Value to be a correct and accurate policy limits value.

360Value Replacement Cost Estimate G2Y3-D2BA-7 (v.2)                                          Page 1 of 2

Replacement Cost Estimate for:

# SHEAHAN, BRIAN & ALISON
Estimate G2Y3-D2BA-7 (v.2)                         360Value

Agent: Andy Esquivel

**Owner Information**

| | |
|---|---|
| Name: SHEAHAN, BRIAN & ALISON | Date Entered: 10/15/2009 |
| Street: 3817 MOSS HOLLOW CT | Date Calculated: 10/15/2009 |
| City, State ZIP: SANTA ROSA, CA 95404 | Created By: Andy Esquivel |
| Country: USA | Last Modified By: Andy Esquivel |
| Policy #: 02-G-67-BLC899-2 | |

**General Information**

| | |
|---|---|
| Number of Stories: 100% Split Level | Sq. Feet: 3600 |
| Use: Single Family Detached | Year Built: 1986 |
| Quality Grade: Above Average | |

**Foundation**

| | |
|---|---|
| Foundation Shape: 13+ Corners - Irregular/Complex | Foundation Type: 10% Concrete Slab, 90% Crawlspace |

**Exterior**

| | |
|---|---|
| Roof Shape: Gable | Exterior Wall Construction: 95% Wood Framing, 5% None |
| Exterior Wall Finish: 95% Siding - Redwood (Clapboard), 5% Brick - Solid | - Included in Ext. Wall Finish |

**Interior**

| | |
|---|---|
| Floor Coverings: 60% Carpet, 40% Hardwood - Plank | Interior Wall Finish: 98% Paint, 2% Wallpaper |

**Rooms**

| | |
|---|---|
| Bathrooms: 3 Full Bath | Bedrooms: 1 Medium - (10'x10'), 2 Large - (14'x12'), 1 Extra Large - (16'x14') |

**Attached Structures**

| | |
|---|---|
| Deck #1: | |
| Square Footage: 800 | Material: Redwood Deck |

**Systems**

| | |
|---|---|
| Air Conditioning: 1 Central Air Conditioning | Specialty Systems: 1 Central Vacuum System, 1 Intercom System |
| Fireplace #1: | |
| Type: Wood Stove | |
| Fireplace #2: | |
| Type: Zero Clearance Fireplace | |

**Home Features**

| | |
|---|---|
| Lighting: 1 Ornate Chandelier, 5 Ceiling Fan, 5 Recessed Light | Interior Doors and Millwork: 2 Built-In Desk/Vanity |
| Other Interior Features: 1 Wet Bar | |

## Estimated Replacement Cost (Calculated Value)

Calculated Value:                                              **$524,000.00**

This Xactware estimate provides an estimated replacement cost based on the information you provided about the age, style, size, and features of the building. The more information you provide, the more the estimate will reflect the individual characteristics of the building. The estimate is based on certain assumptions and generalities about construction costs. This estimate is also based on material and labor costs as determined by Xactware pricing surveys. This is a general estimate provided for State Farm® customers and should not be considered to be a professional replacement cost survey of the building.

(Replacement cost includes all applicable permits, fees, overhead, profit, and sales tax)

EXHIBIT 5

88. The State Farm 360 Value Replacement Cost Estimate provides a  calculated value based on the

summation of number of stories, square footage, use, year built, quality grade, foundation shape,

foundation type, roof shape, exterior wall finish, exterior wall construction, floor coverings, interior

wall finish, bathrooms, bedrooms, deck square footage and material, air conditioning, specialty systems, number and type of fireplaces, lighting, interior doors and millwork, other interior features, material and labor costs, permits, fees, overhead, profit, and sales tax. Although not mentioned on the form, in order to fill out a 360 Value form on State Farm's website, a zip code is also required.

89. Defendants' acts and practices constitute unlawful business practices, as they violate 10 California Code of Regulations § 2695.183, Standards for Estimates of Replacement Value. Section 2695.183 provides that "no licensee shall communicate an estimate of replacement cost to an applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis" unless certain "requirements and standards" are met. State Farm's 360 Value estimate does not address many of the required sections and therefore does not meet the California required minimum criteria.

90. Through State Farm's affirmative acceptance of the duty to calculate appropriate policy limits, and the use of the 360 Value factors to calculate a total rebuild cost amount for Plaintiffs' homes, State Farm assumes the risk of determining an accurate policy limit amount. State Farm knows, or should have known, that its policyholders rely on the Estimated Replacement Cost figure it recommends when establishing policy limits for policyholders, including Plaintiffs.

91. Within Plaintiffs' homeowners insurance policies, State Farm represents the following:

> "The limit of liability for this structure (Coverage A) is based on an estimate of the cost to rebuild your home, including an approximate cost for labor and materials in your area, and specific information that you have provided about your home. It is up to you to choose the coverages and limits that meet your needs. We recommend that you purchase a coverage limit at least equal to the estimated replacement cost of your home. Replacement cost estimates are available from building contractors and replacement cost appraisers, or, your agent can provide an estimate from a third-party vendor using information you provide about your home. We can accept the type of estimate you choose as long as it provides a reasonable level of detail about your home. State Farm does not guarantee that any estimate will be the actual future cost to rebuild your home. Higher limits are available at higher premiums. Lower limits are also available, which if selected may make certain coverages unavailable to you. We encourage you to periodically review your coverage and limits with your agent and to notify us of any changes or additions to your home." Emphasis Added. Exhibit 6.

**Your Coverage Amount....**

The limit of liability for this structure (Coverage A) is based on an estimate of the cost to rebuild your home, including an approximate cost for labor and materials in your area, and specific information that you have provided about your home. It is up to you to choose the coverages and limits that meet your needs. We recommend that you purchase a coverage limit at least equal to the estimated replacement cost of your home. Replacement cost estimates are available from building contractors and replacement cost appraisers, or, your agent can provide an estimate from a third-party vendor using information you provide about your home. We can accept the type of estimate you choose as long as it provides a reasonable level of detail about your home. State Farm® does not guarantee that any estimate will be the actual future cost to rebuild your home. Higher limits are available at higher premiums. Lower limits are also available, which if selected may make certain coverages unavailable to you. We encourage you to periodically review your coverages and limits with your agent and to notify us of any changes or additions to your home.

302

EXHIBIT 6

92. State Farm, through its own actions and the actions of its agents, has held itself out as providing a third-party estimate, reliable to determine policy limits. While State Farm does not offer a guarantee as to the actual cost to rebuild a policyholder's home, there is an acceptable range of data within or outside which an estimate can be found to be accurate or inaccurate. For example, in the construction industry, contractors are expected to perform construction work within 10% of the total price quoted. That additional 10% is held as a contingency for unexpected changes. Likewise, if State Farm cannot apply Verisk's software to achieve an accurate value for policy limits and rebuild cost within 10% of the actual cost, then the software's output is unreliable for cost estimating. Plaintiffs argue that State Farm's 360 Value estimates follow a pattern across thousands of California policyholders, where the estimated values were so far outside a reasonable margin of error range as to be completely unreliable and unfit for use in determining policy limits.

93. Furthermore, State Farm represented to Plaintiffs that they could obtain replacement cost estimates from their agents using "a third-party vendor [360 Value] using information [policyholders] provide about [their] home."  State Farm, through the use of 360 Value software, set policy limits which it claimed to be calculated to capture the true rebuild or replacement costs of Plaintiffs' homes so that Plaintiffs could restore their homes to pre-loss condition in the event of a loss.

