SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
FRANK FALZETTA, Cal. Bar No. 125146
JENNIFER M. HOFFMAN, Cal. Bar No. 240600
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:     213.620.1780
Facsimile:      213.620.1398
E-mail:          ffalzetta@sheppardmullin.com
                 jhoffman@sheppardmullin.com

JEFFREY S. CROWE, Cal. Bar No. 216055
650 Town Center Drive, 10th Floor
Costa Mesa, CA 92626-1993
Telephone:     714.424.8231
Facsimile:      714.428.5997
E-mail:          jcrowe@sheppardmullin.com

Attorneys for Defendant
**STATE FARM GENERAL INSURANCE COMPANY**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| BRIAN SHEAHAN and ALISON SHEAHAN, as husband and wife; DOUGLAS POPE and SUSAN AHART as husband and wife; NEIL WYLIE and SANDRA WYLIE, as husband and wife; MADONNA DAY, as a single woman; CARLOS PLASMAN, as a single man; GARY DENNIS and MARYLOU DENNIS as husband and wife; DIANE MALNEKOFF, as a single woman, and et al.<br><br>                    Plaintiffs,<br><br>          v.<br><br>STATE FARM GENERAL INSURANCE COMPANY, an Illinois company; VERISK ANALYTICS, Inc., INSURANCE SERVICES OFFICE, Inc., and XACTWARE SOLUTIONS, Inc., Delaware Corporations, all doing business in California;<br><br>                    Defendants. | Case No. 3:18-cv-06186-EMC<br><br>**DEFENDANT STATE FARM GENERAL INSURANCE COMPANY'S:**<br><br>**(1)      NOTICE OF MOTION AND MOTION TO DISMISS OR STRIKE PORTIONS OF PLAINTIFFS' THIRD AMENDED COMPLAINT; AND**<br><br>**(2)      MEMORANDUM OF POINTS AND AUTHORITIES.**<br><br>[Proposed Order submitted concurrently herewith]<br><br>Date:            November 14, 2019<br>Time:           1:30 p.m.<br>Courtroom:    5<br>Judge:          Hon. Edward M. Chen<br><br>Trial Date:    N/A |

TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on November 14, 2019, at 1:30 p.m. in Courtroom 5 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, defendant State Farm General Insurance Company ("State Farm") will, and hereby does, move the Court, under Federal Rule of Civil Procedure 12(b)(6), to dismiss the Third Amended Complaint ("TAC") filed by plaintiffs Brian and Alison Sheahan (the "Sheahans"), Neil and Sandra Wylie (the "Wylies"), Douglas Pope and Susan Ahart (the "Popes"), Madonna Day, Carlos Plasman, Gary and Marylou Dennis (the "Dennises"), and Diane Malnekoff (the Sheahans, the Wylies, the Popes, Ms. Day, Mr. Plasman, the Dennises and Ms. Malnekoff are collectively referred to herein as "Plaintiffs").

The Motion should be granted because Plaintiffs have either failed to adequately allege facts supporting their claims, or their claims are barred by California law.  Fed. R. Civ. Proc. 12(b)(6).  Thus, State Farm moves to dismiss Plaintiffs' entire TAC, including the First through Sixth Causes of Action for:  (1) Negligent Misrepresentation;  (2) Negligence; (3) Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("Section 17200"); (4) Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*; (5) Violation of the Sherman Act – Cartel; and (6) Violation of the Sherman Act – Conspiracy.

Alternatively, State Farm moves to dismiss or strike the portions of Plaintiffs' Section 17200 claim that the Court previously dismissed with prejudice.  Fed. R. Civ. Proc. 12(f).

State Farm bases its Motion upon this Notice, the attached Memorandum of Points and Authorities, the TAC and all attached exhibits, the concurrently filed Proposed Order, all other pleadings, papers and records on file in this action, those matters of which this Court may take judicial notice, and upon the oral argument of counsel made at the hearing, if any, on this Motion.

Dated:  September 19, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
*/s/ Jennifer M. Hoffman*
JENNIFER M. HOFFMAN
Attorneys for Defendant
STATE FARM GENERAL INSURANCE COMPANY

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND STATEMENT OF ISSUES ........................................................1

II.   BACKGROUND FACTS ............................................................................................4

      A.    Plaintiffs File Successive Pleadings Attempting to Plead a Valid Claim. ................4

      B.    The Court Grants State Farm's and Verisk's Motion to Dismiss..............................6

      C.    Plaintiffs File a Third Amended Complaint, But Fail to Cure The Pleading
            Defects...........................................................................................................7

III.  PLAINTIFFS MUST ALLEGE *FACTS*, NOT LEGAL CONCLUSIONS,  TO
      SURVIVE A MOTION TO DISMISS............................................................................7

IV.   PLAINTIFFS' CONCLUSORY ALLEGATIONS FAIL TO STATE A CLAIM ..............8

      A.    Plaintiffs Do Not Allege Facts Supporting their Misrepresentation Claim
            (Count 1) ........................................................................................................8

      B.    Plaintiffs' Negligence Claim Fails (Count 5)........................................................14

      C.    Plaintiffs' Section 17200 Claim Fails (Count 3) ...................................................16

            1.    Plaintiffs Improperly Re-Allege Claims Dismissed with Prejudice.............16

            2.    Plaintiffs Do Not Adequately Allege a "Fraudulent" Practice....................17

            3.    Plaintiffs Do Not Adequately Allege an "Unfair" Practice.........................17

      D.    Plaintiffs' Antitrust Claims Remain Deficient (Counts 4-6)...................................18

            1.    Plaintiffs Suffered No Antitrust Injury......................................................18

            2.    Plaintiffs Fail to State a Vertical Conspiracy Claim ...................................20

            3.    Plaintiffs Do Not Allege a "Hub-And-Spoke" Conspiracy Claim ..............22

            4.    Plaintiffs Do Not State a Cartwright Act Claim..........................................24

V.    CONCLUSION ........................................................................................................25

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Page(s)**

3

<u>Cases</u>

4

*A White and Yellow Cab, Inc. v. Uber Techs., Inc.*
  2017 WL 1208384 (N.D. Cal. 2017)........................................................................24

5

*Adamo v. Fire Ins. Exch.*
  219 Cal.App.4th 1286 (2013)................................................................................14

6

7

*Allied Ortho. Appliances Inc. v. Tyco Health Care Group LP*
  592 F.3d 991 (9th Cir. 2010).................................................................................22

8

9

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ..............................................................................................7

10

*Atl. Richfield Co. v. USA Petroleum Co.*
  495 U.S. 328 (1990) ..............................................................................................18

11

12

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*
  166 F.Supp.3d 988 (N.D. Cal. 2015) .......................................................................21

13

*Bell Atlantic v. Twombly*
  550 U.S. 544 (2007)....................................................................................7, 20, 23

14

15

*Brooke Group v. Brown & Williamson Tobacco Corp.*
  509 U.S. 209 (1993) ..........................................................................................20, 22

16

17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
  429 U.S. 477 (1977) ..............................................................................................18

18

*County of Toulumne v. Sonora Community Hosp.*
  236 F.3d 1148 (9th Cir. 2011)................................................................................24

19

20

*Davidson v. Kimberly Clark Corp.*
  76 F.Supp.3d 964 (N.D. Cal. 2014) .......................................................................17

21

*Diediker v. Peele Fin. Corp.*
  60 Cal.App.4th 288 (1997)....................................................................................10

22

23

*Dimidowich v. Bell & Howell*
  803 F.2d 1473 (9th Cir. 1986)................................................................................24

24

*DocMagic, Inc. v. Ellie Mae, Inc.*
  745 F. Supp. 2d 1119 (N.D. Cal. 2010) ...................................................................22

25

26

*Everett v. State Farm Gen. Ins. Co.*
  162 Cal.App.4th 649 (2008).........................................................................11, 13, 14

27

28

*Feitelson v. Google Inc.*
  80 F.Supp.3d 1019 (N.D. Cal. 2015) ...................................................................24

*Fitzpatrick v. Hayes*
  57 Cal.App.4th 916 (1997) ...................................................................... 15, 16

*Fox v. Pollack*
  181 Cal.App.3d 954 (1986) ......................................................................12

*In re Glenfed, Inc. Sec. Lit.*
  42 F.3d 1541 (9th Cir. 1994) ......................................................................8

*Graham v. Bank of American, N.A.*
  226 Cal.App.4th 594 (2014) ......................................................................11

*Hadland v. NN Investors Life Ins. Co.*
  24 Cal.App.4th 1578 (1994) .............................................................. 13, 14

*Hartford Cas. Ins. Co. v. Fireman's Fund Ins. Co.*
  220 F.Supp.3d 1008 (N.D. Cal. 2016) ......................................................16

