UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN SHEAHAN, et al., | Case No. 18-cv-06186-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANTS'**<br>**MOTIONS TO DISMISS AND**<br>**DISMISSING PLAINTIFFS' THIRD**<br>**AMENDED COMPLAINT WITH**<br>**PREJUDICE** |
| STATE FARM GENERAL INSURANCE<br>COMPANY, et al., | |
| Defendants. | Docket Nos. 70, 72, 90 |

Plaintiffs[1] filed their third amended complaint against State Farm General Insurance Company ("State Farm") and three affiliated software companies—Verisk Analytics, Inc.; Insurance Services Office, Inc.; and Xactware Solutions, Inc. (collectively, the "Verisk Defendants").[2] Plaintiffs' theory of the case remains unchanged from its earlier complaints. The TAC alleges that Plaintiffs and others similarly situated who purchased homeowners insurance policies from State Farm were injured by inadequate insurance coverage after their homes were destroyed by wildfires. The damage they allegedly suffered resulted from unexpected rebuild costs. This disparity between the insured coverage and actual cost to rebuild allegedly resulted from State Farm using software developed by the Verisk Defendants to determine insurance value and cost to rebuild. They allege the undervaluation was negligent, fraudulent, and/or the product of a conspiracy between State Farm and the Verisk Defendants.

---

[1] Brian and Alison Sheahan (collectively, the "Sheahans"), Douglas Pope, Neil and Sandra Wylie (collectively, the "Wylies"), Madonna Day, Carlos Plasman, Gary Dennis and Marylou Dennis (collectively, the "Dennises"), and Diane Malnekoff.

[2] *See* TAC ¶ 68 (alleging that "Insurance Services Office, Inc. and Xactware Solutions, Inc. are subsidiaries of Verisk Analytics, Inc.").

United States District Court
Northern District of California

Currently pending before the Court are two motions to dismiss filed by State Farm and the Verisk Defendants. Docket Nos. 70, 72. On the day before the hearing of Defendants' motions to dismiss, Plaintiffs filed a motion for leave to amend in order to add an additional plaintiff(s) (*e.g.*, the Sheahans' contractor and other similarly-situated contractors). Docket No. 90.

## I.  BACKGROUND

A.  Procedural Background

The SAC previously pled thirteen claims for relief. Docket No. 28. The Court dismissed the SAC, permitting leave to amend on a majority of claims.[3] Docket No. 63 ("Dismissing Order"). In the operative complaint (Docket No. 64; "TAC"), Plaintiffs allege six claims: (1) negligent misrepresentation; (2) negligence; (3) violation of California unfair competition law; (4) violation of California Cartwright Act; (5) violation of the Sherman Act for a vertical conspiracy; and (6) violation of the Sherman Act for a hub-and-spoke conspiracy.

B.  Factual Background

State Farm sells insurance. *See* TAC ¶ 75. The Verisk Defendants sell a digital database of home construction information; it offers two software products to State Farm: (1) **360 Value**, which is a zip code calculator used to determine the ***initial*** insurance policy value; and (2) **Xactimate**, which is used to determine the cost to ***rebuild or repair*** property after a loss. *See id*. ¶ 74. Plaintiffs are the named insured under homeowners insurance policies issued by State Farm. *Id.* ¶ 72. Their homes were destroyed in the October 2017 Northern California wildfires and their policies did not cover a complete rebuild. Plaintiffs argue that State Farm and the Verisk Defendants "conspired together to create and apply defective financial technology tools . . . that are not being utilized to issue proper insurance." *Id.* ¶ 26.

According to Plaintiffs, Xactimate "may be used . . . to arrive at a valuation within a 10% margin of error for construction estimation." TAC ¶ 81. However, "Xactimate is based on manufactured home data, such as trailers and prefabricated homes, to price houses like a kit of

---

[3] The Court dismissed the following claims with prejudice: (1) breach of implied covenant of good faith and fair dealing; (2) fraud-intentional misrepresentation; (3) fraud-false promise; (4) reformation; (5) unfair or deceptive acts in the business of insurance; and (6) violation of California Products Liability Act.

1    parts"; therefore, unless used correctly, Xactimate "does not represent the true cost to rebuild

2    homes in Northern California." *Id*. ¶ 79.

3          Plaintiffs allege that State Farm held out 360 Value as a tool that can accurately and

4    reliably be used in setting insurance policy value.  For example, State Farm's website contains the

5    following representation:  "The most appropriate way to estimate the replacement cost of your

6    home is to hire a building contractor or other building professional to produce a detailed

7    replacement cost estimate.  Or your State Farm agent can utilize an estimating tool from Xactiware

8    Solutions [*i.e.*, a Verisk Defendant] to assist you with an estimate."  TAC ¶ 84.  However, there is

9    no allegation in the TAC that any of the Plaintiffs viewed this representation.  Plaintiffs also assert

10   the "behavior" of State Farm sales agents indicated 360 Value was a "detailed replacement cost

11   estimate performed by a contractor or building professional."  *Id*. ¶ 87.  However, Plaintiffs

12   include no details regarding this alleged "behavior."