94. Plaintiffs reasonably relied on State Farm's representation that 360 Value was a dependable valuation tool and the agent using the software to create an estimate knew how to accurately produce a reliable result. Plaintiffs also reasonably relied upon State Farm's representation that 360 Value's valuation represented the true cost to rebuild or replace Plaintiffs' homes to pre-loss condition in the event of a loss. And from this reasonable reliance, Plaintiffs agreed to policy limits

set by State Farm. These policy limits, according to Defendants, would provide enough coverage such that Plaintiffs would be able to rebuild their homes to pre-loss condition in the event of a loss.

95. On information and belief, whereas State Farm represented to Plaintiffs that the reason it had adopted 360 Value was to accurately calculate the total replacement cost of Plaintiffs' homes for the purpose of setting policy limits, State Farm's actual reason for adopting 360 Value was to systematically depress the value of adjusted claims made against State Farm. State Farm policies however, despite allegedly providing coverage for a total loss event, undervalued the true rebuild or replacement costs of Plaintiffs' homes, leaving Plaintiffs underinsured. State Farm has a long history of chronically underinsuring policyholders in California and nationwide.

96. On information and belief, prior to establishing Plaintiffs' policy limits, State Farm was aware that its process of applying 360 Value underestimates the actual rebuild cost of its policyholders' homes. Despite State Farm having knowledge that 360 Value's software inaccurately calculated the total rebuild cost of its policyholders' homes, State Farm represented to Plaintiffs that 360 Value was reliable at estimating the true rebuild cost of Plaintiffs' homes. In other words, on information and belief, State Farm knew, or at the very least should have known that its policyholders were underinsured and unprotected.

97. State Farm knew that its process of applying 360 Value data underestimates home values for claim purposes, it was also aware, or should have been aware, that 360 Value would calculate lower policy limits by underestimating actual home rebuild and replacement costs. Therefore, State Farm and 360 Value should have been aware – and at least warned Plaintiffs – that 360 Value was likely to underestimate their actual home rebuild costs. Instead, State Farm and 360 Value represented that 360 Value was capable of calculating the minimum replacement cost for the purpose of setting insurance policy limits. This lulled policyholders, like Plaintiffs, into relying on those representations when agreeing to the policy limits established by State Farm, which should have been sufficient to cover the total loss of their homes.

98. State Farm has been using data-based home valuation software like 360 Value since at least 1997 to create an estimated value used to determine policyholders' policy limits. 360 Value knew or should have known that State Farm's use of its data has historically resulted in chronic widespread underinsured policies in California.

99. As a vendor providing data analysis software, Verisk has a duty to ensure that its software is suitable for its intended purpose under California Insurance Code and State Law. Verisk breached that duty by egregiously allowing State Farm to harm its customers by intentionally and/or negligently underinsuring them by improperly using and/or misapplying the 360 Value tool.

100.    In the alternative, it is also possible that Verisk's tools are faulty software and cannot be used properly to achieve a proper valuation. This would mean that Verisk carries some blame for false advertising, which has damaged Plaintiffs.

101.    As a result of State Farm's and 360 Value's misapplication of the software, misrepresentations and omissions, Plaintiffs are underinsured. Despite Plaintiffs contracting with State Farm for the purpose of insuring that they could rebuild or replace their properties after a loss event and despite Plaintiffs' reliance on State Farm and 360 Value's representations that their policy limit recommendations were sufficient to cover the total rebuild or replacement cost of Plaintiffs' homes, Plaintiffs are substantially underinsured in an amount to be proven at trial. Agents often did not discuss results of the underwriting data and basis for the policy, keeping clients in the dark, instead of reviewing this critical piece of information.

102.    Furthermore, State Farm perpetuated a scheme of illusory homeowners' coverage on its policyholders. State Farm policyholders believed they were receiving premium home protection (i.e., coverage more than sufficient to compensate the policyholders for the total loss of their home and then some). In fact, the policyholders (in this case, Plaintiffs) were paying premiums for coverage which the policyholders would never be able to receive as a result of State Farm's and 360 Value's failure to accurately calculate the minimum replacement cost for Plaintiffs' homes, sometimes at 30% of value.

103.    Through 1997, homeowners were eligible to purchase Guaranteed Replacement Coverage, and when that was taken away, they were left with 20% Replacement Cap coverage, but it was never explained how drastically different that coverage was at the time their policies were changed.  For those customers the expectation of protection was even greater.

104.    Further, the Replacement Cap coverage which obligates State Farm to "pay up to an additional 20%" of the amount of insurance applying to the damaged building is insufficient to cover the gap from the already underinsured value, to the market cost of rebuilding after disaster.  Thus, despite

paying premiums for homeowners' coverage purportedly sufficient to cover the full replacement or rebuild cost of Plaintiffs' home, plus an additional 20% coverage above the minimum replacement cost, State Farm policyholders, such as Plaintiffs, were paying for coverage that could not cover the minimum replacement and/or rebuild cost of their homes. (Exhibits 7 and 8.)

Option ID – Increased Dwelling Limit is replaced by the following:

Option ID – Increased Dwelling Limit. We will settle losses to damaged building structures covered under COVERAGE A – DWELLING according to the SECTION I – LOSS SETTLEMENT provision shown in the Declarations.

If the reasonable and necessary cost to repair or replace damaged building structures exceeds the applicable limit of liability shown in the Declarations, we will pay the additional amounts not to exceed:

1. the Option ID limit of liability shown in the Declarations to repair or replace the Dwelling; or

2. 10% of the Option ID limit of liability to repair or replace building structures covered under COVERAGE A – DWELLING, Dwelling Extension.

EXHIBIT 7

**State Farm General Insurance Company**
900 Old River Rd.
Bakersfield, CA 93311-9501

H-02- 0035-FBA4    H  W   F

SHRAHAN,  BRIAN & ALISON
3817 MOSS HOLLOW CT
SANTA ROSA CA   95404-1567



Location:  Same as Mailing Address

**Loss Settlement Provisions (See Policy)**
A1  Replacement Cost - Similar Construction
B1  Limited Replacement Cost - Coverage B

**Forms, Options, and Endorsements**
Homeowners Policy                              FP-7955.CA
Increase Dwlg up to $153,740                   OPT   ID
Ordinance/Law   25%/  $192,175                 OPT   OL
Additional Insured                             OPT   AI
Jewelry and Furs $1,500/$2,500                 OPT   JF
Form 438bfu NS Lndr Loss Pay                   FE-1313
Homeowners Policy Endorsement                  FE-3422
Identity Restoration Coverage                  FE-3301
Amendatory Endorsement                         FE-3247

EXHIBIT 8

105.    By its conduct, State Farm has reaped enormous financial benefit to the detriment of its

insureds. State Farm collects premiums on coverages that as a result of State Farm's insufficient,

yet recommended policy limits and improperly applied rebuild estimate, the actual amounts

necessary to rebuild the home can never be reached.

106.    State Farm's intentional undervaluation of homeowners at the time they purchase their policy,

and again at the time that the total loss is calculated is a derogation of special duty that State

Farm's agents take on when they use 360 Value and Xactimate software. It is a malicious and

deliberately unfair business practice, pervasive in the State Farm system, which is operating on

volume of policies sold, and State Farm's use of the Xactimate to reduce the homeowner's payout, rather than upholding underwriting quality to the true value.