*Huber, Hunt & Nichols, Inc. v. Moore*
  67 Cal. App.3d 278 (1977) ......................................................................10

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*
  466 U.S. 2 (1984) ...............................................................................22

*Kelley v. Mort. Elec. Reg. Sys.*
  642 F.Supp.2d 1048 (N.D. Cal. 2009) ......................................................8

*Kendall v. VISA, U.S.A., Inc.*
  518 F.3d 1042 (9th Cir. 2008) ................................................................20

*Malcom v. Farmers New World*
  4 Cal.App.4th 296 (1992) ......................................................................14

*Menasha Corp. v. News Am. Mktg. In-Store*
  354 F.3d 661 (7th Cir. 2004) ................................................................22

*In re Musical Instruments & Equip. Antitrust Litig.*
  798 F.3d 1186 (9th Cir. 2015) .......................................................... 23, 24

*Nat'l Football League's Sunday Ticket Antitrust Litig. v. DirecTV, LLC*
  933 F.3d 1136 (9th Cir. 2019) ................................................................21

*Nelson v. Am. Family Mut. Ins. Co.*
  899 F.3d 475 (8th Cir. 2018) .............................................................. 11, 12

*Paladin Assocs. v. Mont. Power Co.*
  328 F.3d 1145 (9th Cir. 2003) ................................................................20

*Resnick v. Hyundai Motor Am. Inc.*
   2016 WL 9455016 (C.D. Cal. 2016)..................................................................................8

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*
   2013 WL 5694452 (N.D. Cal. 2013)................................................................................24

*Roberts v. Assurance Co. of America*
   163 Cal.App.4th 1398 (2008)....................................................................................14, 15

*Sausalito Pharmacy, Inc. v. Blue Shield*
   544 F. Supp. 230 (N.D. Cal 1980) .................................................................................21

*In re Silicon Graphics, Inc. Sec. Lit.*
   970 F.Supp. 746 (N.D. Cal. 1997) ...................................................................................8

*Stearns v. Select Comfort Retail Corp.*
   2009 WL 1635931 (N.D. Cal. June 5, 2009) .............................................................18, 19

*Swartz v. KPMG LLP*
   476 F.3d 756 (9th Cir. 2007) (per curiam) ......................................................................8

*Tanaka v. Univ. of So. Cal.*
   252 F.3d 1059 (9th Cir. 2001) .......................................................................................21

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*
   346 U.S. 537 (1954) ......................................................................................................23

*Toscano v. PGA*
   258 F.3d 978 (9th Cir. 2001) .........................................................................................21

*Vess v. Ciba-Geigy Corp., USA*
   317 F.3d 1097 (9th Cir. 2003) .........................................................................................8

*Wallman v. Suddock*
   200 Cal.App.4th 1288 (2011).........................................................................................15

*Williams v. Smith*
   820 N.W.2d 807 (Minn. 2012) .......................................................................................12

*World Health & Educ. Found. v. Carolina Cas. Ins. Co.*
   612 F.Supp.2d 1089 (N.D. Cal. 2009) ...........................................................................13

SMRH:4828-7328-8097.7

**Statutes**

Cal. Bus & Prof. Code
    § 7026 ................................................................................................................16
    §§ 16700-16770 ................................................................................................24
    § 16727 ..............................................................................................................24
    § 17043 ........................................................................................................24, 25
    § 17203 ..............................................................................................................17

10 Cal. Code Regs. § 2695.183 ....................................................................3, 16, 17

Cal. Ins. Code
    § 10101 .........................................................................................................1, 13
    § 10102 .....................................................................................................1, 13, 14

Sherman Act, 15 U.S.C. §1 ......................................................18, 20, 21, 22, 23

**Other Authorities**

Fed. R. Civ. Proc.
    8 ..........................................................................................................................7
    9(b) ..........................................................................................2, 3, 6, 7, 8, 10, 17
    12(b)(6) ...............................................................................................................7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION AND STATEMENT OF ISSUES

Plaintiffs' Third Amended Complaint ("TAC") adds new parties and voluminous exhibits, but fails to cure the fatal defects this Court found in granting State Farm's previous Motion to Dismiss.  The Court should again grant State Farm's Motion and dismiss Plaintiffs' claims – this time *without* leave to amend.

All seven groups of Plaintiffs are State Farm insureds whose Northern California homes were destroyed by wildfire in 2017.  Plaintiffs allege that their homeowners policy limits were insufficient to rebuild their homes.  They seek to blame State Farm and one of its vendors, Verisk Analytics, Inc. ("Verisk"), for their failure to purchase higher limits.  According to Plaintiffs, State Farm's agents either knowingly or negligently used Verisk's "defective" replacement cost estimating tool (360Value) in setting their policy limits, which caused them to be underinsured.

Putting aside whether any of Plaintiffs' claims may properly be certified for class treatment (they cannot), the central premise of their suit fails.  California law is clear that homeowners, *not* insurers, are responsible for ensuring that their policy limits are adequate, because homeowners know their property and their circumstances best.  The California Residential Property Insurance Disclosure mandated by Insurance Code sections 10101 and 10102 encourages homeowners to review their policy limits carefully, obtain current replacement cost estimates, and advise insurers of any property improvements.  It also informs homeowners to consider insuring their property for more than its estimated replacement cost to account for "demand surge," the dramatic increase in construction and labor costs that commonly occurs after a widespread disaster, like the 2017 Northern California wildfires.

Plaintiffs do not allege that they did any of these things.  They simply, and vaguely, allege that years or even decades before their fire losses, they or a family member purchased a policy from a State Farm agent.  Plaintiffs contend that their dwelling coverage limit in place at the time of their loss differed from their contractors' post-disaster rebuild estimates.  They then jump to the conclusion that their initial dwelling limits chosen years earlier, based on a 360Value estimate or some other estimate of the cost to rebuild their home ("Estimate"), were unreasonably low, and

that State Farm and Verisk are liable for the difference between their current policy limits and their rebuild costs.  But that is not the law, and after four pleading attempts, Plaintiffs have yet again failed to allege any valid claim against State Farm.

Plaintiffs' negligent misrepresentation claim (Count 1) still fails to identify a specific misrepresentation that Plaintiffs relied upon to their detriment.  The Court previously dismissed Plaintiffs' intentional and negligent misrepresentation claims based on their failure to "allege with specificity what was told as to each of them in order to comply with Federal Rule of Civil Procedure 9(b)."  (ECF 63, p. 8:1-3).  Apparently in response to that ruling, the TAC now includes "Specific Allegations" exhibits which add factual detail regarding Plaintiffs' dealings with State Farm agents and the purchase of their policies.  Those "Specific Allegations" do *not* include any alleged representations made by State Farm or its agents regarding the accuracy of the 360Value tool or the adequacy of their policy limits.  Plaintiffs also do not claim that they received or relied upon any 360Value estimate in purchasing their policies or setting their limits.  Instead, those "Specific Allegations" exhibits confirm that Plaintiffs relied on their own assumptions and unfounded beliefs regarding the adequacy of their limits.

The only specific statement Plaintiffs allege in the TAC is one appearing on State Farm's website.  But all State Farm's website allegedly states is that its agents can utilize 360Value to assist customers with creating a replacement cost estimate.  Plaintiffs do not explain how that statement is false, nor do they allege that they ever saw or relied upon it before purchasing their policies.

In addition, Plaintiffs could never demonstrate reasonable reliance on an estimate as a rebuild cost guarantee.  By definition, a 360Value Estimate is just that – an estimate, *not* a guarantee.  In fact, Plaintiffs concede that their policies provide that "State Farm does not guarantee that any estimate will be the actual future cost to rebuild your home" following a loss.  The policies also include an integration clause that bars any misrepresentation claim based on purported promises or agreements not memorialized in the policies.

Plaintiffs' negligence claim (Count 2) fails because insurers generally have no duty to advise insureds regarding the adequacy of their policy limits.  Plaintiffs allege no facts supporting

an exception to that well-established rule.  Simply receiving an Estimate from their insurance agent does not suffice as a matter of law.

Plaintiffs' third claim for violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("Section 17200") improperly re-alleges claims that the Court previously dismissed with prejudice.  The Court's July 2019 Order granting State Farm's last motion to dismiss barred Plaintiffs from (1) re-alleging a Section 17200 claim based on the "unlawful" prong, or (2) seeking monetary damages under the guise of injunctive relief.  (ECF 63, pp. 9:25-10:28, 21:17).  Plaintiffs inexplicably disregarded that Order and re-allege both claims in the TAC, which should again be dismissed or stricken.  They also fail to plead a Section 17200 "fraudulent" prong claim with the specificity required by Rule 9(b).  Finally, Plaintiffs' "Specific Allegations" exhibits demonstrate that they cannot plead the only Section 17200 "unfair" prong theory that this Court found "plausible" in its ruling on State Farm's previous motion to dismiss. Other than the Sheahans, none of the Plaintiffs allege that 360Value Estimates were ever prepared before they purchased their policies, let alone that those estimates failed to include certain components now mandated by 10 Cal. Code Regs. § 2695.183.  As for the Sheahans, they fail to tie their alleged underinsurance injury to any deficiency in the 360Value Estimate prepared for their home.