13         When a 360 Value estimate is given, a disclaimer is provided (at the bottom of the

14   estimate), which states that it "is a general estimate provided for State Farm customers and should

15   not be considered professional replacement cost survey of the building."  TAC ¶ 86; *see also id*. ¶

16   87 (360 Value replacement cost estimate for the Sheahans).  State Farm also has a disclaimer in its

17   homeowners insurance policy that states:

18              "The limit of liability for this structure (Coverage A) is based on an
                estimate of the cost to rebuild your home, including an approximate
19              cost for labor and materials in your area, and specific information
                that you have provided about your home.  It is up to you to choose
20              the coverages and limits that meet your needs.  We recommend that
                you purchase a coverage limit at least equal to the estimated
21              replacement cost of your home.  Replacement cost estimates are
                available from building contractors and replacement cost appraisers,
22              or, your agent can provide an estimate from a third-party vendor
                using information you provide about your home.  We can accept the
23              type of estimate you choose as long as it provides a reasonable level
                of detail about your home.  State Farm does not guarantee that any
24              estimate will be the actual future cost to rebuild your home.  Higher
                limits are available at higher premiums.  Lower limits are also
25              available, which if selected may make certain coverages unavailable
                to you.  We encourage you to periodically review your coverage and
26              limits with your agent and to notify us of any changes or additions to
                your home."

27

28   *Id*. ¶ 91.

                                              3

According to Plaintiffs, their homeowners insurance policies, estimates, and cost of rebuilding were as follows:

- The Sheahans' insurance policy valued their home at $768,700 at the date of loss. This was ***greater*** than the 360 Value of $509,000. After the loss of their home, Xactimate valued the cost of rebuild at $804,060 but the actual cost of construction was more than $2.1 million. *See* TAC ¶ 82.

- Mr. Pope's insurance policy valued his home at $330,851 at the date of loss. This was ***greater*** than the 360 Value of $170,000. After the loss of his home, Xactimate valued the cost of rebuild at $539,361 but the actual cost of construction was more than $717,000. *Id*.

- The Wylies' insurance policy valued their home at $513,900 at the date of loss. This was ***greater*** than the 360 Value of $227,400. After the loss of their home, Xactimate valued the cost of rebuild at $772,979 but the actual cost of construction was more than $1.2 million.[4] *Id*.

Moreover, Plaintiffs submit attachments with the TAC entitled "Specific Allegations" describing their interactions with State Farm agents at the time they signed their homeowners insurance policies:

- **The Sheahans**: "The agent never asked what the property should be insured for and the Sheahans let him decide. There was no discussion of policy limits or additional options, the Agent only discussed policy costs." Docket No. 66-1 at ¶ 2. "The Sheahans relied on the agent to take care of them because the agent was a licensed agent and was from Healdsburg, so they assumed he knew the market area. The Sheahans believed that the[] Agent was taking care in the intervening years because the policy increased with renewals." *Id*. ¶ 3.

- **The Popes**: The agent "did not explain the underwriting." Docket No. 66-6 at ¶ 2. "Despite huge variation in the economy over 17 years, [the agent] never suggested

---

[4] Plaintiffs have not explained how their insurance policy limits were based on 360 Value given that the policy limits appear to have been ***greater*** than the valuation provided by 360 Value.

any review or adjustment to the policy." *Id.* ¶ 6. Mr. Pope "relied on State Farm's reputation in the marketplace . . . ." *Id.* ¶ 11.

- **The Wylies**: "The Wylies only questions [sic] was 'We bought a new house and we need insurance—How much do we need?' The agent did the rest." Docket No. 66-12 at ¶ 1. "They believed they would be well insured by a large national company with a professional reputation." *Id.* ¶ 4.

- **Ms. Day**: "The husband passed and is the one who spoke with the agent, so nothing further is known about what questions were asked or answered to issue coverage." Docket No. 66-17 at ¶ 1. "Ms. Day does not recall any discussion of reviewing the policy with the agent and has no recollection of any opportunity to discuss appropriate coverage amounts for dwelling or personal property." *Id.* ¶ 3.

- **Mr. Plasman**: "[Mr. Plasman] sent instructions for insurance to . . . Agent Tim Stannish on June 28, 1983 by mail . . . . The Agent issued a policy of insurance for a rental property without any inquiry of Mr. Plasman . . . ." Docket No. 66-23 at ¶ 1. "Since Mr. Plasman was out of the country he had no way to know if the Agent visited the site or how the value was set, He [sic] just had to trust the Agent knew what he was doing." *Id.* ¶ 2.

- **The Dennises**: "Around 2005, they met with [the Agent] at his office in Larkfield to review the policy. They got the impression that the policy was fine . . . ." Docket No. 66-33 at ¶ 4. "The Dennis's [sic] felt that there was no reason to change the policy over time because there were no claims and no issues. After they met with [the Agent], they felt the[] Agent should know what is appropriate and had no reason to doubt the adequacy of insurance. They felt he was competent. They relied on State Farm because their advertising buzz is huge as one of the largest insurers in the US, they felt they could rely on that." *Id.* ¶ 7.

- **Ms. Malnekoff**: "The agent asked questions about her home, and filled out a form. Ms. Malnekoff never saw the application form, and it is not signed. They did not discuss the basis of her insurance policy amount, and did not talk about personal

5

property needs either . . . . Ms. Malnekoff believed that Ron Hozak knew what he

was talking about."  Docket No. 66-38. ¶ 1.

Plaintiffs bring this suit as a class action against State Farm and the Verisk Defendants,

asserting the claims described above.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss

after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic

Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must .

. . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d

1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and

construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.

Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).[5]  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The

plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

## III.  DISCUSSION

State Farm and the Verisk Defendants filed separate motions to dismiss the TAC.  State

Farm argues that Plaintiffs fail to meet the pleading requirements for all six claims.  Docket No.