107.     State Farm knew, or should have known, that using Verisk software to perform underwriting calculations was inappropriate because the data is based on cost information from subdivisions and trailer parks.  The custom-built homes that were lost in the Northern California Wildfires were higher quality than the underlying data used to determine their value. The Verisk software data is inaccurate and inappropriate for the Northern California housing market. Further, State Farm fail to train its adjusters, or worse, intentionally undervalued the Plaintiffs' homes by improperly using Verisk software.

108.     State Farm fleeced its customers both coming and going. It intentionally and fraudulently undervalued initial policies and then upon the loss of the home, in Plaintiffs' claim instances, State Farm refused to honor its own lowballed contract and give the customer their 100% rebuild cost reimbursement.

109.     State Farm told customers that they had full coverage. Through the use of Verisk software, State Farm intentionally underinsured the homes that it provided insurance for in the Norther California Wildfires. While stating that it was selling full coverage policies, State Farm was actually offering reduced premiums at cheaper rates because it knew that this would induce customers to buy the discounted policies. State Farm held itself out as offering full coverage for total loss, but this was not the case.

110.     The Plaintiffs now have experienced a total loss with retroactively underinsured properties, and cannot get reimbursed for the actual value of the homes that they lost. Their damages are the difference between the actual value of the home that they lost and the policy limits of the issued policy – due to reliance on faulty or misapplied software, which State Farm was aware would undervalue the homes.

**PLAINTIFFS' SPECIFIC ALLEGATIONS**

Plaintiff's Specific Allegations accompany their exhibits attached as Exhibits A-G.

**CAUSES OF ACTION**

1.      NEGLIGENT MISREPRESENTATION;
2.      NEGLIGENCE;
3.      VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW;
4.      VIOLATION OF CALIFORNIA CARTWRIGHT ACT;
5.      VIOLATION OF US CODE TITLE 15 SHERMAN ACT – CARTEL;
6.      VIOLATION OF US CODE TITLE 15 SHERMAN ACT – CONSPIRACY;

**FIRST CAUSE OF ACTION**

**Negligent Misrepresentation**

**Against State Farm**

111.    Plaintiffs refer to each and every paragraph in this complaint and incorporate those paragraphs as though set forth in full in this cause of action.

**A. POLICY ISSUANCE**

**MISREPRESENTATION OF MATERIAL FACT**

112.    State Farm misrepresented the limits of the Plaintiffs' insurance policies as adequate.

113.    State Farm used captive agents to sell insurance policies. These agents only worked for State Farm.

114.    State Farm gave their agents tools such as Marshall & Swift data and 360 Value zip code calculators to calculate the cost of replacing Plaintiffs' homes given the specific characteristics of each home, as an alternative to, and equally as reliable as, an estimate from a contractor. State Farm agents misrepresented that the proposed policy limits were accurate and reliable as the actual cost for rebuilding Plaintiffs' homes.

115.    State Farm knowingly and recklessly devalued Plaintiff's home values. Their agents knowingly or recklessly applied the algorithms in the tools, provided by State Farm, to create an inadequate initial policy coverage amount. This lowballed value ensured that nobody was able to recover following a total loss, and all policyholders were affected. Agents did not perform any additional checks to determine whether the policy coverage amount was adequate. The agents misrepresented an adequate initial policy coverage amount without performing further evaluation.

116.    CA Insurance Code Section 10102 became operative July 1, 2011. This required a disclosure form in the insurance renewal packet about extended replacement cost for demand surge

following a disaster. The disclosure forms were never signed by Plaintiffs, and there was never a call from Plaintiffs' agents about the importance of the changes necessitating the disclosure. No Plaintiffs were told to review their coverage for extended replacement cost.

117.    Agents made additional errors that further compounded the undervaluation of Plaintiffs homes. Building code elements were not applied correctly according to the age of the house and the number of building code changes that had occurred. Agents rarely verified whether garages were detached or attached, and did not actually perform in-person site visits to verify the condition and quality of the existing home.

118.    The tools, data, and algorithm applied to each Plaintiff's initial policy through the zip code calculator were flawed. State Farm agents used market value, not construction cost, to calculate replacement cost with its zip code calculator tool. For example, a custom stone and beam home in a suburban neighborhood may have an average market resell value, but the cost to rebuild the house that was using these materials is significantly more than to rebuild a typical wood frame construction home.

**NO REASONABLE GROUNDS FOR STATE FARM TO BELIEVE TOOLS WERE ACCURATE**

119.    State Farm had no reasonable grounds for believing its representations about the accuracy of its policy limit recommendations and the availability of the insurance policy to Plaintiffs' were true. State Farm received many complaints about its software's tendency to underestimate rebuilding and replacements costs. State Farm also failed to fully and accurately account for Plaintiffs' homes architecture, building materials, finishing, and other details that substantially determine building costs.

120.    Because State Farm is a large insurance company that provides insurance, completes underwriting, and performs claims adjustment for millions of policyholders. State Farm negligently made representations, and specifically undertook to guide Plaintiffs in selecting policy amounts, and proposed coverage amounts with little or no discussion.

121.    State Farm knew that their tools were not accurate because they had all of the cost and experience data. They were aware that the undervalued policy value would be inadequate for rebuilding.

122.    Because they knew that costs would increase after a disaster, State Farm added a 20% increased dwelling cost multiplier to all Plaintiffs in an attempt to address demand surge costs. However, the number was too low to provide demand surge assistance when the policy was already undervalued at 30-40% of construction cost.

**STATE FARM INTENDED TO INDUCE RELIANCE BY PLAINTIFFS**

123.    Plaintiffs purchased State Farm insurance in substantial part because of Defendants' false representations that Verisk's software satisfied Plaintiffs' desire that their policies have sufficient limits to fully compensate them in the event of total loss.

124.    State Farm knew that the only way for it to remain competitive in the technologically changing insurance industry was to sell lesser quality policies under the Illusory Coverage Scheme that would not provide adequate coverage to policyholders.

**IGNORANCE OF THE TRUTH AND JUSTIFIABLE RELIANCE BY PLAINTIFFS**

125.    Plaintiffs reasonably relied on State Farm's false representations because the Plaintiffs' agents held themselves out as experts in the field of insurance valuation.

126.    Plaintiffs relied on the inaccurate and inappropriate insurance coverage offered by their agents because they believed that State Farm was a knowledgeable industry giant, with well-trained agents using good tools to determine the appropriate insurance amounts for their homes.

127.    State Farm used the term "Increased Dwelling" to meet the requirements of CA Insurance Code Section 10102 for extended replacement cost for demand surge following a disaster. Used together with Coverage A Dwelling, Plaintiffs relied on agent's representations that the offered coverage was adequate. This misled Plaintiffs into believing that they had purchased sufficient insurance to cover replacement of their entire homes following a total loss.

**RESULTING DAMAGE**

128.    Following a total loss, even with full policy limits, Plaintiffs are unable to rebuild because they are deeply underinsured.

129.    Plaintiffs have been damaged by State Farm's false and misleading representations about policy adequacy. Instead of compensating Plaintiffs for their rebuilding costs, State Farm will only pay Plaintiffs up to their inadequate policy limits, so Plaintiffs cannot afford to rebuild their homes. Plaintiffs' inability to cover the costs of rebuilding their homes stems directly from, and was a

substantial factor in, their reliance on Defendants' false representations about adequate coverage, and Plaintiffs' consequent purchase of State Farm insurance.