Finally, Plaintiffs' state and federal antitrust claims (Counts 4 through 6) again fail because they still do not allege facts supporting an antitrust injury, a vertical conspiracy violating Section 1 of the Sherman Act, or a "hub-and-spoke" conspiracy barred by Section 1 of the Sherman Act. Their Cartwright Act claim, which largely mirrors their Sherman Act claim, fails for similar reasons, and because the specific Cartwright Act provisions cited in connection with that claim have nothing to do with the subject matter of the TAC.

As this is now Plaintiffs' fourth attempt at stating a valid claim, State Farm requests that the Court dismiss Plaintiffs' TAC in its entirety, ***without*** leave to amend.

## II.   BACKGROUND FACTS

**A.**   **Plaintiffs File Successive Pleadings Attempting to Plead a Valid Claim.**

Plaintiffs filed their original Complaint in this lawsuit on October 10, 2018.  (ECF 1).  They filed their First Amended Complaint in December 2018.  (ECF 12).  In January 2019, they filed their Second Amended Complaint.  (ECF 28, "SAC").

In all of their pleadings, Plaintiffs alleged that their homes were destroyed by wildfires in Northern California in 2017, and that their State Farm homeowners policy limits were insufficient to rebuild.  Recognizing that California law does not generally impose a duty on homeowners insurers to set adequate policy limits, Plaintiffs vaguely alleged that State Farm undertook a special duty "through the behavior of its sales agents and the plain language on its website."  (SAC, ¶ 58).  They alleged that State Farm's website states that "your State Farm agent can utilize an estimating tool from Xactware Solutions to assist you with an estimate."  (SAC, ¶ 55).

That estimating tool is 360Value, one of two Verisk software products used by State Farm.  (SAC, ¶ 45).  Plaintiffs conceded that, "[a]fter a detailed inventory and input … 360Value can deliver an accurate result."  (SAC, ¶ 49).  But, they claimed that, either "intentionally or by negligence, most State Farm agents do not use 360Value in the correct manner to achieve an accurate result."  (SAC, ¶ 49).  Plaintiffs alleged that State Farm's agents did not use 360Value properly, because "they were never specifically interviewed about the qualities of their dwelling such as might be appropriate to create a reasonable estimate of value for underwriting."  (SAC, ¶ 84).

Despite not providing agents with information they believed was necessary to create a reliable estimate, Plaintiffs alleged that State Farm "sets an expectation and understanding that Plaintiffs can rely upon the 360Value to be a correct and accurate policy limits value."  (SAC, ¶ 58).  Plaintiffs allege that State Farm does this by "setting policy limits based upon the exact cost in the 360Value document."  (SAC, ¶ 58).  Yet, Plaintiffs inconsistently alleged that policy limits are "often" more than the 360Value result.  (SAC, ¶ 49).  Indeed, none of their policy limits matched their alleged Estimates.  (SAC, ¶ 53).

With the exception of the Sheahans, Plaintiffs also did not clearly allege that they ever received a 360Value estimate.  Plaintiffs' claimed that each received a "360/Initial Value" estimate, but did not explain what an "Initial Value" estimate was, who prepared "Initial Value" estimates, or how an "Initial Value" estimate differed from a 360Value estimate.  (SAC ¶ 53).

Importantly, Plaintiffs *admitted* that they received several written disclaimers regarding the 360Value tool and Estimates generally.  They alleged that the Sheahans' 360Value Estimate included the following language:

> This Xactware estimate provides an estimated replacement cost based on the information you provided about the age, style, size, and features of the building.  The more information you provide, the more the estimate will reflect the individual characteristics of the building.  …  This is a general estimate provided for State Farm® customers and should not be considered to be a professional replacement cost survey of the building.  (SAC, ¶ 58, p. 13).

They also alleged that their State Farm policies included the following language:

> The limit of liability for this structure (coverage A) is based on an estimate of the cost to rebuild your home, including an approximate cost for labor and materials in your area, and specific information that you have provided about your home.  ***It is up to you to choose the coverages and limits that meet your needs.***  We recommend that you purchase a coverage limit at least equal to the estimated replacement cost of your home.  Replacement cost estimates are available from building contractors and replacement cost appraisers, or, your agent can provide an estimate from a third-party vendor using information you provide about your home.  We can accept the type of estimate you choose as long as it provides a reasonable level of detail about your home.  ***State Farm does not guarantee that any estimate will be the actual future cost to rebuild your home.***  Higher limits are available at higher premiums.  Lower limits are also available, which if selected may make certain coverages unavailable to you.  ***We encourage you to periodically review your coverage and limits with your agent and to notify us of any changes or additions to your home.***  (SAC, ¶ 62) (emphasis added).

Consistent with that disclosure, Plaintiffs conceded that "State Farm does not offer a guarantee as to the actual cost to rebuild a policyholder's home."  (SAC, ¶ 63).  While all Plaintiffs alleged receiving the above disclosures, not one alleged facts supporting that they saw or relied upon State Farm's website, or any specific conduct or statement by a State Farm agent, in purchasing their policies or setting their dwelling limits.

Based on these vague allegations, Plaintiffs asserted thirteen separate putative class claims against State Farm, and eleven against Verisk, on behalf of themselves and all "homeowners who have purchased homes and insured with State Farm, sustained damage or loss during the Northern California Wildfires, and their property has been undervalued by State Farm's business practices." (SAC, ¶ 29).

**B.** **The Court Grants State Farm's and Verisk's Motion to Dismiss.**

State Farm and Verisk moved to dismiss all of Plaintiffs' claims.  State Farm explained, among other things, that the fraud-based claims failed to satisfy Rule 9(b).  Plaintiffs also could not have reasonably relied on any Estimate as a replacement cost guarantee based on the policy disclaimers they admittedly received and the integration clause included in the policy.  State Farm added that Plaintiffs' antitrust claims failed for numerous reasons, including that Plaintiffs had not alleged any type of antitrust injury.

On July 2, 2019, the Court issued an Order granting State Farm's and Verisk's motions. (ECF 63).  The Court dismissed all of Plaintiffs' fraud-based claims, including their claim under the "fraudulent" prong of Section 17200 claim, with leave to amend.  (ECF 63, p. 21:12-23).  The Court found that Plaintiffs had not alleged "with specificity what was told as to each of them." (ECF 63, p. 8:2).  The Court did not reach State Farm's additional defenses based on the policy's disclaimers and integration clause, because the Court lacked "an understanding as to what the alleged misrepresentations were in the first place."  (ECF 63, p. 8:8-12).  The Court also dismissed Plaintiffs' negligence claim, on the ground that it was duplicative of their negligent misrepresentation claim.  (ECF 63, p. 9:15).

The Court found all of Plaintiffs' antitrust claims "deficient" for "various" reasons, including that they had not alleged any antitrust injury, had not adequately alleged a conspiracy between State Farm and Verisk, and had not identified any purported restraint of trade.  (ECF 63, pp. 14-16).  The Court therefore dismissed those claims with leave to amend.

The Court also dismissed, with prejudice, Plaintiffs' Section 17200 claim to the extent that it was based on "unlawful" conduct.  (ECF 63, p. 21:17).  The Court found their Section 17200 "unfair" prong claim viable only on to the extent they alleged that State Farm unfairly failed to

1   include certain cost items in an Estimate.  However, the Court dismissed, with prejudice,

2   Plaintiffs' request for monetary damages and an injunction ordering State Farm to issue additional

3   policy disclosures not required by law.  (ECF 63, pp. 9:25-10:28).

4   **C.**      **Plaintiffs File a Third Amended Complaint, But Fail to Cure The Pleading Defects.**

5          On August 2, 2019, Plaintiffs filed their TAC which repeats many of the conclusory

6   allegations of the SAC, but now alleges only six claims for relief (negligent misrepresentation,

7   negligence, a Section 17200 claim, and three antitrust claims).

8          The TAC also includes a "Specific Allegations" exhibit for each of the now seven groups

9   of Plaintiffs.  (ECF 66-1, 66-6, 66-12, 66-17, 66-23, 66-33, 66-38).  Those exhibits add new

10  allegations regarding Plaintiffs' purchase of their policies and the handling of their fire loss

11  claims.  (*Id.*).  But none of those exhibits identifies a specific false misrepresentation by State

12  Farm or any of its agents that any Plaintiff relied on to their detriment, as Rule 9(b) requires.  (*Id.*).

13  Nor does the TAC allege antitrust injury, or cure any of the other pleading defects the Court

14  identified in its Order granting State Farm's prior pleading motion.