---

[5] A court "need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

72 ("State Farm Mot.").  The Verisk Defendants join State Farm's motion, but they also argue two additional defenses:  (1) the economic-loss rule bars Plaintiffs' state law claims; and (2) the McCarran-Ferguson Act bars Plaintiffs' antitrust claims.  Docket No. 70 ("Verisk Mot.").

A.    Negligent Misrepresentation (First Claim for Relief)

Plaintiffs' claim for negligent misrepresentation is against State Farm only.  The theory of this claim is alleged as follows:  State Farm misrepresented that 360 Value and/or Xactimate could provide accurate calculations for determining insurance policy value and replacement cost, respectively.  *See, e.g.*, TAC ¶¶ 111–44.  The elements of a California negligent misrepresentation claim are the following:  (1) misrepresentation; (2) knowledge of the falsity; (3) justifiable reliance; and (4) resulting damage.  *Saldate v. Wilshire Credit Corp.*, 268 F.R.D. 87, 101 (E.D. Cal. 2010) (citing *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996)).  The Court previously dismissed this claim without prejudice to allow Plaintiffs to plead what State Farm—or its agents—allegedly misrepresented.

State Farm contends Plaintiffs' misrepresentation claim is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  Plaintiffs do not disagree.  Rule 9(b) states that an allegation of "fraud or mistake must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  The "circumstances" required by Rule 9(b) are the "who, what, when, where, and how" of the activity.  *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  In addition, the allegation "must set forth what is false or misleading about a statement, and why it is false."  *Id*.

State Farm argues that under Rule 9(b), the TAC still does not sufficiently allege facts indicating that Plaintiffs received a misrepresentation (*i.e.*, a representation that 360 Value could accurately and reliably determine insurance policy value) and reasonably relied on it.  State Farm continues to point out that Plaintiffs have not alleged they ever saw the statement on State Farm's website.  Therefore, the website statement cannot be the representation on which Plaintiffs relied. State Farm also contends that, although Plaintiffs indicated the "behavior" of State Farm agents suggests 360 Value "is accurate and can be relied upon to determine policy limits," TAC ¶ 87, Plaintiffs have not pled the alleged behavior with specificity, as required by Rule 9(b).

Plaintiffs argue, however, that they "have alleged with particularity that they communicated with their agents . . . and relied upon their agents' representations that policy limits were sufficient to replace the homes." Docket No. 76 ("State Farm Opp.") at 10. Moreover, "Plaintiffs reasonably relied on State Farm's false statements as they continued to renew their policies and believe they had sufficient insurance coverage." *Id*. But, again, the TAC does not specify what the false statements were, and from whom/to whom they were made. In somewhat of a contradictory manner, Plaintiffs also seem to make an argument that State Farm had a practice of negligent misrepresentation by ***nondisclosure***—*i.e.,* State Farm failed to disclose that its agents were using 360 Value to perform homeowners insurance valuations at the time of sign-up. *Id*. Neither claim meets the Rule 9(b) pleading standards. *See Patriot Sci. Corp. v. Korodi*, 504 F. Supp. 2d 952, 966 (S.D. Cal. 2007) (dismissing negligent-misrepresentation claims under Rule 9(b) because there was no allegation regarding where the false representation was made); *see also Griffin v. Green Tree Servicing, LLC*, 166 F. Supp. 3d 1030, 1058 (C.D. Cal. 2015) (same).

Regarding Plaintiffs' Specific Allegations, no affirmative representation about 360 Value's accuracy or that their policies covered the entire rebuild cost is alleged. Accordingly, absent an allegation that Plaintiffs read the statement on State Farm's website or a specific allegation from a State Farm agent that amounts to an affirmative misrepresentation, Plaintiffs' claim must fail because "[a]n 'implied' assertion or representation is not enough." *Diediker v. Peelle Fin. Corp.*, 60 Cal. App. 4th 288, 298 (1997), *as modified on denial of reh'g* (Jan. 16, 1998) (negligent misrepresentation requires a "positive assertion.").

Plaintiffs attempt to overcome this by citing to *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799 (1979) for the proposition that, as a party to the contract (*e.g.*, the homeowners insurance policy), State Farm and its agents owed a duty to Plaintiffs to exercise reasonable care—*i.e.*, to take care that Plaintiffs bought sufficient homeowners' insurance. In *J'Aire*, a restaurant owner sued a general contractor for damages that resulted from the delayed completion of a construction project, which forced the restaurant to shut down. *Id*. at 802. But in *J'Aire*, the legal relationship was not between an insured and an insurer. There, the legal relationship was between the lessee of a commercial property and a contractor who was hired by the lessor to install heating/air-

conditioning on the commercial rental property.  The lessee's argument was that the contractor owed a duty to them as they were the third-party beneficiary of the contract, so the contractor had an obligation to have the construction "completed within a reasonable time as defined by custom and usage." *Id*. at 802.  Instead, the contractor delayed the completion of the project, which caused damages to the lessee's business in the form of lost profits. *Id*.  The California Supreme Court held that "a contractor owe[d] a duty of care to the tenant of a building undergoing construction work to prosecute that work in a manner which does not cause undue injury to the tenant's business, where such injury is reasonably foreseeable." *Id*. at 808.

*J'Aire* is inapposite, because there is no alleged contract between State Farm and the Verisk Defendants to which Plaintiffs can claim to be a third-party beneficiary.  As discussed at the last hearing, it appears that State Farm is merely a consumer of the software, and there is no basis to find that the agreement between Verisk Defendants and State Farm was intended to benefit State Farm's insureds.  *See* discussion, *infra*, at Section III.B.