130.     As a proximate result of Plaintiffs' reliance on Defendants' false representations, Plaintiffs have suffered, and will continue to suffer in the future, damages, plus interest, and other economic, non-economic and consequential damages, for a total amount to be shown at the time of trial.

131.     As a further proximate result of Plaintiffs' reliance on Defendants' false promise, Plaintiffs have suffered anxiety, worry, mental and emotional distress, all to Plaintiffs' general damages in a sum to be determined at the time of trial.

**B. CLAIMS PROCESS**

**MISREPRESENTATION OF MATERIAL FACT**

132.     Following the loss of their homes, Plaintiffs worked with a State Farm claims adjuster to calculate the replacement cost of their homes, based on faulty, inaccurate, or misapplied tools, which came up with lowballed, inaccurate costs to rebuild.

133.     Across the board, State Farm's rebuild estimate values were significantly lower than contractor construction estimates, the latter of which must be within 10% of actual construction cost to be considered accurate.

**NO REASONABLE GROUNDS FOR STATE FARM TO BELIEVE TOOLS WERE ACCURATE**

134.     State Farm knew or should have known from their experience handling claims, and internal knowledge of the tools, that the Xactimate values for re-construction do not line up with the initial policy limits determined by the zip code calculator. The values from the Xactimate are much higher than the zip code calculator, but still too low to afford to rebuild.

135.     State Farm was in position to know that the values from the zip code calculator and Xactimate should have been in alignment. State Farm was also in a position to correct the misaligned policies and to know the value of construction in the area using recent claims data.

136.     State Farm had reason to know after the Lake Fire that their valuation for policies in Northern California were not appropriate for construction. Yet State Farm knowingly or negligently failed to align these two estimating tools, and further failed to review the Northern California undervalued policies.

**STATE FARM INTENDED TO INDUCE RELIANCE BY PLAINTIFFS**

137.    State Farm, which had the ability to know about the misalignment issue between the zip code calculator and Xactimate, knowingly or negligently kept its agents in the dark, instead allowing them to continue to issue policies below rebuild value.

138.    Because they knew that costs would increase after a disaster, State Farm applied a 20% increased dwelling cost multiplier to all Plaintiffs in an attempt to address demand surge costs. However, the number was too low to overcome this additional cost. It should have been 30-40% of policy limits.

**IGNORANCE OF THE TRUTH AND JUSTIFIABLE RELIANCE BY PLAINTIFFS**

139.    Plaintiffs reasonably relied on State Farm's false representations on rebuild cost because the Plaintiffs' claims adjusters held themselves out as experts in the field of insurance valuation.

140.    Plaintiffs relied on the inaccurate and inappropriate rebuild estimates offered by their claims adjusters because they believed that State Farm was a knowledgeable industry giant, with well-trained adjusters using good tools to determine an accurate rebuild value for their homes.

**RESULTING DAMAGE**

141.    Following a total loss, even with full policy limits, Plaintiffs are unable to rebuild because they are deeply underinsured.

142.    Plaintiffs have been damaged by State Farm's false and misleading representations about policy adequacy. Instead of compensating Plaintiffs for their rebuilding costs, State Farm will only pay Plaintiffs up to their inadequate policy limits, so Plaintiffs cannot afford to rebuild their homes. Plaintiffs' inability to cover the costs of rebuilding their homes stems directly from, and was a substantial factor in, their reliance on Defendants' false representations about adequate coverage, and Plaintiffs' consequent purchase of State Farm insurance.

143.    As a proximate result of Plaintiffs' reliance on Defendants' false representations, Plaintiffs have suffered, and will continue to suffer in the future, damages, plus interest, and other economic, non-economic and consequential damages, for a total amount to be shown at the time of trial.

144.    As a further proximate result of Plaintiffs' reliance on Defendants' false promise, Plaintiffs have suffered anxiety, worry, mental and emotional distress, all to Plaintiffs' general damages in a sum to be determined at the time of trial.

**SECOND CAUSE OF ACTION**

**Negligence**

**Against All Defendants**

145.    Plaintiffs refer to each and every paragraph in this complaint and incorporate those paragraphs as though set forth in full in this cause of action.

**VERISK HAD A DUTY TO THE PLAINTIFFS**

146.    Verisk is an admitted monopoly. It is the largest provider of insurance cost estimating tools, with a greater than 90% market share.

147.    Verisk had a duty to Plaintiff as the principal supplier of software tools and controllers of the data applied to value the Plaintiffs' homes. Verisk was in a position to ensure that the 360 Value zip code calculator and Xactimate values aligned.

148.    By providing software tools to State Farm as a subcontractor, Verisk assumes the fiduciary duty, and duty of care that must be provided to policyholders.

149.    Verisk represented to State Farm that its software could accurately calculate the replacement and/or rebuild costs for each home, knowing that such representations would be relied upon by Plaintiffs, or to State Farm policyholders similarly situated, for the purpose of calculating what State Farm represented as the equivalent of a contractor's estimate to determine the rebuilding costs, and as reflected in policy limits State Farm recommended to Plaintiffs and those similarly situated.

**STATE FARM HAD A DUTY TO THE PLAINTIFFS**

150.    State Farm also had a duty to ensure that their representations regarding the appropriate values for policy limits, and the values output by the Xactimate and 360 Value tools were accurate. Defendants represented themselves as possessing particular expertise in calculating rebuilding costs in case of property loss. Having undertaken this duty, and having made affirmative assertions that the values provided for rebuilding Plaintiffs' homes were accurate, Defendants were obliged to ensure that their representations had accurately determined rebuilding costs, and by extension, Plaintiffs' policy limits, were accurate because Plaintiffs, and any reasonable person in Plaintiffs' position would foreseeably rely on the truth of those representations.

151.    When an insurer sets policy limits and advises clients as to the adequacy of the same, it assumes the risk for inadequate insurance coverage. By advising the Plaintiffs that their policy

limits as set by State Farm would be adequate for replacing the Plaintiffs' homes, State Farm took on the role of construction estimator and assumed the risk of advising regarding the adequacy of the policy.

152.    State Farm had a duty of good faith and care to policyholders, and State Farm clearly negligently breached all fiduciary duties owed to the Plaintiffs.

**DEFENDANTS BREACHED THEIR DUTIES**

153.    State Farm represented to Plaintiffs that they could produce an estimate, equal to that of a construction estimate, which could be relied upon to accurately represent the costs of replacing or reconstructing Plaintiffs' homes following a loss event. State Farm knew, or should have known, that policyholders would rely on Defendants' recommended policy limits due to State Farm's representation that they were experts in setting minimum policy limits that would enable Plaintiffs to replace or rebuild their homes in the event of loss. State Farm also knew that if Plaintiffs, or those in Plaintiffs' position, relied on Defendants' expertise, but the policy limits proved inadequate, Plaintiffs would be materially harmed and unable to replace or rebuild their homes.

154.    State Farm knew or should have known that its agents would intentionally and/or negligently use software tools to achieve calculations that were underinsurance.