15      **III.**      **PLAINTIFFS MUST ALLEGE *FACTS*, NOT LEGAL CONCLUSIONS,**

16                    **TO SURVIVE A MOTION TO DISMISS**

17         Rule 8 of the Federal Rules of Civil Procedure requires, at a minimum, enough specific

18  factual allegations to provide both "fair notice" of the particular claim being asserted and the

19  "grounds" upon which that claim rests. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).  "A

20  plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than

21  labels and conclusions …." *Id.*   To avoid dismissal under Rule 12(b)(6), a plaintiff must allege

22  "more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*,

23  556 U.S. 662, 678 (2009).  Rather, a complaint must "contain sufficient factual matter, accepted as

24  true, to 'state a claim for relief that is plausible on its face.'" *Id.*  "[A] formulaic recitation of the

25  elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555).

26

27

28

1        IV.        **PLAINTIFFS' CONCLUSORY ALLEGATIONS FAIL TO STATE A CLAIM**

2        A.        **Plaintiffs Do Not Allege Facts Supporting their Misrepresentation Claim (Count 1)**

3                 Plaintiffs' claim for negligent misrepresentation is subject to Rule 9(b)'s heightened

4        pleading standard and must be plead with particularity.  Fed. R. Civ. Proc. 9(b).  That requires, at a

5        minimum, that Plaintiffs allege the "time, place and specific content of the false representations as

6        well as the identities of the parties to the misrepresentations."  *Swartz v. KPMG LLP*, 476 F.3d

7        756, 764 (9th Cir. 2007) (per curiam) (internal citation omitted); *see also Vess v. Ciba-Geigy*

8        *Corp., USA*, 317 F.3d 1097, 1106-08 (9th Cir. 2003).  Plaintiffs "must set forth what is false or

9        misleading about the statement, and why it is false."  *In re Glenfed, Inc. Sec. Lit.,* 42 F.3d 1541,

10       1548 (9th Cir. 1994), superseded by statute on other grounds as stated in *In re Silicon Graphics,*

11       *Inc. Sec. Lit.*, 970 F.Supp. 746, 754 (N.D. Cal. 1997).  Plaintiffs must also allege facts supporting

12       that they actually and reasonably relied on the false statements.  *Kelley v. Mort. Elec. Reg. Sys.*,

13       642 F.Supp.2d 1048, 1056 (N.D. Cal. 2009).

14                 ***No misrepresentation***.  Plaintiffs make the conclusory allegation that "State Farm

15       misrepresented the limits of the Plaintiffs' insurance policies as adequate," but still fail to offer

16       specific factual allegations to support that claim as Rule 9(b) requires.  (TAC, ¶112.)  As before,

17       Plaintiffs allege only the following specific statement on State Farm's website:

18                      The most appropriate way to estimate the replacement cost of your
                        home is to hire a building contractor or other building professional
19                      to produce a detailed replacement cost estimate.  Or your State Farm
                        agent can utilize an estimating tool from Xactware Solutions to
20                      assist you with an estimate.  (TAC, ¶84.)

21                 Like before, not one Plaintiff alleges that they actually saw this website statement before

22       purchasing their policy.  That omission alone is fatal.  *See, e.g., Resnick v. Hyundai Motor Am.*

23       *Inc.*, 2016 WL 9455016, *15 (C.D. Cal. 2016) (plaintiffs failed to plead actual reliance where they

24       did not allege facts supporting that they saw the alleged misrepresentations on the defendant's

25       website) (citing *Durell v. Sharp Healthcare*, 183 Cal.App.4th 1350, 1363 (2010) (same)).

26                 Even if Plaintiffs had alleged that they visited State Farm's website, they do not contend

27       that this website statement alone was false or misleading.  Instead, Plaintiffs again allege that State

28       Farm's website, combined with "the behavior of its sales agents," falsely represented to them that

1    the 360Value tool is as reliable as a contractor estimate.  (TAC, ¶87).  But, Plaintiffs also concede

2    that the 360Value tool *can* produce reliable replacement cost estimates.  (TAC, ¶78).  The Court

3    noted that concession, and the absence of any specific allegation of "what was told as to each of

4    them," in dismissing Plaintiffs' fraud-based claims in the SAC.  (ECF 63, pp. 7:11-14, 8:2).

5        In an effort to cure that defect, the TAC now includes "Specific Allegations" exhibits for

6    each group of Plaintiffs.  But, those exhibits do ***not*** allege any specific statement by State Farm

7    regarding 360Value, or anything else.  Rather, the allegations in those exhibits only confirm the

8    ***absence*** of any actionable misrepresentation here.

- ***The Sheahans:***  "The agent never asked what the property should be insured for and the Sheahans let him decide.  There was no discussion of policy limits or additional options, the Agent only discussed policy costs."  (ECF 66-1, ¶2).  "The Sheahans relied on the agent to take care of them because the agent was a licensed agent and was from Healdsburg, so they assumed he knew the market area.  The Sheahans believed that the[] Agent was taking care in the intervening years because the policy increased with renewals."  (*Id.*, ¶3).

- ***The Popes:***  The agent "did not explain the underwriting."  (ECF 66-6, ¶2).  "Despite huge variation in the economy over 17 years, [the agent] never suggested any review or adjustment to the policy."  (*Id.*, ¶6).  Mr. Pope "relied on State Farm's reputation in the marketplace …."  (*Id.*, ¶11).

- ***The Wylies:***  "The Wylies only questions [sic] was 'We bought a new house and we need insurance – How much do we need?' The agent did the rest."  (ECF 66-12, ¶1).  "They believed they would be well insured by a large national company with a professional reputation."  (*Id.*, ¶4).

- ***Ms. Day:***  "The husband passed and is the one who spoke with the agent, so nothing further is known about what questions were asked or answered to issue coverage."  (ECF 66-17, ¶ 1).  "Ms. Day does not recall any discussion of reviewing the policy with the agent and has no recollection of any opportunity to discuss appropriate coverage amounts for dwelling or personal property."  (*Id.*, ¶3).

- ***Mr. Plasman:***  "[Mr. Plasman] sent instructions for insurance to … Agent Tim Stannish on June 28, 1983 by mail [citation].  The Agent issued a policy of insurance for a rental property without any inquiry of Mr. Plasman …."  (ECF 66-23, ¶1).  "Since Mr. Plasman was out of the country he had no way to know if the Agent visited the site or how the value was set, He [sic] just had to trust the Agent knew what he was doing."  (*Id.*, ¶2).

- ***The Dennises:***  "Around 2005, they met with [the Agent] at his office in Larkfield to review the policy.  They got the impression that the policy was fine …."  (ECF 66-33, ¶4).  "The Dennis's [sic] felt that there was no reason to change the policy over time because there were no claims and no issues.  After they met with [the Agent], they felt the[] Agent should know

what is appropriate and had no reason to doubt the adequacy of insurance. They felt he was competent.  They relied on State Farm because their advertising buzz is huge as one of the largest insurers in the US, they felt they could rely on that."  (*Id.,* ¶7).

• **Ms. Malnekoff:**  "The agent asked questions about her home, and filled out a form.  Ms. Malnekoff never saw the application form, and it is not signed.  They did not discuss the basis of her insurance policy amount, and did not talk about personal property needs either. …  Ms. Malnekoff believed that Ron Hozak knew what he was talking about."  (ECF 66-38, ¶1).

These new "Specific Allegations" do not even come close to pleading agent misrepresentations with the specificity required by Rule 9(b).  In fact, they confirm that the opposite it true – that **no** Plaintiff relied on any statement by State Farm or its agents in setting their policy limits.  Instead, they relied on their own subjective beliefs and unsupported assumptions about what the agents knew or what they thought the agents would do in the years after they purchased their policies and set their limits.  That does not suffice.  California law is clear that negligent misrepresentation "requires a 'positive assertion.'"  *Diediker v. Peele Fin. Corp.*, 60 Cal.App.4th 288, 297-298 (1997) (internal citation omitted).  "An 'implied' assertion or representation is not enough."  *Id.* at 298 (internal citation omitted); *Huber, Hunt & Nichols, Inc. v. Moore*, 67 Cal. App.3d 278, 304 (1977) ("No case has been cited and we find none in which any court held that the doctrine of negligent misrepresentation applies to implied representations. In all cases a 'positive assertion' was involved.").  Moreover, "[p]arties cannot read something into a neutral statement in order to justify a claim for negligent misrepresentation."  *Diediker*, 60 Cal.App.4th at 297.