Absent an affirmative misrepresentation, the general rule is that "an insurance agent does not have a duty to volunteer to an insured that the latter should procure additional or different insurance coverage." *Fitzpatrick v. Hayes*, 57 Cal. App. 4th 916, 927 (1997), *as modified* (Oct. 16, 1997).  As discussed in *Fitzpatrick*, the general rule changes only in the following three scenarios:  (1) the agent misrepresents the nature, extent or scope of the coverage being offered or provided; (2) there is a request or inquiry by the insured for a particular type or extent of coverage; and (3) the agent assumes an additional duty by either express agreement or by him- or herself out as having expertise in a given field of insurance being sought by the insured. *Id*.  Plaintiffs attempt to argue that scenario (1) is the case here, but the Specific Allegations do not describe with any specificity the alleged misrepresentations.  Instead, they merely indicate that Plaintiffs were acting on their assumptions based on, *inter alia*, State Farm's reputation in the insurance industry. This does not satisfy scenario (1) of *Fitzpatrick*.  There is no allegation that any of the Plaintiffs requested a certain type of insurance coverage,  nor is there an allegation that the State Farm agents held themselves out as having any expertise beyond being insurance agents.

1.      Disclaimers

Even if Plaintiffs had demonstrated a misrepresentation that fit into one of the *Fitzpatrick*

exceptions thus imposing a duty upon State Farm, any reliance was not reasonable or justified

because of the multiple disclaimers that State Farm gave to Plaintiffs.  State Farm notes first that

there is a disclaimer contained in each insurance policy:

> "The limit of liability for this structure (Coverage A) is based on an
> estimate of the cost to rebuild your home, including an approximate
> cost for labor and materials in your area, and specific information
> that you have provided about your home.  It is up to you to choose
> the coverages and limits that meet your needs.  We recommend that
> you purchase a coverage limit at least equal to the estimated
> replacement cost of your home.  Replacement cost estimates are
> available from building contractors and replacement cost appraisers,
> or, your agent can provide an estimate from a third-party vendor
> using information you provide about your home.  We can accept the
> type of estimate you choose as long as it provides a reasonable level
> of detail about your home.  ***State Farm does not guarantee that any
> estimate will be the actual future cost to rebuild your home.***
> Higher limits are available at higher premiums.  Lower limits are
> also available, which if selected may make certain coverages
> unavailable to you.  We encourage you to periodically review your
> coverage and limits with your agent and to notify us of any changes
> or additions to your home."

TAC ¶ 91 (emphasis added).

State Farm further points out that disclaimers are required by the California Insurance

Code.  Section 10101 provides:

> On and after July 1, 1993, no policy of residential property
> insurance may be first issued or, with respect to policies already in
> effect on January 1, 1994, initially renewed in this state by any
> insurer unless the named insured is provided a copy of the California
> Residential Property Insurance disclosure statement as contained in
> Section 10102.

Cal. Ins. Code § 10101.  Section 10102 in turn provides in relevant part:

> The disclosure shall contain the following language:
>
> . . . .
>
> **READ YOUR POLICY AND POLICY DECLARATIONS
> PAGE CAREFULLY:** The policy declarations page shows the
> specific coverage limits you have purchased for your dwelling,
> personal property, separate structures such as detached garages, and
> additional living expenses.  The actual policy and endorsements

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

provide the details on extensions of coverage, limitations of coverage, and coverage conditions and exclusions. The amount of any claim payment made to you will be reduced by any applicable deductibles shown on your policy declarations page. It is important to take the time to consider whether the limits and limitations of your policy meet your needs. Contact your agent, broker, or insurance company if you have questions about what is covered or if you want to discuss your coverage options.

**INFORMATION YOU SHOULD KNOW ABOUT RESIDENTIAL DWELLING INSURANCE**

**AVOID BEING UNDERINSURED:** Insuring your home for less than its replacement cost may result in your having to pay thousands of dollars out of your own pocket to rebuild your home if it is completely destroyed. Contact your agent, broker, or insurance company immediately if you believe your policy limits may be inadequate.

**THE RESIDENTIAL DWELLING COVERAGE LIMIT:** The coverage limit on the dwelling structure should be high enough so you can rebuild your home if it is completely destroyed.

Please note:

- The cost to rebuild your home is almost always different from the market value.
- Dwelling coverage limits do not cover the value of your land.
- The estimate to rebuild your home should be based on construction costs in your area and should be adjusted to account for the features of your home. These features include but are not limited to the square footage, type of foundation, number of stories, and the quality of the materials used for items such as flooring, countertops, windows, cabinetry, lighting and plumbing.
- The cost to rebuild your home should be adjusted each year to account for inflation.
- Coverage limits for contents, separate structures, additional living expenses and debris removal are usually based on a percentage of the limit for the dwelling. If your dwelling limit is too low, these coverage limits may also be too low.

You are encouraged to obtain a current estimate of the cost to rebuild your home from your insurance agent, broker, or insurance company or an independent appraisal from a local contractor, architect, or real estate appraiser. If you do obtain an estimate of replacement value, and wish to change your policy limits, contact your insurance company. **While not a guarantee, a current estimate can help protect you against being underinsured.**

**DEMAND SURGE:** After a widespread disaster, the cost of construction can increase dramatically as a result of the unusually high demand for contractors, building supplies and construction labor. This effect is known as demand surge. Demand surge can increase the cost of rebuilding your home. Consider increasing your

coverage limits or purchasing Extended Replacement Cost coverage to prepare for this possibility.

**CHANGES TO PROPERTY:** Changes to your property may increase its replacement cost. These changes may include the building of additions, customizing your kitchen or bathrooms, or otherwise remodeling your home. Failure to advise your insurance company of any significant changes to your property may result in your home being underinsured.