155.    Defendants' representations about appropriate and adequate policy limits were not true. State Farm agents and Verisk's software did not accurately calculate rebuilding costs, and thus denied Plaintiffs' the ability to replace or rebuild their homes to pre-loss condition. Plaintiffs' policy limits are based on Plaintiffs' reasonable reliance on the State Farm agents' representations and agent's use of Verisk's software calculations, which systematically underestimated the true costs of replacing or rebuilding Plaintiffs' homes to pre-loss condition.

**DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT THE BREACH COULD CAUSE HARM**

156.    Defendants knew, or should have known, that the insufficient data collected from homeowners, and the generalized assumptions that 360 Value used to calculate loss, did not provide an accurate approximation of the true costs, and did not provide a reasonable basis for calculating homeowners' policy limits. Defendants also knew, or should have known, that the initial policy value set through the 360 Value zip code calculator was not in alignment with the

construction cost data produced by an Xactimate. This is a significant discrepancy, and should have been addressed immediately upon discovery by Defendants.

157.    State Farm also negligently made misrepresentations in the Illusory Coverage Scheme to bolster State Farm's profits to the detriment of its policyholders. As such, Defendants knew, or should have known that their representations were false when made, and would cause an underinsurance situation.

**PLAINTIFFS HAVE BEEN HARMED, AND STATE FARM'S NEGLIGENCE WAS A SUBSTANTIAL FACTOR IN CAUSING PLAINTIFFS HARM**

158.    After Plaintiffs' homes were destroyed in whole or in part by fire, the true extent of Defendants' false representations became apparent. State Farm now states that it will only compensate Plaintiffs up to their policy limits, which Plaintiffs have now discovered are completely insufficient to replace or rebuild Plaintiffs' homes to their pre-loss condition.

159.    Defendants purposely made these false representations intending that Plaintiffs would rely on them and for the purpose of inducing Plaintiffs to purchase and renew their State Farm insurance policies.

160.    Defendants knew, or should have known that Xactimate and/or 360 Value was insufficient to calculate the specific rebuilding costs of each home. Defendants also knew, or should have known that as a result of their failure to accurately calculate policy limits which reflected the cost to rebuild or replace Plaintiffs' homes, in addition to other actions described herein regarding the Illusory Coverage Scheme, Plaintiffs were denied the ability to access additional home coverages, such as the Home Protector Coverage, despite Plaintiffs paying premiums for those coverages.

161.    Defendants' reliance on Verisk's software to accurately calculate policy limits for rebuilding each of Plaintiffs' homes, was, instead, made to undervalue policies and thereby induce policy sales that would systematically depress claim reimbursements.

162.    Given the foreseeability of Plaintiffs' harm, the close connection between Defendants' wrongful acts and Plaintiffs' harm, and the morally bankrupt commercial motives for Defendants' wrongs, Defendants undertook a special duty to use reasonable care and to accurately set each of Plaintiffs' policy limits to fully compensate them for the cost of replacing or rebuilding their homes in the event of a loss.

163.    Verisk likewise represented that its software could accurately calculate the replacement costs for each home, knowing that Plaintiffs, or State Farm policyholders similarly situated, would consider and rely upon such representations for the purpose of calculating rebuilding costs. Verisk understood that Plaintiffs, or those in Plaintiffs' position, would foreseeably rely on its expertise in selecting policy limits.

164.    Having undertaken this special duty, Defendants were obliged to use reasonable care to ensure that Plaintiffs' policy limits for replacing and/or rebuilding their homes to their pre-loss condition was adequate.

165.    Defendants breached that duty because Verisk's software did not accurately calculate rebuilding costs. Instead, Plaintiffs' policy limits, as set by Verisk's software calculations and Plaintiffs' adoption of State Farm's recommendations, substantially underestimated the true costs of replacing and/or rebuilding each of Plaintiffs' homes. The glaring discrepancy between the initial zip code calculator and the construction cost estimator, both of which are still lower than an actual contractor's estimate after loss, are a key indicator that Verisk's software is inaccurate for the purposes of calculating policy limits and construction rebuild cost.

166.    In the alternative, State Farm breached its special duty by intentionally and/or negligently applying the software tool to achieve a lowballed estimate, which it knew would be used as Plaintiff's policy limits.

167.    Plaintiffs reasonably relied on Plaintiffs' false representations because the Plaintiffs' held themselves out as experts in the field of insurance valuation. As any reasonable person would, Plaintiffs believed that if a large insurance carrier and a large, sophisticated software company stated that each individually, or jointly, or both, could accurately calculate the costs of rebuilding, Plaintiffs could rely upon these statements to set an appropriate value for an adequate insurance policy.

168.    Plaintiffs' policy limits, calculated with Verisk software and recommended to Plaintiffs by defendant State Farm, are inadequate to replace or rebuild Plaintiffs' homes to pre-loss condition. Plaintiffs relied on State Farm's representations that the policy limits they recommended to Plaintiffs were adequate. Given State Farm's representations of expertise, and references to

replacement in the policy, this was a reasonable reliance. Defendants' breach of their duty therefore was a substantial factor in causing Plaintiffs' harm.

169.     As a proximate result of Defendants' breach, Plaintiffs have suffered, and will continue to suffer in the future, damages, plus interest, and other economic and consequential damages, for a total amount to be shown at the time of trial.

170.     As a further proximate result of Defendants' breach, Plaintiffs have suffered anxiety, worry, mental and emotional distress, all to Plaintiffs' general damages in a sum to be determined at the time of trial.

171.     Defendants' conduct described herein was intended by Defendants to cause injury to Plaintiffs or was despicable conduct Defendants pursued with a willful and conscious disregard of the rights of Plaintiffs, subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights. Alternatively, Defendants' conduct was an intentional or negligent misrepresentation of a material fact known to Defendants with the intention to deprive Plaintiffs of property or legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil Code 53294, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants and their conduct.

## THIRD CAUSE OF ACTION

**Violation of California Unfair Competition Law, Bus. & Prof. Code 517200, et seq.**

**Against All Defendants**

172.     Plaintiffs refer to each and every paragraph in this complaint and incorporate those paragraphs as though set forth in full in this cause of action.

**BUSINESS PRACTICES FORBIDDEN BY LAW**

173.     California Insurance Code § 1861.03 authorizes antitrust and unfair competition cases against insurance companies in their jurisdiction.

174.     In order to compete in the California market, State Farm issued policies at unfairly low coverage amounts so that it would retain a large market share.

175.     Verisk conspired and acted in concert with State Farm to create a rigorous system to implement defective insurance policies, using faulty software tools, intentional lack of agent training, and no

additional checks on policy amounts, to knowingly and/or intentionally issue unfairly low insurance coverage amounts. The Defendants continue to sell these underinsured policies below cost regardless of injuries caused.

176.     Verisk and State Farm had access to all the data to know that their construction Xactimates do not line up statistically with the policy setting zip code calculator tools. They have known this for years, and yet they still continue to reap the benefits of intentional underinsurance at the initial policy sales stage, and then continued underinsurance during the claims phase.

177.     Verisk has created a false data loop using State Farm's own claim data. The database only reflects information from insureds who can afford to rebuild, which means that the database no longer reflects real market data. Reports are feeding back into each other, further diluting the actual value of claims and construction. The tools are broken and continue to spit out #FAKEREPORTS.

178.     Verisk has the ability to inform State Farm that the policy estimates and construction estimates are way off. Verisk owns the software for both policy underwriting and construction estimating, and Verisk has all the data to know that the costs are not lining up between the two tools as applied in California.