**No actual reliance**.  Because they fail to allege a positive misrepresentation, Plaintiffs cannot establish actual reliance.  In fact, the TAC now specifically alleges State Farm's agents treated the 360Value tool "as proprietary trade secret information and did not show the zip code calculator results to the policyholder, and generally discussed only the cost of coverage with the policyholder at the time of issuance."  (TAC, ¶34).  And the new "Specific Allegations" exhibits support that only *one* of the seven groups of Plaintiffs – the Sheahans – had a pre-policy issuance 360Value Estimate prepared for their property.  The Sheahans, however, expressly disclaim that

they ever saw, much less relied upon, that estimate in purchasing their policy and setting their limits.  (ECF 66-1, ¶2).

*__No reasonable reliance__*.  In addition to lacking facts supporting falsity and actual reliance, Plaintiffs do not and cannot allege that they ***reasonably*** relied on any Estimate, 360Value or otherwise, as a replacement cost guarantee.  That is because a replacement cost estimate is just that – an ***estimate*** – and cannot support claims against an insurer for bad faith, misrepresentation or policy reformation.  *Everett v. State Farm Gen. Ins. Co*., 162 Cal.App.4th 649, 653, 661 (2008).

Like this case, *Everett* involved a home destroyed by fire, and a homeowner who alleged that her State Farm policy limits were too low to fully rebuild.  Like Plaintiffs here, Everett alleged numerous theories against State Farm seeking to hold it liable for the difference.  The trial court found that all of her theories failed as a matter of law, and the Court of Appeal affirmed.  In particular, the court agreed with State Farm that "it never represented to her that her home was covered for up to 100 percent of the amount to replace her property."  *Everett*, 162 Cal.App.4th at 654.  To the contrary, State Farm repeatedly reminded Everett that it was her duty to ensure that her stated policy limits were adequate:

> Each year that Everett had her insurance with State Farm, State Farm sent renewal certificates.  These certificates reminded Everett that the replacement cost figure identified by State Farm was merely an estimate, and that it was her responsibility to determine whether her property was adequately insured.  Thus, contrary to Everett's contention that it was State Farm's duty to maintain policy limits equal to replacement cost, Everett bore such duty.

*Id.* at 661.  As a result, the court held that there was "no misrepresentation, negligent or intentional" that could support Everett's claims.  *Id.* at 664; *see also*, *Graham v. Bank of American, N.A.*, 226 Cal.App.4th 594, 606 (2014) (statements regarding the estimated appraised value of property are not actionable misrepresentations).

The Eighth Circuit Court of Appeal came to the same conclusion just last year in *Nelson v. Am. Family Mut. Ins. Co.*, 899 F.3d 475, 481 (8th Cir. 2018).  In *Nelson*, the plaintiffs' homeowners insurer, American Family, relied on 360Value to estimate the replacement cost of plaintiffs' home.  *Id.* at 478.  According to plaintiffs, the designated "quality grade" for their home led to a replacement cost that was too high.  *Id.* at 478-479.  They sued American Family for

breach of contract, negligent misrepresentation and consumer fraud claims, all "based on the notion that the company misrepresented the replacement cost of the property, which caused [the insureds] to pay excessive premiums." *Id.* at 477.

Applying Minnesota law, which requires the same justifiable reliance element for fraud-based claims as California law (*compare Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012) with *Fox v. Pollack*, 181 Cal.App.3d 954, 962 (1986)), the Eighth Circuit rejected plaintiffs' claims.  Like State Farm's policy here, American Family's Gold Star Homeowners Insurance Policy expressly disclaimed any replacement cost guarantee, as follows:

> The actual cost to replace your dwelling may be different.  We do not guarantee that this figure will represent the actual cost to replace your dwelling.  You are responsible for selecting the appropriate amount of coverage.  You may wish to obtain a detailed replacement cost appraisal or estimate from a contractor.

*Nelson*, 899 F.3d at 478.  Thus, American Family "[did] not guarantee its replacement cost estimate will be the actual replacement in the event of a covered loss;" instead, it was "up to the policyholder to select the proper amount of coverage."  *Id.* at 481.  "Under these circumstances," the Eighth Circuit concluded, "the [insureds] cannot show justifiable reliance upon American Family's replacement cost estimates."  *Id.* at 481.[1]

**_Written disclaimers_**.  Similarly here, Plaintiffs admit that State Farm disclosed that their replacement cost estimate was merely an estimate, that it does **_not_** guarantee that any replacement cost estimate will be the actual cost to rebuild their home after a loss, and that it was Plaintiffs' responsibility to ensure that their policy limits were adequate.  (TAC, ¶¶ 91-92).  Specifically, State Farm's policy explained that it is up to the insured "to choose the coverages and limits that meet your needs," and that "State Farm does not guarantee that any estimate will be the actual future cost to rebuild your home" (TAC, ¶ 91).  The 360Value Estimate form also cautions that it

---

[1] The *Nelson* Court also rejected the breach of contract claim because "[n]othing in the Policy imposes on American Family a contractual obligation to make objectively reasonable or accurate replacement cost estimates."  *Id.* at 480.  Additionally, the consumer fraud claim failed because "[a]ny claim that the replacement costs estimate was a false statement is contrary to the express provision of the Policy that clearly states that the estimate may or may not be correct and that the insured should independently verify the proper amount of coverage."  *Id.* at 482.

is "a general estimate provided for State Farm customers and should not be considered to be a professional replacement cost survey of the building."  (TAC, ¶¶ 86 and 87, Exh. 5).  Those disclosures are consistent with California law, which mandates that insurers include a California Residential Property Insurance Disclosure (the "Disclosure") with all residential property insurance policies.  Cal. Ins. Code §§ 10101-10102.  The Disclosure advises insureds, among other things:

> **READ YOUR POLICY AND POLICY DECLARATIONS PAGE CAREFULLY:**  The policy declarations page shows the specific coverage limits you have purchased for your dwelling ….  It is important to take the time to consider whether the limits and limitations of your policy meet your needs. …
>
> **THE RESIDENTIAL DWELLING COVERAGE LIMIT:**  The coverage limit on the dwelling structure should be high enough so you can rebuild your home if it is completely destroyed. … You are encouraged to obtain a current estimate of the cost to rebuild your home from your insurance agent, broker, or insurance company or an independent appraisal from a local contractor, architect, or real estate appraiser. … While not a guarantee, a current estimate can help protect you against being underinsured.
>
> **DEMAND SURGE:**  After a widespread disaster, the cost of construction can increase dramatically as a result of the unusually high demand for contractors, building supplies and construction labor.  This effect is known as demand surge.  Demand surge can increase the cost of rebuilding your home.  Consider increasing your coverage limits or purchasing Extended Replacement Cost coverage to prepare for this possibility.

Cal. Ins. Code § 10102; see also ECF 66-3, pp. 5-6.

 *Integration clause*.  The TAC's new Exhibits also reflect inclusion of an integration clause in State Farm homeowner policies.  (See, e.g., ECF 66-14, p. 12) ("You agree, by acceptance of this policy, that: … 4.  this policy contains all of the agreements between you and us and any of our agents.").  California courts enforce that clause to bar fraud, misrepresentation and estoppel claims based on alleged representations not included in the written policy.  *Everett*, 162 Cal.App.4th at 664 ("no alleged oral representation could have been effective to change the terms of the fully integrated policy"); *World Health & Educ. Found. v. Carolina Cas. Ins. Co.*, 612 F.Supp.2d 1089, 1097 (N.D. Cal. 2009) (dismissing without leave to amend fraud, misrepresentation and promissory estoppel claims alleging promise of broader coverage than

1    provided under fully integrated policy); *see also Hadland v. NN Investors Life Ins. Co.*, 24

2    Cal.App.4th 1578 (1994) ("A court must hold the insured bound by clear and conspicuous

3    provisions in the policy, even if evidence suggests that the insured did not read or understand

4    them."). Similarly here, the clause bars a misrepresentation claim based on some oral statement

5    that contradicts the express language of their policies.

6    **B.      Plaintiffs' Negligence Claim Fails (Count 5)**

7           The Court previously dismissed Plaintiffs' negligence claim as duplicative of their fraud-

8    based claims, which failed. (ECF 63, p. 9:11-17). That reasoning still applies, as Plaintiffs' TAC

9    again centers its negligence claim on a purported misrepresentation. (ECF 66, ¶150). According to

10   Plaintiffs, State Farm undertook a "duty" to ensure that their policy limits were accurate based on

11   "affirmative assertions that the values provided for rebuilding Plaintiffs' homes were accurate."

12   (*Id.*). As detailed above, that conclusory allegation is insufficient.

13          To the extent Plaintiffs' TAC could be construed as alleging some negligence theory

14   independent of any purported misrepresentation, it still fails. California courts consistently hold

15   that an insurer "is permitted to set policy limits on a homeowners fire policy," but that "'[i]t is up to

16   the insured to determine whether he or she has sufficient coverage for his or her needs.'" *Adamo*

17   *v. Fire Ins. Exch.*, 219 Cal.App.4th 1286, 1295 (2013) (quoting *Everett*, 162 Cal.App.4th at 649).