. . . .

*Id.* § 10102 (emphasis added). In response, Plaintiffs do not specifically address the disclaimers aside from calling them "pattern language disclaimers." State Farm Opp. at 7.

In this regard, the Eighth Circuit's decision in *Nelson v. American Family Mutual Insurance Company*, 899 F.3d 475 (8th Cir. 2018) is instructive. In *Nelson*, the Court of Appeals upheld the district court's order granting summary judgment for the insurer, holding that its use of 360 Value to calculate an estimate was not a representation that the policy would cover the entire replacement cost of the insured's home. Thus, summary judgment was appropriate against the plaintiff's negligent misrepresentation claim because "the Policy expressly states that American Family does not guarantee its replacement cost estimate will be the actual replacement cost in the event of a covered loss and that it is up to the policy holder to select the proper amount of coverage." *Id.* at 481.

Here, Plaintiffs argue that *Nelson* is distinguishable because State Farm "expressly represented to Plaintiffs that its tools are the same quality as estimates performed by California licensed professionals, and the insurer in *Nelson* never made that representation . . . ." State Farm Opp. at 13.[6] However, as indicated above, Plaintiffs' Specific Allegations attached to the TAC do not indicate that there were any affirmative representations made to them to indicate that 360 Value is equivalent to a contractor appraisal. Moreover, the disclaimers from State Farm are equal, if not more express and conspicuous, than the disclaimers in *Nelson*.[7]

---

[6] Plaintiffs also argue that the *Nelson* court failed to "properly consider the Insurer's relationship with and role of big data in providing the 360 Value replacement cost estimate." State Farm Opp. at 13.

[7] In *Nelson*, the disclaimer read as follows:

12

1    In sum, the disclaimers would render any reliance on the alleged misrepresentation by

2    State Farm unreasonable.  Accordingly, because Plaintiffs have not sufficiently pled

3    misrepresentation or reliance, their claim for negligent misrepresentation must fail.  State Farm's

4    motion to dismiss this claim is **GRANTED with prejudice**.  *See Salameh v. Tarsadia Hotel*, 726

5    F.3d 1124, 1133 (9th Cir. 2013) ("A district court's discretion to deny leave to amend is

6    'particularly broad' where the plaintiff has previously amended.").

7    B.    <u>Negligence Against State Farm and The Verisk Defendants (Second Claim for Relief)</u>

8    In Plaintiffs' second claim for relief, they allege that both State Farm and the Verisk

9    Defendants were negligent because they owed them a duty.  Given these allegations, the

10   negligence claim appears to be duplicative of the claim for negligent misrepresentation.  *See*

11   *Roberts v. Assurance Co. of Am.*, 163 Cal. App. 4th 1398, 1403–04 (2008) (arguing that an

12   insurance company has no duty to determine whether an insured has sufficient coverage for his or

13   her needs).  To the extent that Plaintiffs attempt to argue that "[o]nce insurance companies began

14   setting policy limits using big data, they took on the responsibility to achieve an accurate

15   replacement coverage estimate[,]" State Farm Opp. at 14, they do not cite authority for this

16   proposition.

17   Oddly, Plaintiffs allege negligence against the Verisk Defendants, too, despite not pleading

18   a negligent-misrepresentation claim against them.  In support of their negligence claim, Plaintiffs

19   allege that

20

21   ───────────────

22          ***Our*** residential building cost guide may be used to develop an
       estimated replacement cost based on general information about ***your***
       dwelling.  It is developed from researched costs of construction

23     materials and labor rates.  This is the minimum amount for which to
       insure ***your*** dwelling.  The actual cost to replace your dwelling may

24     be different.  ***We*** do not guarantee that this figure will represent the
       actual cost to replace ***your*** dwelling.  ***You*** are responsible for

25     selecting the appropriate amount of coverage.  ***You*** may wish to
       obtain a detailed replacement cost appraisal or estimate from a

26     contractor.  ***You*** may select a coverage amount equal to that
       appraised value or that cost of construction, if the amount is greater

27     than the replacement cost as estimated by ***our*** residential building
       cost guide, and ***we*** agree to that amount.

28   *Nelson*, 899 F.3d at 478 (emphasis in original).

13

> Verisk represented **to State Farm** that its software could accurately calculate the replacement and/or rebuild costs for each home, knowing that such representations would be relied upon by Plaintiffs, or to State Farm policy holders similarly situated, for the purpose of calculating what State Farm represented as the equivalent of a contractor's estimate to determine the rebuilding costs, and as reflected in policy limits State Farm recommended to Plaintiffs and those similarly situated.

TAC ¶ 149 (emphasis added). In the Dismissing Order, this Court previously found that Plaintiffs failed to allege that the Verisk Defendants made any representations to them and "[a]t best, Plaintiffs suggest that State Farm and the Verisk Defendants have conspired or colluded to defraud Plaintiffs and other policy holders." Dismissing Order, at 8. The Court also admonished Plaintiffs to replead in good faith as required by Rule 11.