179.     It is clear from State Farm's actions that it wanted to underinsure and set a lower rate for homes in California. If State Farm had insured a home for $1.8 Million, but it costs $2.2 Million to rebuild, the actual cost to purchase the appropriate $2.2 Million policy would have been far too expensive in the current insurance market. Issuing a State Farm policy at the appropriate $2.2 Million rebuild level is not competitive, so State Farm uses a zip code calculator to determine the average policy amount for the area instead.

180.     Each Defendant is a "person" subject to the California Unfair Competition Law ("UCL") pursuant to Business and Professions Code § 17201.

181.     The UCL prohibits acts of "unfair competition" including any "unlawful, unfair or fraudulent business act or practice." Cal Bus. & Prof. Code § 17200.

182.     California Business & Professions Code § 517204 permits individuals, such as Plaintiffs, to institute an action on behalf of the general public to obtain injunctive and restitutionary relief against persons and entities that engage in unfair business practices and/or unfair competition.

183.    Defendants' acts and practices, including establishing Plaintiffs' insurance policy limits and the Illusory Coverage Scheme, as alleged in this Complaint, constitute unlawful, unfair, and fraudulent business practices, in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code SS 17200 et seq.

**VIOLATION OF 10 CALIFORNIA CODE OF REGULATIONS SECTION 2695.183**

184.    Defendants' acts and practices constitute unlawful business practices, as they violate 10 California Code of Regulations § 2695.183, Standards for Estimates of Replacement Value. Section 2695.183 provides that "no licensee shall communicate an estimate of replacement cost to an applicant or insured in connection with an application for or renewal of a homeowners' insurance policy that provides coverage on a replacement cost basis" unless certain "requirements and standards" are met. Among these requirements and standards are "consideration of components and features of the insured structure," including "at least" the following criteria:

A.   The estimate of replacement cost shall include the expenses that would reasonably be incurred to rebuild the insured structure(s) in its entirety, including at least the following:

(1) Cost of labor, building materials and supplies;

(2) Overhead and profit;

(3) Cost of demolition and debris removal;

(4) Cost of permits and architect's plans; and

(5) Consideration of components and features of the insured structure, including at least the following:

(A) Type of foundation;

(B) Type of frame;

(C) Roofing materials and type of roof;

(D) Siding materials and type of siding;

(E) Whether the structure is located on a slope;

(F) The square footage of the living space;

(G) Geographic location of property;

(H) Number of stories and any nonstandard wall heights;

(I) Materials used in, and generic types of, interior features and finishes, such as, where applicable, the type of heating and air conditioning system, walls, flooring, ceiling, fireplaces, kitchen, and bath(s);

(J) Age of the structure or the year it was built; and

(K) Size and type of attached garage.

B.   The estimate of replacement cost shall be based on an estimate of the cost to rebuild or replace the structure taking into account the cost to reconstruct the single property being evaluated, as compared to the cost to build multiple, or tract, dwellings…"

185.   Defendants' method of calculating the initial policy limits replacement cost of Plaintiffs' homes materially failed to consider several of these components and features of Plaintiffs' insured structures. The 360 Value estimate failed to include: 1. costs for architect's plans; 2. roofing material and type of roof; 3. Whether the structure is located on a slope; 4. Nonstandard wall heights; and 5. Size and type of attached garage.

186.   The Xactimate estimate following a loss also does not address a cost for architect's plans. As a result of Defendants' failure to perform and rely upon an estimate that meets the minimum criteria set forth by California law, and Defendants' use of the estimate to determine policy limits, Plaintiffs are underinsured and unable to replace and/or rebuild their homes to their pre-loss condition.

187.   The State Farm 360 Value Replacement Cost Estimate provides a "calculated value" based on the summation of number of stories, square footage, use, year built, quality grade, foundation shape, foundation type, roof shape, exterior wall finish, exterior wall construction, floor coverings, interior wall finish, bathrooms, bedrooms, deck square footage and material, air conditioning, specialty systems, number and type of fireplaces, lighting, interior doors and millwork, other interior features, material and labor costs, permits, fees, overhead, profit, and sales tax. Although not mentioned on the form, in order to fill out a 360 Value form on State Farm's website, a zip code is also required.

188.   In addition, Section 2695.183 specifically references the need to address the structure as a single property being evaluated, as opposed to the cost to build tract dwellings. Defendants' should have determined individual properties calculated replacement cost "as compared to the cost to build multiple, or tract, dwellings…". California law is explicit in addressing the replacement cost so

that it cannot rely upon the reduced cost to produce tract dwellings, and therefore the importance of estimating the rebuild of a house as a single standalone project, rather than a subdivision or tract homes, which can achieve reduced cost through economies of scale. Verisk's faulty tools are based upon market rate sales data for the zip code calculator, and the cost to build tract homes for its claims construction estimator.

**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONAL CODE SECTION 7026**

189.    Defendants are not licensed as construction contractors under California Bus. & Prof. Code Sections 7000-7173. Section 7026 defines "contractor" as "any person who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or **submits a bid to**, or does himself or herself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, parking facility, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, … whether or not the performance of work herein described involves the addition to, or fabrication into, any structure, project, development or improvement herein described of any material or article of merchandise. 'Contractor' includes subcontractor and specialty contractor." (Emphasis added)

190.    A "contractor" according to section 7026 is required to hold one of three categories of contractor's license: Class A (general engineering contractor), class B (general building contractor), or class C (covering "specialty" licenses). (Sections 7055–7058.)

191.    Neither State Farm nor Verisk are licensed as contractors in California, yet both are submitting bids to construct a building. This is a violation of Bus. & Prof. Code Sections 7026.

192.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs have suffered injury in fact and lost money or property, in that they suffered monetary loss from having their policy limits set too low and their rebuild cost was substantially undervalued as a result of Defendants' unfair business practices.

193.    Defendants' misrepresentations and omissions regarding the calculation of replacement value on Plaintiffs' homes were material and likely to deceive reasonable consumers such as Plaintiffs.

194.    Defendants' acts and practices, as alleged above, are substantially injurious to Plaintiffs and State Farm policyholders; (ii) any claimed utility of Defendants' conduct is outweighed by the harm

to Plaintiffs and similarly situated State Farm policyholders; and (iii) the injury is not one that consumers reasonably could have avoided.

195.   Defendants' acts and practices constitute unfair, unlawful, and/or fraudulent business practices in that they are likely to deceive a reasonable consumer by causing policyholders, like Plaintiffs, to believe that State Farm and Verisk had accurately calculated replacement costs in the event of a loss to their homes. Had Plaintiffs not been misled, Plaintiffs would have used alternative means of calculating the replacement costs of their homes, and would not have relied on Defendants' calculations and recommendations to adopt their policy limits.

196.   Defendants represented themselves as experts regarding the calculation of replacement costs, and Plaintiffs could not reasonably be expected to learn or discover the true facts related to these calculations without accurate disclosures of the methods used and qualifications of those applying the calculations.

197.   Pursuant to section 17203 of the California Business and Professions Code and available equitable powers, Plaintiffs are entitled to a preliminary and permanent injunction enjoining Defendants from continuing the unlawful and unfair business practices described above. This specifically includes Plaintiffs' demand to have State Farm adjust their claims without respect to the policy limits set forth in their homeowners insurance policies. In addition, Plaintiffs are entitled to recover reasonable attorneys' fees pursuant to Section 1021.5 of the California Code of Civil Procedure.