18   In other words, California law squarely "places the burden of determining the higher limit of

19   liability needed on the insured." *Everett*, 162 Cal.App.4th at 660-661 (citing Cal. Ins. Code §§

20   10101, 10102). Thus, an insurer generally has no duty to make a particular kind or extent of

21   coverage available, advise an insured of the availability of such coverage elsewhere in the

22   industry, or "advise them of inadequacies in coverage of which [insureds] as reasonable persons,

23   have themselves been aware." *Gibson*, 162 Cal.App.3d at 452; *Malcom v. Farmers New World*,  4

24   Cal.App.4th 296, 303-304 (1992).

25          Likewise, an insurance agent "generally has no duty to volunteer that an insured should

26   obtain different or additional insurance coverage." *Roberts v. Assurance Co. of America*, 163

27   Cal.App.4th 1398, 1403-04 (2008). That rule changes "when—but only when—one of the

28   following three things happens: (a) the agent misrepresents the nature, extent or scope of the

coverage being offered or provided …, (b) there is a request or inquiry by the insured for a particular type or extent of coverage …, or (c) the agent assumes an additional duty by either express agreement or by 'holding himself out' as having expertise in a given field of insurance being sought by the insured …." *Id.* at 1404.  Simply having a longtime relationship with an agent, an agent having superior knowledge regarding coverages, or an agent reviewing an insured's policy does not suffice. *Fitzpatrick v. Hayes*, 57 Cal.App.4th 916, 929 (1997); *Wallman v. Suddock*, 200 Cal.App.4th 1288, 1312 (2011) (allegation that purchased insurance from agent for years and followed agent's advice on insurance matters not sufficient to support heightened duty as "insurance expert").  Whether a heightened duty sufficient to support a negligence claim exists is a question of law. *Fitzpatrick v. Hayes*, 57 Cal.App.4th at 920.

In *Fitzpatrick*, the Fitzpatricks alleged that their State Farm agent assumed a duty to advise them regarding adequate coverage where:  (1) they had purchased insurance from their agent for 20 years, (2) they relied on their agent to advise them regarding adequate coverage, and (3) the agent "led [Mr. Fitzpatrick] to believe" that the coverage "was fine." *Id.* at 927-928.  The trial court found that that evidence did not support a heightened duty as a matter of law and granted summary judgment on their negligence claim for State Farm.  The Court of Appeal affirmed, finding "notably lacking from this conclusory statement [by Mr. Fitzpatrick] any sort of specific inquiry from [him] to [the agent] much less specific advice in the opposite direction." *Id.* at 928.  The court also rejected that State Farm held out its agent as an insurance "expert" based on general statements in a "Family Insurance Checkup" brochure.  That brochure simply "and in very bland terms, … suggests that the insured ask himself or herself—and perhaps then the agent—about additional insurance needs." *Id.* at 929.  In sum, the court agreed with other California courts that have "steadfastly refused to find any such enlarged duty" based on "the longtime relationship between them and their agent, the generally superior knowledge of the agent regarding coverages, [or] the agent's review of the policies issued." *Id.* at 930.

Plaintiffs' "Specific Allegations" exhibits, excerpted above, show that they rely on precisely the same type of allegations the plaintiffs in *Fitzpatrick* offered to support their claim of a heightened duty.  (ECF 66-1, 66-6, 66-12, 66-17, 66-23, 66-33, 66-38).  As *Fitzpatrick* squarely

1   held, those types of allegations do not impose on an insurance agent the duty to advise an insured

2   regarding the adequacy of their policy limits.

3        To the extent Plaintiffs claim the statements on State Farm's website supported a

4   heightened duty, that fails because no Plaintiff alleges having seen the website before purchasing

5   their policy.  *Hartford Cas. Ins. Co. v. Fireman's Fund Ins. Co*., 220 F.Supp.3d 1008, 1018 (N.D.

6   Cal. 2016) (website statements from 2013 not sufficient to create an elevated duty of care of

7   insurance agents to insured in 2008 when policy purchased).  Even if they had, all State Farm's

8   website allegedly said was that its agents could assist with providing an estimate prepared by

9   360Value.  Like the brochure at issue in *Fitzpatrick*, that general statement falls far short of

10   "holding out" that State Farm agents have some special estimating expertise.  *See, e.g*., *Fitzpatrick*,

11   57 Cal.App.4th at 929.  In addition, Plaintiffs concede that State Farm does not guarantee that any

12   Estimate would accurately reflect the cost to rebuild or replace their property following a loss.

13   (TAC, ¶92).  Thus, as a matter of law, no heightened duty exists here.

14   **C.**    **<u>Plaintiffs' Section 17200 Claim Fails (Count 3)</u>**

15       **1.**    **<u>Plaintiffs Improperly Re-Allege Claims Dismissed with Prejudice</u>**

16        The Court previously dismissed, with prejudice, Plaintiffs' Section 17200 claim to the

17   extent it was based on an "unlawful" act.  (ECF 63, p. 21:17).  The TAC disregards that ruling,

18   and again improperly alleges a section 17200 claim based on purported violations of 10 Cal. Code

19   Regs. § 2695.183 and Cal. Bus. & Prof. Code § 7026.  (TAC ¶¶ 184-192).  Plaintiffs relied on

20   both of those laws in opposing State Farm's last Motion to Dismiss.  (ECF 43, p. 13: 26-27).  State

21   Farm responded by explaining why neither law applied here.  (ECF 60, pp. 10-12).  Plaintiffs

22   cannot resurrect a Section 17200 "unlawful" claim based on those laws after the Court dismissed

23   their "unlawful" theory with prejudice.

24        The Court also dismissed, with prejudice, Plaintiffs' requests for injunctive relief requiring

25   State Farm to:  (1) adjust their claims "without respect to the policy limits set forth in their

26   homeowners insurance policies," as that amounted to a request for monetary damages which

27   Section 17200 does not allow; and (2) issue "Truth in Insurance" disclosures, as the Legislature

28   has already mandated what disclosures must be provided.  (ECF 63, p. 10:8-11:4).  Plaintiffs

inexplicably renew those requests in their TAC.  (ECF 66, ¶197 and p. 49:26-50:15).  The Court should enforce its prior Order and again dismiss or strike Plaintiffs' Section 17200 claim to the extent it is based on purported "unlawful" conduct and seeks impermissible relief.

### 2.   Plaintiffs Do Not Adequately Allege a "Fraudulent" Practice.

Claims alleged under Section 17200's fraudulent prong are subject to Rule 9's heightened pleading requirement.  *Davidson v. Kimberly Clark Corp.*, 76 F.Supp.3d 964, 974 (N.D. Cal. 2014) (dismissing without leave to amend Section 17200, Section 17500 and other claims where, among other things, the plaintiff failed to allege those fraud-based claims with particularity under Rule 9(b).  As discussed above, Plaintiffs have failed to allege fraud with specificity.  Consequently, they have not alleged a "fraudulent" practice under Section 17200.  *Id.*

### 3.   Plaintiffs Do Not Adequately Allege an "Unfair" Practice.

The Court previously found Plaintiffs' Section 17200 claim viable against State Farm "to the extent that Plaintiffs allege unfair conduct because State Farm did not include certain expenses in its estimate (*i.e.* regardless of what § 2695.183 requires)."  (ECF 63, p. 10:3-5).

The TAC, however, does not adequately allege any such "unfair" prong claim.  Plaintiffs repeat their prior general allegation that State Farm's "method of calculating the initial policy limits replacement cost of Plaintiffs' homes" did not consider several components required by later-enacted Section 2695.183 – more specifically, that "[t]he 360Value estimate failed to include:  (1) costs for architects plans; (2) roofing material and type of roof; (3) Whether the structure is located on a slope; (4) Nonstandard wall heights; and (5) Size and type of attached garage."  (TAC, ¶185).  But in their new "Specific Allegations" exhibits, they fail to allege any specific deficiencies in any 360Value Estimate used to set Plaintiffs' policy limits.  That is because none of the Plaintiffs, other than the Sheahans, allege that the State Farm agent actually prepared a 360Value Estimate before they purchased their policy.

Plaintiffs also fail to allege facts connecting their alleged underinsurance injury to a 360Value Estimate, regardless of whether it included all components now mandated by Section 2695.183.  Cal. Bus. & Prof. Code § 17203 (standing to bring a Section 17200 claim requires injury in fact and lost money or property as a result of the unfair competition).  The specific

1  allegations of their TAC make clear that their injury resulted from unilateral assumptions and

2  mistaken beliefs regarding what State Farm's agents would or would not do as part of the

3  application process, not the absence of a particular component from a 360Value Estimate.  And in

4  the case of the Sheahans, the TAC demonstrates that their injury resulted from the fact that their

5  contractor's Estimate proposed to build a much larger and more luxurious home than the one

6  described in their 360Value Estimate.[2]  Including the five allegedly omitted components listed in

7  paragraph 185 of the TAC would not have avoided that injury.