All Plaintiffs' negligence allegations against the Verisk Defendants are one stepped removed—*i.e.*, they rely on alleged representations that the Verisk Defendants made to State Farm, which then require the inference that State Farm made those identical representations to Plaintiffs. There is no factual allegation supporting this conduit theory of reiterated misrepresentation. According to Plaintiffs, the Verisk Defendants "represented that its software could accurately calculate the replacement costs for each home, knowing that Plaintiffs, or State Farm policy holders similarly situated, would consider and rely upon such representations for the purpose of calculating rebuilding costs." TAC ¶ 163. It is unclear what, if any, representations about 360 Value the Verisk Defendants conveyed to State Farm or whether it was conveyed for the purpose of reaching Plaintiffs. No further factual allegations pertain to the Verisk Defendants on this claim for relief, and Plaintiffs' opposition explicitly states that "[d]iscovery is needed to understand the extent of the relationship and communications between [State Farm and the Verisk Defendants]." Docket No. 75 ("Verisk Opp."), at 14. Plaintiffs fail to satisfy Rule 9(b) pleading requirements.

Plaintiffs also cite to *J'Aire* to support its negligence claim against the Verisk Defendants by analogizing the subcontractor relationship, arguing that they were a third-party beneficiary of any contract between State Farm and the Verisk Defendants and, thus, owed a duty. *See* Verisk Opp. at 14. This analogy is not persuasive. If anything, State Farm was simply a direct consumer of the 360 Value software; as noted above, there are no alleged facts providing a basis to apply the

14

third party beneficiary doctrine. Indeed, Plaintiffs conceded—and, here, still concede—that 360 Value and Xactimate can yield accurate results if properly used. There is nothing inherent in these products that would inevitably injure State Farm's customers.

As such, the Court **GRANTS** State Farm's motion to dismiss Plaintiffs' negligence claim against all Defendants **with prejudice** for the reasons stated above.

C.   Violation of California Business & Professions Code § 17200 Against State Farm and The Verisk Defendants (Third Claim for Relief)

In the third claim for relief, Plaintiffs allege a violation of California Business & Professions Code § 17200 against both State Farm and the Verisk Defendants. Plaintiffs, again, invoke all three prongs of § 17200—*e.g.*, fraudulent, unlawful, and unfair conduct. Defendants argue that Plaintiffs' claim cannot survive because it was mostly dismissed with prejudice. This Court previously ruled as follows:

> The claim based on fraudulent conduct is dismissed with leave to amend. ***The claim based on unlawful conduct is dismissed with prejudice. The claim based on unfair conduct is viable but, based on the factual predicate, is sustainable as to State Farm only.*** Plaintiffs have leave to amend the unfair conduct claim as to the Verisk Defendants. ***Certain remedies sought by Plaintiffs for the alleged violation of § 17200 are not cognizable and are dismissed without leave to amend***; but Plaintiffs are not barred at this juncture from seeking an order "enjoining Defendants from continuing" their alleged illegal conduct.

Dismissing Order at 21 (emphasis added).

1.   Fraudulent Conduct

Plaintiffs have not alleged enough under Rule 9(b) to establish a claim for fraudulent misrepresentation. As to the Verisk Defendants, Plaintiffs have not alleged that the Verisk Defendants made any misrepresentations, and there are insufficient allegations to support a conspiracy to defraud. Therefore, Plaintiffs' fraudulent-conduct claim under Section 17200 is **DISMISSED with prejudice** for failure to plead any misrepresentation with specificity.

2.   Unlawful Conduct

The Court previously dismissed this prong with prejudice. But Plaintiffs nonetheless argue that Defendants' conduct was unlawful because they "failed to meet the requirement of Insurance

15

Code § 10103 and Contractor's license § 7208[,]" which, according to Plaintiffs, "may be considered unlawful." State Farm Opp. at 17. They argue that pursuant to Section 7028, "Contractors, including subcontractors, specialty contractors, and persons engaged in the business of home improvement . . . must be licensed before submitting ***bids***." Verisk Opp. at 11 (emphasis added). Based on this quote from the California Business and Professions Code, Plaintiffs argue that only licensed contractors may estimate the construction costs in California and thus, State Farm and the Verisk Defendants acted unlawfully when they created the estimates. *Id.* However, Section 7028 explicitly refers to a required license when submitting a bid to build homes—not an estimate for selling insurance. Plaintiffs do not allege that State Farm or the Verisk Defendants were using 360 Value to submit a bid as contractors. This Court's dismissal of this claim with prejudice stands.

       3.    <u>Unfair Conduct</u>

      The Court previously ruled that this prong is only viable against State Farm. The TAC argues that "Defendants' method of calculating the initial policy limits replacement cost of Plaintiffs' homes materially failed to consider several of these components and features of Plaintiffs' insured structures." TAC ¶ 184. Specifically, Plaintiffs argue that the 360 Value estimate failed to include: (1) costs for architect's plans; (2) roofing material and type of roof; and (3) whether the structure is located on a slope; (4) nonstandard wall heights; and (5) size and type of attached garage. *Id.* ¶ 185 (citing 10 California Code of Regulations § 2695.183).

      State Farm argues that based on the Specific Allegations submitted with the TAC, only the Sheahans allege that State Farm created their estimate using 360 Value (the remaining plaintiffs' estimates predate the use of 360 Value). After comparing the 360 Value report for the Sheahans in October 2009 to their contractor's rebuild estimate, the large disparity is, according to State Farm, based on the Sheahans' desire to rebuild a "more luxurious home."[8]

---

[8] *See* State Farm Mot. at 18, fn. 2 ("Their October 2009 360Value Estimate was based on a 3,600 square foot split level home with three bathrooms built in 1986. Their contractor's rebuild estimate, dated December 2018, is for a 4,233 square foot home with five bathrooms, a 1,100 square foot garage, and more than $100,000 in landscaping. It also includes a $12,500 jacuzzi, a $13,000 refrigerator, a $30,000 custom patio door, and a $2,800 shower door, among other luxury features not documented in their 360Value Estimate.").