**FOURTH CAUSE OF ACTION**

**Violation of California Cartwright Act - Bus. & Prof. Code, Section 16700 et seq.**

**Against All Defendants**

198.   Plaintiffs refer to each and every paragraph in this complaint and incorporate those paragraphs as though set forth in full in this cause of action.

199.   California Bus. & Prof. Code Section 16727 prohibits charging a price discount where the effect of such sale may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State.

200. Plaintiffs' allege that Defendants engaged in price fixing as an unlawful combination of resources through the Illusory Coverage Scheme to sell fraudulent homeowners insurance policies at a reduced rate. Here, State Farm and Verisk are offering insurance by the use of this software system, methodology and data sets, disadvantaging homeowners and other insurance companies not using these software, methods and data. Plaintiffs are consumers of the Defendant's fraudulent insurance policies. They are harmed by decreased quality and supply of policies provided in the California insurance market due to Plaintiffs' scheme to sell undervalued policies that do not reflect actual construction pricing.

201. Defendants unlawfully conspired to prevent insurance companies from competing, which created a sham organization, and it is clear there was a conspiracy where both State Farm and Verisk conspired to restrain trade.

202. State Farm engaged in price fixing and artificially lowering their policy underwriting values to remain competitive.

203. Plaintiffs are suffering from Defendants' anticompetitive activities because they depress the market expectation of insurance coverage, reducing quality of coverage geographically.

204. Furthermore, both State Farm and Verisk unlawfully conspired to sell exclusivity while offering inferior quality with their big data software tool.

205. In addition, Plaintiffs allege that Defendants have violated Cal. Bus. & Prof. Code Section 17043 by selling products at prices below the Defendants cost with the intent to injure the complaining party or destroy competition.

206. As an insurance company, State Farm makes its money by gambling on aggregate risk spread out over many home insurance policies. In the case of the Wine Country Wildfires, State Farm intentionally issued fraudulent policies to many California homeowners, with the knowledge that the actually policy coverage would not be enough to rebuild in the event of a total loss. Plaintiffs contend that State Farm could not possibly recoup its cost for actual building replacement coverage for all of the individual policies issued, if they were indeed issued at the correct replacement value. Therefore, State Farm is actively, intentionally, and fraudulently selling products at prices below its own cost, in order to make more money by selling volume, rather than quality, homeowner's insurance policies.

207.    State Farm and Verisk engaged in collusive, predatory pricing conduct, by selling policies that State Farm knew would not cover the replacement of the insureds' homes, with the express intention of not providing full replacement cost insurance coverage to insureds following a loss or damage to their homes.

208.    The undervaluation and subsequent discounted policies sold to State Farm's insureds were below an appropriate measure of the cost of adequate homeowners insurance. State Farm has been able to increase its sales volume and further saturate the market because the fraudulently inadequate policies it sold were cheaper than those offered by other insurance companies.

209.    Plaintiffs demand treble damages, all legal and attorney fees, and injunctive relief as allowed by the Cartwright Act.

**FIFTH CAUSE OF ACTION**

**Violation of US Code Title 15 Sherman Act – Cartel**

**Against All Defendants**

210.    Plaintiffs refer to each and every paragraph in this complaint and incorporate those paragraphs as though set forth in full in this cause of action.

211.    The McCarran-Ferguson Act does not exempt insurers from conspiring to fix prices as a cartel. State law provides many protections to Insurance Companies, until and unless their activities go outside of the field of insurance.  Here, State Farm has ventured into the world of data analytics, combining the efforts of the largest insurance company in the U.S. with a global, multinational corporation that is invested in software and data.

212.    Plaintiffs allege a vertical conspiracy between Verisk and State Farm to restrain trade in violation of Section 1 of the Sherman Act.

**SECTION 1:**

**AN AGREEMENT AMONG TWO OR MORE PERSONS OR DISTINCT BUSINESS ENTITIES**

213.    Together, the Defendants are driving the field of insurance to the use of Verisk's software system, methodology and data sets, disadvantaging homeowners with lowballed, underinsured policies; and hurting other insurance companies not using these software, methods and data.

214.   These two businesses have combined their activities to flood the market and sell a high volume of cheap, fraudulent homeowners insurance policies, to the detriment of the policyholders.  In effect State Farm and subcontractor Verisk are working together as a vertical cartel.

**WHICH IS INTENDED TO HARM OR UNREASONABLY RESTRAIN COMPETITION**

215.   This is a sellers' conspiracy case, where the insurance buyers have received excessively low prices from State Farm and the members of its sellers' cartel. The harm caused is artificially lowered prices for consumers, with significantly decreased insurance coverage quality. The harm to the competing insurance companies is the inability to offer policies for comparatively low rates because the goalposts were moved to underinsure the property at the time that the policy value was offered to Plaintiffs. Insurers offering appropriate policies for the actual construction cost cannot compete with the State Farm and Verisk cartel cheap pricing and diminished coverage quality.

**WHICH ACTUALLY CAUSES INJURY TO COMPETITION**

216.   State Farm had a 17% market share in California in 2017. It is clear that their practices of undercutting on price and quality allowed them to dominate in sales, thereby forcing out other competing insurers from the market.

**ADVERSE IMPACTS TO INTERSTATE COMMERCE**

217.   Plaintiffs allege that Verisk has participated in an agreement with the insurance industry in general (the whole market), and with State Farm, to restrain trade by falsely estimating construction costs in a manner that affects domestic commerce, in California and throughout the country.

218.   Verisk's cost data is drawn from market sales and construction cost data nationwide. It has become the industry price setter for insurance claims following a disaster. However, Verisk's flawed data is causing more individuals every year to be unable to rebuild their homes because the numbers do not come in where they should for local construction rebuild costs, and homeowners cannot afford to make up the cost gap.

219.   Plaintiff Sheahan's contractor is available to testify that he engaged and then lost over $10-20 million in business when clients could not afford to build due to insurance undervaluation and claims process challenges.

---

220.   Xactimate software was developed to control claims and restrain construction costs after loss, and has affected a great number of policyholders, contractors, and whole communities where rebuild statistics are drastically low.

221.   Plaintiff Sheahan had to abandon his project because the disparity was too large to bridge the gap. Plaintiffs Wylie and Pope have needed to add hundreds of thousands of dollars to their insurance proceeds in order to rebuild. Plaintiffs, local contractors, and the whole community have been damaged by this cartel.

222.   Plaintiffs and most of the 6,000+ families who lost their homes in Sonoma County are suffering because of underinsuring and denial of claims benefits with false reports. Verisk's impact on the community extends far and wide into this disaster.

223.   Further, plaintiffs allege there is a continuous feedback of pricing information into the software systems that reinforces the falsity of these reports. The more they are used and become "standard" in the industry without competition, the more the data is distorted from reflecting real market conditions.

## SIXTH CAUSE OF ACTION

### Violation of US Code Title 15 Sherman Act - Conspiracy

### Against All Defendants

224.   Plaintiffs refer to each and every paragraph in this complaint and incorporate those paragraphs as though set forth in full in this cause of action.

225.   The McCarran-Ferguson Act does not exempt insurers from conspiring to fix prices.

**TIME**

226.   Verisk was wholly owned by the Loveland brothers. State Farm purchased a 30% ownership in the 50% share owned by James Loveland after his 2005 death. Since then, State Farm and Verisk have been working together to analyze claims data, share it in Verisk's central database, and re-package historic data for new policy quotes.