8         These defects compel dismissal of Plaintiffs' "unfair" prong Section 17200 claim.[3]

9  **D.     Plaintiffs' Antitrust Claims Remain Deficient (Counts 4-6)**

10        Plaintiffs once again attempt to plead federal and California antitrust claims against State

11  Farm and Verisk.  But their renewed antitrust claims suffer from all of the same defects that

12  doomed their previous efforts.[4]

13         **1.     Plaintiffs Suffered No Antitrust Injury**

14        To bring a Sherman Act claim, a private plaintiff must suffer "injury of the type the

15  antitrust laws were intended to prevent and that flows from that which makes the defendant's acts

16  unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  The

17  "antitrust injury" requirement "ensures that a plaintiff can recover only if the loss stems from a

18  competition-reducing aspect or effect of the defendant's behavior."  *Atl. Richfield Co. v. USA*

19  *Petroleum Co.*, 495 U.S. 328, 334 (1990); *see also Stearns v. Select Comfort Retail Corp.*, 2009

20  WL 1635931, *13 (N.D. Cal. June 5, 2009) ("The antitrust laws are intended to prevent harm to

21

22

23  _____

[2] Their October 2009 360Value Estimate was based on a 3,600 square foot split level home with
24  three bathrooms built in 1986.  (ECF 66-2).  Their contractor's rebuild estimate, dated December
2018, is for a 4,233 square foot home with five bathrooms, a 1,100 square foot garage, and more
25  than $100,000 in landscaping.  (ECF 66-5).  It also includes a $12,500 jacuzzi, a $13,000
refrigerator, a $30,000 custom patio door, and a $2,800 shower door, among other luxury features
26  not documented in their 360Value Estimate.  (*Compare* ECF 66-5 with ECF 66-2).

27  [3] State Farm also joins in Verisk's Motion to Dismiss the Section 17200 claim.

28  [4] In addition to the arguments below, State Farm joins in Verisk's McCarran Ferguson arguments
in opposition to Plaintiffs' Sherman Act claims (Counts 5 and 6).

1   competition manifested as higher prices, lower output, or decreased quality in the products within

2   a defined market.").

3        Plaintiffs have again failed to meet this fundamental antitrust pleading requirement.

4   Plaintiffs identify one – and only one – injury.  They claim they purchased inadequate amounts of

5   home insurance coverage, and consistently refer to their injury as "underinsurance" or

6   "undervaluation."  (TAC, ¶¶ 16, 25, 28, 37, 38, 83, 95, 101, 106,107, 108, 110, 121, 122, 135,

7   154, 192, 200).  As Plaintiffs describe it, that injury consists of the difference between the amount

8   of insurance they believed they were purchasing (*i.e.*, an amount sufficient to cover the total

9   rebuild or replacement cost of their homes) and the amount they actually purchased.  (TAC, ¶¶ 43-

10  44, 79, 80, 83, 102, 108).  Significantly, Plaintiffs do not contend they paid a supra-competitive

11  price or received coverage lower in quality than they otherwise would have obtained for the same

12  price absent an antitrust violation.  Hence, the traditional, consumer-level forms of antitrust injury

13  are not present.  *See Stearns*, 2009 WL 1635931 at *13.  And to the extent Plaintiffs allege injury

14  suffered by others, including other insurance companies (TAC, ¶ 213, 215-217) or contractors

15  (TAC, ¶ 220, 221), Plaintiffs do not show any antitrust injury as to themselves.

16        In a last ditch effort to suggest some sort of antitrust injury, the TAC characterizes State

17  Farm's insurance coverage as being of "reduc[ed], "inferior," or "decreased" quality.  (TAC, ¶¶

18  200, 203, 215).  Notwithstanding, they identify no injury they suffered beyond the underinsurance

19  alleged.  They point to no deficiency inherent in the coverage itself.  In fact, the crux of Plaintiffs'

20  grievance is that they would have purchased *more* coverage from State Farm (not less) had they

21  known the truth.  Hence, Plaintiffs' injury rests entirely on their allegedly unmet expectation that

22  the policy limits they chose would, in the event of a complete loss, be sufficient to rebuild their

23  home.  This is not harm generally associated with the "higher prices, lower output, or reduced

24  quality" resulting from an antitrust violation.  *Stearns*, 2009 WL 1635931 at *13 (rejecting

25

26

27

28

"Plaintiffs' attempt to wedge an antitrust claim into a case grounded on alleged common law tort and breach of contract claims").[5]

But even assuming "underinsurance" could qualify as antitrust injury (which it cannot), Plaintiffs would still need to connect it to an "injury to competition." *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury.").   As shown below, they do not come close to doing so.

### 2.   Plaintiffs Fail to State a Vertical Conspiracy Claim

Count 5 purports to plead a "vertical conspiracy" between State Farm and Verisk in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  (TAC, ¶ 212).  According to Plaintiffs, State Farm uses Verisk software to "flood the market and sell a high volume of cheap, fraudulent homeowners insurance policies to the detriment of policyholders."  (TAC, ¶¶ 212, 214).  This "hurt[s] other insurance companies not using these software, methods and data." (TAC, ¶ 213; *see also* TAC, ¶ 216 ("It is clear that their practices of undercutting on price and quality allowed them to dominate in sales, thereby forcing out other competing insurers from the market.").

Section 1 prohibits a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade."  15 U.S.C. § 1.  To state a Section 1 claim, a complaint must contain "enough factual matter" to plausibly suggest "an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Plaintiffs, however, rely exclusively on the conclusory terms "cartel," "conspiracy," "combination," and "agreement."  (TAC, ¶¶ 212, 213, 214, 215 217).  This manifestly fails to state a claim for relief, and is fatal.  *See Twombly*, 550 U.S. at 555 (2007) (stating that federal pleading "requires more than labels and conclusions, and a formulaic recitation of the elements of a [Sherman Act § 1] cause of action will not do").

Indeed, the TAC omits even the most basic facts showing when and how any conspiracy was formed, and by whom.  *See Kendall v. VISA, U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)

---

[5] *See also Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U,S. 209, 225 (1993) (observing that " the federal antitrust laws . . . do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce") (internal quotation marks omitted).

1  (dismissing complaint for failing to "answer basic questions: who, did what, to whom (or with

2  whom), where, and when?"); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F.Supp.3d

3  988, 995 (N.D. Cal. 2015) ("[S]imply alleging that [three companies] conspired is not a sufficient

4  allegation of the 'who'" because the defendants "are large organizations, and Plaintiffs' bare

5  allegation of a conspiracy would be essentially impossible to defend against").  At most, the TAC

6  describes a licensing agreement allowing State Farm to use 360Value and Xactimate software and

7  "analyze claims data, share it in Verisk's central database, and repackage historic data for new

8  policy quotes."  (TAC, ¶¶ 69, 74, 226).  An agreement setting the terms and conditions of sale

9  between contracting parties does not, without more, show an actionable agreement to restrain

10  trade.  *Sausalito Pharmacy, Inc. v. Blue Shield*, 544 F. Supp. 230, 237 (N.D. Cal 1980).

11      Plaintiffs also concede that Verisk software, when properly used, can yield accurate

12  results.  (TAC,  ¶¶ 99, 107, 235).  Alternatively, they contend "it is also possible that Verisk's

13  tools are faulty software and cannot be used properly to achieve a proper valuation."  (TAC, ¶

14  100).  Either way, no alleged facts plausibly suggest Verisk, as an insurance industry software

15  supplier, would knowingly agree, much less did agree, to design its software to enable State Farm

16  to suppress competition in the insurance market, or otherwise knowingly encouraged State Farm

17  to use its software for that purpose.  *See Toscano v. PGA*, 258 F.3d 978, 983-84 (9th Cir. 2001)

18  ("For an agreement to constitute a violation of section 1 of the Sherman Act a 'conscious

19  commitment to a common scheme designed to achieve an unlawful objective' must be

20  established.") (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

21  Normally, it is not in any supplier's economic interest to create a downstream monopolist.

22      Plaintiffs must also meet the specific requirements for pleading vertical conspiracy claims,

23  including allegations of (1) a relevant product and geographic market, and (2) injury to

24  competition in that market.  *Tanaka v. Univ. of So. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).