It is unclear what conduct Plaintiffs are alleging to be an unfair business practice, and the opposition does not provide additional details. Instead, the opposition states that "Plaintiffs' rebuild costs would have been a bit more accurate . . . if the 360 Value estimate included the omitted components required by the State of California." State Farm Opp. at 18. State Farm argues that including the five criteria identified by Plaintiffs would not avoid the difference in costs stemming from Plaintiffs' new-home design.

In any event, the core problem with Plaintiffs' Section 17200 claim is that the requested relief identified by Plaintiffs for Defendants' alleged failure to consider all components of cost was already found by the Court to be inappropriate.

The Court previously dismissed with prejudice Plaintiffs' request for an order requiring State Farm to adjust Plaintiffs' claims without respect to the policy limits of their homeowners insurance policies. Dismissing Order at 10. The Court also dismissed with prejudice Plaintiffs' request for an order compelling State Farm to provide Truth in Insurance disclosures during future policy issuances because the request invades areas that are more appropriate for the California legislature and is largely unnecessary and/or moot by California Insurance Code section 10101 *et seq.* *See* Cal. Ins. Code § 10101 (providing that "no policy of residential property insurance may be first issued or . . . . initially renewed in this state by any insurer unless the named insured is provided a copy of the California Residential Property Insurance disclosure statement as contained in Section 10102").

Accordingly, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' Section 17200 claim **with prejudice** because they have not sufficiently pled fraud; they have not identified unlawful conduct; and they have not sought appropriate relief from this Court. [9]

D.    Violation of the California Cartwright Act and the Federal Sherman Act (*e.g.*, Cartel and Conspiracy) (Fourth through Sixth Claims for Relief)

The fourth, fifth, and sixth claims for relief are antitrust claims brought pursuant to state and federal law—the Cartwright Act and the Sherman Act, respectively. Plaintiffs continue to

---

[9] Because Plaintiffs' state-law claims do not meet the pleading standards, this Court does not address the Verisk Defendants' additional defense (*e.g.*, the economic-loss rule).

17

label the three claims as "cartel" and "conspiracy" in their hub-and-spoke conspiracy theory. Defendants offer various arguments against this antitrust conspiracy. State Farm argues that Plaintiffs (1) suffered no antitrust injury and (2) fail to state a claim for a vertical conspiracy, hub-and-spoke conspiracy, and Cartwright Act claim. The Verisk Defendants join State Farm's arguments and also argue that the McCarran-Ferguson Act bars Plaintiffs' Sherman Act claims. Verisk Mot. at 17. As discussed below, Plaintiffs claims are problematic because, *inter alia*, they still have not identified an antitrust injury.[10]

As pled in the TAC, Plaintiffs' antitrust theory is as follows: State Farm deliberately sells inadequate homeowners insurance (*i.e.*, not enough to cover "true" replacement cost) so that it can offer a product cheaper than that offered by the competition. Because the insurance is cheaper, State Farm can sell at a greater volume. Plaintiffs still make reference to State Farm selling insurance "below cost," *see, e.g.*, TAC ¶ 175, but, as stated in the Court's last order, Plaintiffs are not using that phrase in its ordinary sense—*i.e.*, State Farm selling insurance at a price cheaper than what it actually costs. Rather, Plaintiffs are using "below cost" to refer to State Farm's alleged practice of selling ***inadequate*** insurance, which means below the cost of a policy providing complete replacement. This, according to Plaintiffs, allows State Farm to sell insurance at a cheaper price compared to insurance offered by other companies (which presumably offer ***adequate*** replacement cost at a higher price). This theory would seem to characterize the other insurance companies as competitors. But Plaintiffs contradict their theory of injury to competitors by taking the position that "Verisk has participated in an agreement with ***the insurance industry in general (the whole market)***, and with State Farm, to restrain trade by falsely estimating construction costs . . . ." *Id.* ¶ 217 (emphasis added).

The Court previously found that Plaintiffs failed to allege any antitrust injury. "Antitrust injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the [antitrust] defendants' acts unlawful.'" *Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. C 05-3465 PJH, 2006 U.S. Dist. LEXIS 2176, at *14 (N.D. Cal. Jan. 3, 2006).

---

[10] Because Plaintiffs' antitrust claims fail for lack of pleading an identifiable antitrust injury, this Court does not address the Verisk Defendants' additional defense (*e.g.*, McCarran-Ferguson Act).

Defendants argue that there is no injury recognized by the antitrust laws because "Plaintiffs do not contend they paid a supra-competitive price or received coverage lower in quality than they otherwise would have obtained for the same price absent an antitrust violation." State Farm Mot. at 19.

In response, Plaintiffs allege that "[t]he harm is artificially lowered prices for consumers, with significantly decreased insurance coverage quality. The harm to the competing insurance companies is the inability to offer policies for comparatively low rates because the goalposts were moved to underinsure the property at the time that the policy value was offered to Plaintiffs." TAC ¶ 215. The result, according to Plaintiffs, is that other insurers cannot compete with State Farm's cheap pricing that are a product of "diminished coverage quality." *Id.*

It is unclear what competition or trade State Farm and the Verisk Defendants are alleged to have suppressed, especially if all the other insurance companies are also part of this alleged agreement. If Plaintiffs are alleging that the agreement is ***only*** between State Farm and the Verisk Defendants, and the purpose of the agreement is to offer a discounted insurance policy, then the antitrust injury, if any, is suffered by competitors of State Farm. Plaintiffs do not suffer antitrust injury because they are free to purchase more expensive and complete insurance from other non-conspiring insurers—at least Plaintiffs have not alleged otherwise.