**PLACE**

227.   State Farm and Verisk collaborate through custom online portals designed by Verisk for State Farm's specific uses. Employees of both companies attend industry conferences, and Verisk provides software training for State Farm.

**MANNER**

228.     Verisk is the hub in a hub-and-spoke cartel between State Farm and many other insurance customers, comprising between 88-91% market share of the national insurance industry, and growing. State Farm and the other insurance company spokes share their customer and cost data with Verisk, who then returns it to the spokes as part of its software product. The American Property Casualty Insurance Association looks to them as the source for all information about property and casualty insurance. Verisk reports "for at least 96 percent of all business written by U.S. property/casualty insurers."[12]

229.     State Farm and Verisk have conspired to eviscerate the Plaintiffs' life savings, without regard for how they are manipulating data and departing from standard local business practices in delivering qualified estimates of property values and construction costs.  They are doing this without license to operate in the fields of real estate and construction, but nonetheless acting with the upper hand due to their tremendous power in market, their volume allows them to disadvantage the Plaintiffs and many similarly situated families.

230.     Verisk and State Farm are conspirators in a "Hub-and-Spoke" conspiracy. A Hub-and-Spoke agreement is a collection of horizontal and vertical agreements. Plaintiffs allege that Verisk is the hub of the cartel, State Farm is one of the spokes, and that all insurers utilizing Verisk tools are the rim of the cartel, circling the wagons around a system that is faulty. The spokes are aware that their information is shared with one another and that this sharing has the effect of driving down homeowner insurance valuations and construction cost rebuild estimates. The Plaintiff policyholders have no way to know that they are underinsured, but State Farm and Verisk have every way to know, and they are deliberately underinsuring and underestimating.

231.     Defendants acted in concert to frustrate Plaintiffs' ability to receive benefits under their insurance policies, misled Plaintiffs regarding the extent and propriety of their selected coverages, and refused to investigate Plaintiffs' losses, thereby concealing the extent of Defendants' fraudulent, conspiratorial, anticompetitive, and bad faith conduct.

---

[12] "Property Casualty Insurance Results: 2018," Neil Spector, President ISO and Robert Gordon Senior VP, Policy, Research, and International, APCIA.

232.   The Plaintiffs allege that State Farm and Verisk, both persons and two major industry entities, intentionally agreed to violate state and federal law and defraud their customers, and committed to performing the Illusory Coverage Scheme in furtherance of the agreement.

**MEANS**

233.   Defendants colluded and conspired to build this system comprised of software products, process, and data, including training agents/failing to properly train agents, and setting up internal processes, which disadvantage the homeowners at each level of dealing with the insurance and claims process.

234.   Verisk is a monopoly construction cost data aggregator, working in concert with State Farm to deeply underinsure Plaintiff policyholders deliberately in a scheme to monopolize the market and drive profits. Verisk is not an insurance company, professional appraiser, real estate professional, or general contractor, yet it provides data analytics and predictive modeling tools to State Farm and other insurance company customers to provide all cost data at every step of the insurance process; data which turns out to be grossly inaccurate in a total disaster, full rebuild. Verisk has created tools it is using to decide the values, underwrite policies, and control claims, without the policyholder's involvement or concern for their recovery.

235.   Verisk data has been intentionally used in ways that it was not designed.  State Farm has moved to stand firmly behind Verisk's generic zip code data, as if that represents any information of interest to a unique subject property. Custom homes are not automobiles, and cannot be replaced with a standard kit of parts and set labor rates. The appropriate solution is to create a tool that actually quantifies and protects customer's individual needs for homeowners insurance, not market or construction cost averaging based on geographic area.

**EFFECT OF THE VIOLATION**

236.   Plaintiffs are consumers of the faulty reports from the zip code calculator produced by Verisk as part of their purchase of an underinsured State Farm policy. They have been sold underinsured policies because of State Farm and Verisk's conspiracy to sell a high volume of State Farm policies. These policies are not enough for the Plaintiffs to rebuild following a disaster.

237.   Plaintiffs are also consumers of Verisk's flawed construction cost data, as they are subjected to Verisk's database during the claims process, and are restrained from achieving actual rebuild value

because the software does not allow the adjuster to produce an accurate result. This results in the loss of the Plaintiffs' life savings because they cannot rebuild their most valuable asset.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and members of the alleged Class request that the Court enter an order or judgment against the Defendants, and each of them as named in the future, as follows:

1. For an award of Plaintiffs' past, present and future general, special, actual, and compensatory damages as proven at time of trial;

2. For reformation of Plaintiffs' insurance policies to mandate Coverage A at the true cost of rebuilding Plaintiffs' dwelling, and increasing all coverage limits commensurate with the new value of Coverage A, notwithstanding the stated policy limits;

3. For attorneys' fees, expert fees, consultant fees, engineering fees, related costs, and litigation costs and expense, as allowed under California Code of Civil Procedure § 1021.9;

4. Emotional distress damages for fear, worry, annoyance, disturbance, inconvenience, mental anguish, and for such other and further relief as the Court shall deem proper, all according to proof;

5. For punitive/exemplary and/or treble damages pursuant to California Civil Code §3294 and or US Code Title 15, Section 1, Chapter 15;

6. For prejudgment interest, according to proof, and interest, as allowed by law;

7. For all costs of suit incurred;

8. For injunctive relief:

   a. enjoining Defendants from continuing their alleged illegal conduct;

   b. enjoining State Farm from offering new insurance policies based on the use of 360 Value and/or Xactware without detailed interviews, site visits, market understanding, actual rebuild construction cost estimates, and explanations of the details of the quote;

   c. enjoining State Farm From adjusting claims by applying policy limits based on the use of 360 Value and/or Xactware without detailed interviews, site visits, market

understanding, actual rebuild construction cost estimates, and explanations of the details of the estimates;

d. compelling State Farm to provide better training to agents and adjusters in the use of any software they disseminate for underwriting policies or estimating construction  costs, and ensuring consistency between the underwriting and the replacement cost estimating;

e. compelling State Farm to issue replacement cost insurance policies that are based on the replacement cost of rebuilding the home as a singular rebuild regardless of the market value of the improvement at the time of policy issuance;

f. compelling State Farm to provide a second verification that the underwriting and policy values proposed will adequately protect homeowner's in the event of catastrophic loss;

g. compelling State Farm to provide "Truth in Insurance" disclosures at policy issuance, so that insureds understand the basis of the policy, the level of insurance and the maximum coverage afforded by the policy;

h. enjoining all Defendants from the monopolistic activities that are creating a stranglehold on the insurance industry;

i. enjoining Verisk from promoting their software to State Farm and other insurers based on claims of increasing the profits of insurers by reducing their payment on their obligations (denying the claims of the insureds);

j. compelling Verisk to create consistent products when selling multiple products to the same insurer and creating a method of ensuring that the products are coordinated;

k. and enjoining all other continuing unlawful and unfair business practices.

9. For such other and further relief which this Court deems just and proper.

Dated:  August 1, 2019

by:   /s/ Julia Donoho

Julia Donoho (SBN 263966)

 Attorney for Plaintiffs and the Proposed Class


by:   /s/ Rebecca McWilliams

Rebecca Mc Williams (Pro Hac Vice)

 Attorney for Plaintiffs and the Proposed Class