25  According to Plaintiffs, the vertical conspiracy here "affect[ed] domestic commerce, in California

26  and throughout the country."  (TAC, ¶¶ 211, 217).  Assuming Plaintiffs are referring to a U.S. or

27  California insurance market, no allegations show State Farm and Verisk possessed market power

28  sufficient to render them capable of injuring competition in either market.  *See Nat'l Football*

1   *League's Sunday Ticket Antitrust Litig. v. DirecTV, LLC*, 933 F.3d 1136, 1151 (9th Cir. 2019) ("In

2   order to show that an agreement injures competition, a plaintiff must generally show that the

3   defendants have market power within a relevant market.") (citing *Newcal Indus., Inc. v. Ikon*

4   *Office Sol.*, 513 F.3d 1018, 1044 (9th Cir. 2008).[6]  The TAC alleges State Farm is "the largest

5   insurance company in the U.S."  (TAC, ¶ 211).  That says nothing about State Farm's U.S. market

6   share relative to other competing firms.  And although the TAC alleges "State Farm had a 17%

7   market share in California in 2017" (TAC, ¶ 216), that share falls below any recognized market

8   power threshold.  *See Jefferson Parish*, 466 U.S. at 27 (30% market share is insufficient as a

9   matter of law to confer market power).  Plaintiffs also fail to allege "significant barriers to entry

10  into the market exist and that existing competitors cannot increase their production in the short

11  run."  *See DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1136 (N.D. Cal. 2010).

12      In any event, the TAC identifies no injury to competition.  Plaintiffs merely posit that other

13  insurers are unable "to offer policies for comparatively low rates," and so "cannot compete with

14  … cheap pricing and diminished coverage quality."   (TAC, ¶ 215).  All of this, however, "is of no

15  moment to the antitrust laws," which "were passed for 'the protection of competition, not

16  competitors.'"  *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993)

17  (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).  To the extent a restraint

18  excludes competitors, to injure competition, it must "foreclose competition in a substantial share

19  of the line of commerce affected."  *Allied Ortho. Appliances Inc. v. Tyco Health Care Group LP*,

20  592 F.3d 991, 996 (9th Cir. 2010) (internal quotation omitted).  No facts suggest that has occurred.

21      **3.    Plaintiffs Do Not Allege a "Hub-And-Spoke" Conspiracy Claim**

22      In Count 6, as an alternative basis for Section 1 liability, the TAC alleges "Verisk is the

23  hub in a hub-and-spoke cartel between State Farm and many other insurance customers,

24

25

_____

26  [6] *See also Menasha Corp. v. News Am. Mktg. In-Store*, 354 F.3d 661, 663 (7th Cir. 2004) (citing
    *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984)) ("The first requirement in every

27  suit based on the Rule of Reason is market power, without which the practice cannot cause those
    injuries (lower output and the associated welfare losses) that matter under the federal antitrust

28  laws.").

comprising between 88-91% market share of the national insurance industry, and growing." (TAC, ¶ 228).  This claim directly contradicts Count 5, which alleges a stand-alone vertical conspiracy between just State Farm and Verisk to "forc[e] out other competing insurers from the market."  (TAC, ¶216).  Now, in Count 6, the vast majority of insurers have supposedly agreed to provide customers with false valuation and rebuild estimates via Verisk software tools and data. (TAC, ¶ 228) ("State Farm and the other insurance company spokes share their customer and cost data with Verisk, who then returns it to the spokes as part of its software product.").

"A traditional hub-and-spoke conspiracy has three elements:  (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes."  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015).

Here, the TAC's hub-and-spoke allegations are, once again, "entirely conclusory."  (ECF 63, p. 18:23-24).  The alleged "spoke" agreement between State Farm and Verisk suggests nothing beyond a vendor/purchaser relationship.  Regarding the "rim," Plaintiffs once again fail to allege any facts supporting an express horizontal agreement between State Farm and the other unidentified  insurers "comprising between 88-91% market share of the national insurance industry, and growing."[7]  (TAC, ¶ 228).  The TAC merely alleges parallel conduct – that other insurance companies, in addition to State Farm, selected and used Verisk as their software and cost-data vendor.  But as *Twombly* instructs, parallel conduct by competitors is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Twombly*, 550 U.S. at 554.  And even if the firms are allegedly "aware that their information is shared with one another" and aware of the market effect this has (TAC, ¶ 230), that sort of "conscious parallelism" does not, without more, plausibly

---

[7] Even assuming the TAC identified an express, cost data sharing agreement, it is generally recognized that the sharing of cost information among competitors is, without more, insufficient to trigger Section 1 scrutiny.  *See* ABA Section of Antitrust Law, Antitrust Law Developments 101-02 (8th ed. 2017).

1   suggest agreement.  *Twombly*, 550 U.S. at 553-54 (observing that "conscious parallelism [is] a

2   common reaction of firms in a concentrated market") (internal quotations omitted).[8]  Plaintiffs

3   must instead allege facts showing that the alleged parallel use of Verisk's software products was

4   the result of collusion, rather than independent, unilateral decision making by competing insurers.

5   *In re Musical Instrs. & Equip. Antitrust Litig.*, 798 F.3d at 1193-94.   Plaintiffs' conclusory

6   allegations fail to allege any plausible "hub-and-spoke" conspiracy under *Twombly*.

7           **4.      Plaintiffs Do Not State a Cartwright Act Claim**

8           In Count 4, Plaintiffs purport to plead a claim under California's Cartwright Act, Cal. Bus.

9   & Prof. Code §§ 16700-16770.  That statute is patterned after Section 1 of the Sherman Act.

10  *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1476-77 (9th Cir. 1986).   Thus, the legal analysis

11  applicable to Plaintiffs' Cartwright Act claim "mirrors the analysis under federal law."  *County of*

12  *Toulumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2011).  As a result, the

13  Cartwright Act claim fails for the same reasons as Plaintiffs' Sherman Act § 1 claims.

14          The Cartwright claim also fails for other reasons.  Plaintiffs accuse State Farm of "price

15  fixing and artificially lowering their policy underwriting values to remain competitive (TAC, ¶

16  202), but no actual price-fixing conduct is identified.  Count 4 also cites to a specific Cartwright

17  Act provision, Bus & Prof. Code § 16727, which addresses exclusive dealing and tying

18  arrangements.  (TAC ¶ 199); *Feitelson v. Google Inc.*, 80 F.Supp.3d 1019, 1033-34 (N.D. Cal.

19  2015).  However, the TAC nowhere alleges the setting of prices by Verisk on the condition that

20  State not purchase a competing vendor's goods or services, or by State Farm on condition that its

21  customers not purchase a competing insurer's goods or services.

22          Count 4 also points to a provision of California's Unfair Practices Act, Cal. Bus. & Prof.

23  Code § 17043 ("UPA"), which prohibits selling a product below cost "for the purpose of injuring

24  competitors or destroying competition."  (TAC, ¶ 205).  The UPA requires a plaintiff to allege that

25

26  _____

27  [8] Other TAC allegations also render any alleged "rim" collusion implausible.  (TAC, ¶¶ 27
    (alleging Verisk supplies State Farm with software "conform[ing] to specific algorithms and costs
    specified by State Farm"), 40 ("Xactimate tools  . . . are made proprietary to State Farm's

28  requirements"), 227 ("State Farm and Verisk collaborate through custom online portals designed
    by Verisk for State farm's specific uses.")).

the defendant sold goods at a price below their "fully allocated cost."  *See Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, 2013 WL 5694452, *17 (N.D. Cal. 2013).  A plaintiff must also "allege [a] defendant's sales price, its cost in the product and its cost of doing business" to plead a claim under this section.  *A White and Yellow Cab, Inc. v. Uber Techs., Inc.*, 2017 WL 1208384, **11-12 (N.D. Cal. 2017) (dismissing Section 17043 claim because "Plaintiff has not alleged any facts regarding [the defendants'] prices, the costs of their product, or their costs of doing business") (citation omitted).

In support of their UPA claim, Plaintiffs do not allege State Farm sold insurance coverage to Plaintiffs at a price below State Farm's fully allocated cost, nor do they allege any facts regarding Verisk's sales prices or costs.  Rather, they allege only that State Farm "could not possibly recoup its cost for actual replacement coverage for all of the individual policies issued, if they were indeed issued at the correct replacement value."  (TAC, ¶ 206).  That is not a below cost allegation, much less one conforming to the UPA's specific below "fully allocated cost" test.[9]

## V.    CONCLUSION

For all of the forgoing reasons, State Farm respectfully requests that the Court grant its Motion to Dismiss Plaintiffs' Third Amended Complaint ***without*** leave to amend.

Dated: September 19, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
*/s/ Jennifer M. Hoffman*
FRANK FALZETTA
JENNIFER M. HOFFMAN
Attorneys for Defendant
STATE FARM GENERAL INSURANCE COMPANY

---

[9] As this Court has already observed, Plaintiffs do not use the phrase "below cost" in its "ordinary sense," but rather as a reference to the sale of inadequate insurance, i.e., "underinsurance."  (ECF 63, p. 15:8-10).