If Plaintiffs are alleging that all insurance companies are using the Verisk Defendants' software, thus causing insureds like Plaintiffs unavoidable injury in the marketplace. Plaintiffs failed to adequately allege such conspiracy. Plaintiffs describe the conspiracy as a hub-and-spoke cartel. TAC ¶ 21; *see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (explaining that a hub-and-spoke conspiracy "involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy. The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes"). An example of a hub-and-spoke conspiracy is where "a vertical player participates in and facilitates a horizontal conspiracy"—*e.g.*, to fix prices. *See United States v. Apple Inc.*, 952 F. Supp. 2d 638, 690 (S.D.N.Y. 2013). According to Plaintiffs, in the instant case, "Verisk is the hub of the cartel"; State Farm and other

1    insurance companies are spokes, *i.e.*, competing entities that have entered into vertical agreements

2    with Verisk"; and "all insurers utilizing Verisk tools are the rim of the cartel" who have horizontal

3    agreements with one another.  TAC ¶ 230.

4        For this hub-and-spoke theory, Plaintiffs rely heavily on *United States v. Apple Inc.*

5    During a bench trial in *Apple*, however, the district court made a finding that electronic-book

6    publishers conspired with each other and Apple to "eliminate retail price competition in order to

7    raise e-book prices, and that Apple played a central role in facilitating and executing that

8    conspiracy." *Apple Inc.*, 952 F. Supp. 2d at 647.  However, Plaintiffs fail to allege specific facts

9    establishing any agreement among insurance companies to use 360 Value in the same way as State

10   Farm—selling policies which purposefully undervalues the property insured in order to reduce

11   premiums.  And if all insurers were reducing policy values and hence premium rates, then none

12   are receiving a competitive advantage over other insurers.  And, if anything, an industrywide

13   practice of selling cheap insurance would seem to diminish overall profits.  Plaintiffs' theory is

14   thus counterintuitive from an antitrust perspective.  Plaintiffs failed to state a plausible antitrust

15   claim under *Twombly*.

16       Furthermore, Plaintiffs continue to fail to allege antitrust injury.  Whereas in *Apple,* the

17   consumers of e-books suffered an antitrust injury in the form of overpriced goods, here Plaintiffs

18   have not overpaid for goods resulting from monopoly power or unreasonable restraint of trade;

19   they allegedly are paying less for an inadequate product. [11]  *Apple* is inapposite.

20       Plaintiffs seek to argue (and further amend in their complaint) to assert anti-competition or

21   trade restraint aimed at the construction industry; they assert that Sheahan's contractor is available

22   to testify that he lost over $10–20 million in business due to these undervalued policies.  *Id.* ¶ 219.

23   But neither of the Plaintiffs here are contractors.  State Farm or the Verisk Defendants are not in

24   competition with the construction industry.  Again, Plaintiffs fail to allege antitrust injury to

25   _____

26   [11] Nor have Plaintiffs overcome the issues previously identified.  For instance, in the Court's last
     order, it held Plaintiffs "are not direct consumers of the Verisk Defendants; any claim Plaintiffs
27   might conceivably have as indirect purchasers of 360 Value and Xactimate (factually a stretch)
     would be barred by *Illinois Brick*."  Dismissing Order at 17 (citing *Illinois Brick Co. v. Illinois*,
28   431 U.S. 720 (1977) ["only direct purchasers, and not indirect purchasers, are injured by an
     antitrust violation."]).

1    themselves.

2       Recognizing their failure to overcome the deficiencies identified by this Court when it

3    dismissed similar claims in the SAC, Plaintiffs belatedly seek to amend the complaint (yet again)

4    to add a new Plaintiff—a contractor.  But Plaintiffs have had ample opportunity to allege viable

5    antitrust claim.  The Court will not allow a fourth amended complaint.  *Chodos v. W. Publ'g Co.*,

6    292 F.3d 992, 1003 (9th Cir. 2002) (discretion to deny leave to amend is particularly broad where

7    plaintiff has had prior opportunities to amend).   The Court therefore **GRANTS** Defendants'

8    motions to dismiss.  Plaintiffs' antitrust claims are **dismissed with prejudice** because this Court

9    has afforded them multiple opportunities to plead antitrust claims, and they are unable to do so.

10       Additionally, Plaintiffs' request for leave to file an amended complaint (Docket No. 90) to

11    add the Sheahans' contractor as a plaintiff is **DENIED**.

12         **IV.**      **PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE**

13       On December 9, 2019 (over a month after the briefing on these motions to dismiss were

14    completed) Plaintiffs filed a request for judicial notice, asking the Court to take judicial notice of

15    the chronology of legislation and case law following *Fitzpatrick v. Hayes*, 57 Cal. App. 4th 916

16    (1997).  Docket No. 82 ("RJN").  State Farm objects to the RJN as, among other things, untimely

17    because it was not filed with Plaintiffs' opposition.

18       This Court **DENIES** Plaintiffs' request for judicial notice, as it was submitted after

19    briefing closed.  *See* Civil L.R. 7-3(d) ("Once a reply is filed, no additional memoranda, papers, or

20    letters may be filed without prior Court approval . . . .").

21       This order disposes of Docket Nos. 70, 72, and 90.  The Clerk is instructed to enter

22    Judgment and close the case.

23

24       **IT IS SO ORDERED**.

25

26    Dated: March 4, 2020

27                        _____

28                        EDWARD M. CHEN
                           United States District Judge